UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,  :
                                                        :

        **Plaintiff,**  :

                                                      :

        **vs.**  :   **Civil Action No. 21-cv-5429**

                                                      :

**OFER ABARBANEL, VICTOR CHILELLI,**  :   **ECF CASE**
**INCOME COLLECTING 1-3 MONTHS**
**T-BILLS MUTUAL FUND,**  :

                                                      :

        **Defendants,**  :   **JURY TRIAL DEMANDED**

                                                      :

**And**  :

                                                      :

**INSTITUTIONAL SYNDICATION LLC,**  :
**NORTH AMERICAN LIQUIDITY**  :
     **RESOURCES LLC,**  :
**INSTITUTIONAL SECURED CREDIT LLC,**  :
**GROWTH INCOME HOLDINGS LLC,**  :
**CLO MARKET NEUTRAL LLC,**  :
**GLOBAL EMEA HOLDINGS LLC,**  :

                                                      :

        **Relief Defendants.**  :

-----------------------------------------------------------------------x

## COMPLAINT

       Plaintiff Securities and Exchange Commission (the "SEC" or "Commission"), alleges as follows:

### SUMMARY

       1.     From at least March 2018 to the present, Defendants Ofer Abarbanel ("Abarbanel") and Victor Chilelli ("Chilelli"), and the Income Collecting 1-3 Months T-Bills Mutual Fund (the "Fund") that they formed and which Abarbanel controls, have engaged in a fraudulent investment scheme to deceive and defraud investors in the Fund. During the course of their scheme, Abarbanel, Chilelli, and the Fund have depleted, dissipated, and misappropriated

investor funds deposited in the Fund through a fraudulent course of conduct that includes the creation of nominee shell companies, the diversion of funds to these shell companies in uncollateralized loan transactions that violate the requirements of the Fund prospectus, and the submission of false or misleading statements of material facts to investors to disguise their misconduct.

2.      Most recently, Abarbanel and the Fund have refused to honor the redemption demands of their largest group of investors ("Investor Group A") of approximately $106 million they invested with the Fund, in violation of the Fund's Prospectus. Instead, the Defendants have misappropriated and dissipated Investor Group A's assets, including on June 4, 2021, by transferring $64 million of Investor Group A's deposits into a brokerage account from which no redemptions may be drawn, and from which these assets are subject to further dissipation and misappropriation.

3.      At all relevant times, Abarbanel has exercised control over the Fund, with the substantial assistance of Chilelli.

4.      Abarbanel and Chilelli also at all relevant times have exercised control over two Limited Liability Companies (LLCs), Institutional Syndication LLC ("IS") and North American Liquidity Resources LLC ("NALR") (the "Counterparties"), that they formed and used to misappropriate Investor Group A's assets by causing them to enter into unauthorized and uncollateralized lending agreements with the Fund, as described herein.

5.      Abarbanel also at all relevant times has exercised control over at least four other LLCs that the Defendants used to receive, hold, transfer, and misappropriate investors' assets in furtherance of their scheme: Institutional Secured Credit LLC ("ISC"), Growth Income Holdings LLC ("GIH"); CLO Market Neutral LLC ("CLO") and Global EMEA Holdings LLC

("EMEA").  Together, the Counterparties and these four LLC's (collectively,  the "Relief Defendants"), received ill-gotten  proceeds of the fraudulent scheme subject to disgorgement.

6.    The Defendants' fraudulent scheme to misappropriate Investor Group A's funds involved a number of steps and fraudulent acts, including  but not necessarily limited  to the following:

a.  The Fund issued a prospectus ("Prospectus") and other documents which were prepared by Abarbanel, representing that the Fund would reinvest investor assets only in stable, secure, liquid,  and easily redeemable securities falling  into one of two categories:  (i) United States Treasury securities ("Treasuries"); or (ii) certain types of defined loan agreements known as repurchase agreements or reverse repurchase agreements (collectively,  "Reverse Repos") that the Fund would enter into in with established, well-funded,  independent institutions  such as banks and insurance companies, in arms-length loan transactions.  The Reverse Repos were required to be collateralized  by Treasuries or other specific types of secure collateral.  The fact that these loan agreements were to be secured and collateralized  by Treasuries or other specified secure collateral was a critical representation to Investor Group A, as it provided stability and security similar to owning Treasuries themselves.

b.  From March 2019 through February 2021, Investor Group A made a series of large deposits into the Fund's custodian, a United States bank account (the "Fund Bank Account"), on the basis of the representations in the Prospectus and other documents, such as fact sheets issued by the Fund.

c.  As soon as Investor Group A deposited their funds into the Fund Bank Account, Abarbanel, Chilelli, and the Fund would immediately enter into purported loan transactions with the Counterparties that Abarbanel and Chilelli controlled, IS and NALR. These loan transactions were not collateralized as required, and were in no way equivalent to the type of secured collateralized Reverse Repos promised and authorized in the Prospectus. Importantly, IS and NALR did not transfer *any collateral* (let alone the highly secure Treasuries or other collateral promised and required by the Prospectus) to the Fund as part of these loan transactions, which was in direct violation of the requirements set forth in the Prospectus.

d.  Abarbanel and the Fund then directed and caused the transfer of Investor Group A's funds from the Fund Bank Account to bank accounts that they formed in the name of IS and NALR.

e.  Abarbanel and Chilelli then directed and caused the transfer of the funds from IS and NALR bank accounts to brokerage firm accounts in the name of IS and NALR.

f.  From there, Abarbanel and Chilelli misused Investor Group A's funds in violation of the terms of the Prospectus, in ways that benefitted Abarbanel, Chilelli, IS and NALR, but not the Fund or Investor Group A. For example, Abarbanel and Chilelli caused IS and NALR to purchase securities in their own accounts, often on margin, transferred funds to other accounts (including those of Relief Defendants), and opened up new accounts from which they made other investments benefitting themselves, but not the Fund or Fund investors.

7.     Throughout the course of their scheme, in addition to the Prospectus, Abarbanel and the Fund prepared and provided to Investor Group A regular documentation including fact sheets. Through the Prospectus and these other documents, Abarbanel and the Fund knowingly or recklessly made misrepresentations and misleading omissions of material facts with respect to the investments made by the Fund, the absence of required collateral for Fund investments, the conditions for redemption of shares in the Fund, and the basis for the Fund's purported return on investments.

8.     By engaging in the described conduct, Abarbanel, Chilelli, and the Fund have violated, and unless restrained and enjoined will continue to violate, the antifraud provisions of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77 et seq.] and the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78 et seq.] and rules thereunder.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

9.     The Commission brings this action against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to seek an order enjoining the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of ill-gotten gains, civil penalties, and such further relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants transact

business in this District, and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.

## DEFENDANTS

12.     **Ofer Abarbanel**, age 46, is a citizen of Israel and has resided in Woodland Hills, California since at least 2016. He carries an Israeli passport. From at least October 2014 to the present, Abarbanel was the owner and sole control person for an investment adviser that was registered with the Commission from approximately January 2015 to March 2019. At all relevant times, Abarbanel, with the knowing and substantial assistance and participation of Chilelli, has exercised full control over the Fund, its investments and operations, and its dealings with investors, from his residence in California. For example, Abarbanel approved investors' subscriptions into the Fund while in California, or otherwise within the United States. Abarbanel also controls the Relief Defendants. With and through Chilelli, Abarbanel also controls the Counterparties, IS and NALR. Abarbanel is the named manager of ISC. He controls bank accounts in at least Israel and Singapore, and likely the Cayman Islands and the Bahamas, in his name and in the names of the Fund and Relief Defendants ISC, T-Bill Securities, CLO, and EMEA.

13.     **Victor Chilelli**, age 51, is a United States citizen residing in Lewes, Delaware. Until 2020 he resided in Staten Island, New York. Until November 2016, Chilelli was Portfolio Manager for the investment advisor of the Fund, located in Nevada. Until October 2017, Chilelli was Deputy Compliance Officer for a U.S.-registered mutual fund controlled by Abarbanel.

From December 2017 through the present, Chilelli was the founder and sole owner of Counterparties IS and NALR, and is the named manager of GIH. Chilelli and Abarbanel controlled IS and NALR. At relevant times, Chilelli provided substantial assistance to Abarbanel and the Fund in their design and execution of the fraudulent scheme. For example, Chilelli, along with Abarbanel, directed and controlled the component of the scheme involving the unauthorized transfer of Fund assets to the Counterparties. With respect to Investor Group A, as outlined further herein, Chilelli founded IS and NALR, set up their bank and brokerage accounts, improperly transferred Investor Group A's invested funds, , and made unauthorized investments benefitting himself and Abarbanel, not the Fund or Investor Group A, using Investor Group A's misappropriated funds.

14.     **Income Collecting 1-3 Months T-Bills Mutual Fund (the "Fund")** is a mutual fund registered in the Cayman Islands (registration number CR-319456), which consists of multiple share classes listed on the Nasdaq market headquartered in New York City, and using Nasdaq symbols including "BILLX," "GOVAX," "GOVBX," "GOVDX," "GOVTX," and "USABX." As of May 21, 2021, all share classes in the Fund other than GOVBX have been redeemed. The Fund is not registered with the Commission, and has or had directors on its Board of Trustees located in New York, Florida, and the Cayman Islands. The Fund's custodian, the Fund Bank Account, is located in San Francisco, its brokerage account is located in New York City, its nominal investment advisor is located in Nevada and/or the Bahamas, and its administrator is located in Ohio. The registered investment advisor for Investor Group A is located in Utah, and Abarbanel, Chilelli, and other Fund representatives had regular communications with this investment advisor during the course of and in furtherance of the scheme.

## RELIEF DEFENDANTS

15.     As alleged herein, the Relief Defendants received investor funds and/or ill-gotten proceeds of the fraudulent scheme alleged herein, subject to disgorgement, for which they gave no bona fide consideration and to which they have no legitimate claim.

16.     **Institutional Syndication LLC (IS)** is a New Jersey limited liability company, which Chilelli formed on October 31, 2017, domiciled and headquartered in New Jersey. Chilelli is the managing member and Authorized Representative of IS. IS is a shell company, controlled by Abarbanel and Chilelli, that they and the Fund used to enter into unsecured uncollateralized lending transactions with the Fund, in furtherance of their scheme. From March 2019 through November 2020, Abarbanel and the Fund transferred approximately $2,030,000 of the funds invested by Investor Group A into IS accounts, and IS had no legitimate claim to those funds. Abarbanel and Chilelli further diverted and misappropriated the funds that they deposited in IS accounts.

17.     **North American Liquidity Resources LLC (NALR)** is a Nevada limited liability company, formed by Chilelli on October 17, 2017, domiciled and alleged herein. NALR is a shell company, controlled by Abarbanel and Chilelli, which Defendants used to enter into unsecured uncollateralized lending transactions with the Fund, in furtherance of their scheme. From March 2019 through November 2020, Abarbanel and the Fund transferred approximately $102,000,000 of the funds invested by Investor Group A into NARL accounts. NALR had no legitimate claim to those funds. Abarbanel and Chilelli further diverted and misappropriated the funds that they deposited in NALR accounts.

18.     **Institutional Secured Credit LLC (ISC)** is a Nevada limited liability company

domiciled and headquartered in Nevada. Abarbanel owns and controls ISC. At relevant times Abarbanel and Chilleli used ISC to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds. From at least May 2019 through April 2021, Abarbanel, Chilleli, and the Fund transferred at least $627,000 worth of Fund assets into ISC accounts, a significant portion of which represented funds deposited by Investor Group A. ISC had no legitimate claim to those funds.

19.     **Growth Income Holdings LLC (GIH)** is a Nevada limited liability company domiciled and headquartered in Nevada. Chilelli is the sole owner of GIH. At relevant times, Abarbanel and Chilelli used GIH to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds. From at least April 2019 through January 2021, Abarbanel, and Chilleli transferred at least $9.4 million worth of Fund assets into GIH accounts, a substantial portion of which represented funds deposited by Investor Group A. GIH had no legitimate claim to those funds.

20.     **CLO Market Neutral LLC** (CLO) is a Nevada limited liability company domiciled and purportedly headquartered in Nevada. Abarbanel controls CLO. At relevant times, Abarbanel and Chilelli used CLO to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds. From at least May 2019 through May 2021, Abarbanel and Chilleli transferred at least $700,000 worth of Fund assets into CLO accounts, a significant portion of which represented funds deposited by Investor Group A. CLO had no legitimate claim to those funds.

21.     **Global EMEA Holdings LLC (EMEA)** is a Nevada limited liability company domiciled and purportedly headquartered in Nevada. At all relevant times Abarbanel owned and controlled EMEA, directly or indirectly. From at least October 15, 2019 through August 18,

2020, Abarbanel and Chilelli transferred at least $1.4 million of Fund assets into EMEA accounts, a significant portion of which represented funds invested by Investor Group A. EMEA had no legitimate claim to those funds.

## FACTUAL ALLEGATIONS

### Overview of Abarbanel's and Chilelli's Establishment of the Fund and Control of Its Operations

22.     In or around March 2018, Abarbanel and Chilelli took steps to register the Fund in the Cayman Islands by renaming an exempted company previously incorporated under the name "US Bonds Mutual Fund."

23.     Abarbanel and Chilelli arranged for friends (including a friend's wife) and nominee personnel in the Bahamas and British Virgin Islands to serve as directors of the Fund, leaving Abarbanel and Chilelli free to control the activities of the Fund without meaningful hindrance or oversight.

24.     Abarbanel at all relevant times has controlled all aspects of the Fund. A March 2020 letter signed by the fund's Director and Chairman describes a motion by the Fund's Board "authorizing Mr. Ofer Abarbanel to represent the fund in all matters and that Interactive Brokers LLC is allowed to disclos[e] all fund information to Mr. Ofer Abarbanel."

25.     Chilelli at all relevant times has provided substantial assistance to Abarbanel with respect to the scheme described herein, and in particular he has controlled and directed the part of the Defendants' investment scheme that involves the transfer of Fund assets to the Counterparties. In particular, Chilelli, together with Abarbanel, directed and controlled the misappropriation of Investor Group A's Funds, as described herein, by (i) organizing and implementing the unauthorized, unsecured, and uncollateralized lending agreements entered into by the Fund and the Counterparties; and (ii) effecting the unauthorized transfers of Investor

10

Group A's assets into the Counterparties' accounts, and beyond.

**Abarbanel and the Fund Made Misrepresentations and Misleading Omissions of Material Facts in the Fund Prospectus**

26.     In or about January 2019, Abarbanel created the Prospectus on behalf of the Fund, and issued and/or made it available to Fund investors on the Fund's website (www.govbxfund.com), where Investor Group A accessed and reviewed it. From February 2019 through at least August 2020, on at least 9 occasions (including February, March, April, May, June, and July of 2019, and April, July, and August of 2020) Abarbanel and the Fund issued updates to the Prospectus that contained minor modifications, and posted the Prospectus on the Fund website.

27.     The Prospectus described the Fund's structure, investment strategy, investments, anticipated returns, and the methods for purchasing and redeeming shares. It described the Fund's investment objective as "seek[ing] current income consistent with preservation of capital and daily liquidity." As Abarbanel and the Fund knew or were reckless in not knowing as outlined further herein, that representation was a false and misleading statement of material fact. The Defendants' transfer of funds to the Counterparties in uncollateralized, unsecured lending transactions was not consistent with the preservation of capital or daily liquidity.

28.     The Prospectus represented that the Fund would invest primarily in Treasuries with remaining maturities of one to three months. In the description of the Fund's "Principal Investment Strategies," the Prospectus disclosed, in relevant part, that "the Fund invests its net assets primarily (exclusive of collateral with respect to securities lending and reverse repurchase agreement transactions) in U.S. Treasury securities, which include bills, notes, and bonds issued by the U.S. Treasury." As Abarbanel and the Fund knew, or were reckless in not knowing, that representation was a false and misleading statement of material fact. The Fund did not invest

primarily in Treasuries. In fact, as reported in an end of 2019 Fund report, the Fund only invested in approximately 1% worth of Treasuries.

29.     The Prospectus also stated that the Fund may enter into Reverse Repos. As stated in the Prospectus: "In order to enhance income, the Fund intends to enter into securities lending, repurchase agreements and/or reverse repurchase agreement transactions that provide the Fund with income at either fixed or floating (variable) interest rates and fees." As Abarbanel and the Fund knew, or were reckless in not knowing, that representation was a false and misleading statement of material fact. The Fund did not inter into Reverse Repos with the Counterparties that provided income at fixed or floating interest rates.

30.     The Prospectus further stated that the Fund "may enter into repurchase agreements and/or reverse repurchase agreements with counterparties such as: broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies."

31.     As Abarbanel and the Fund knew, or were reckless in not knowing, that statement was a false and misleading statement of material fact. All of the Counterparties to the supposed Reverse Repos that the Fund entered into on behalf of Investor Group A were not independent, well-funded, established institutions such as those listed, but instead, were single-member shell LLCs, formed and/or controlled by Abarbanel and Chilelli, with no apparent assets, operations, or business purpose other than to facilitate the unauthorized investment, transfer and misappropriation of investor funds.

32.     The Prospectus further represented that "Reverse repurchase transactions involve the sale of securities with an agreement to repurchase the securities at an agreed upon price, date and interest payment," and that the "proceeds (collateral) secured to the Fund with respect to

reverse repurchase agreements will include either (1) 100% units of mutual fund symbols: STATX or of this Fund or (2) 102%-115% U.S. Treasury securities."

33.     As Abarbanel and the Fund knew, or were reckless in not knowing, that statement was a false and misleading statement of material fact because, in practice, the purported Reverse Repos with the Counterparties involved neither the lending nor sale of securities with an agreement to repurchase the securities at an agreed upon price, date and interest payment, nor collateral in the form of mutual fund shares or Treasuries.

34.     Rather, as directed by Abarbanel and Chilelli, between March 2019 and February 2021, each transaction involved the Fund sending Investor Group A's investment funds to one of the Counterparties, and in return, the Fund and the applicable Counterparty executed a boilerplate "Master Securities Loan Agreement," and the Fund sent a hard copy of the Master Securities Loan Agreement to the Fund's custodian. This did not satisfy the Prospectus's requirement to supply collateral in the Form of Treasuries or the other specified collateral.

35.     In short, as Abarbanel and the Fund knew, or were reckless in not knowing, the representations in the Prospectus were false and misleading statements of material facts because: (a) the Master Securities Loan Agreement was not a repurchase agreement or reverse purchase agreement as described in the Prospectus, or as a reasonable investor would find, (b) the Prospectus and other documents issued by Abarbanel and the Fund did not correctly describe the actual related-party transactions that Defendants caused to be transpired between the Fund and the Counterparties -- in that the Fund neither bought nor sold securities with an agreement to repurchase the securities at an agreed upon price, date, and interest payment; and the Fund never received collateral in the form of the specified mutual fund symbols or Treasuries. In addition, the Counterparties were single-member shell LLCs with no significant assets or business

operations, not "broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies."

**Abarbanel and the Fund Made Misrepresentations and Misleading Omissions of Material Facts in Fund Fact Sheets**

36.     In addition to the Prospectus, Abarbanel also prepared a "fact sheet" for the Fund that he and the Fund issued and updated on a monthly basis throughout 2019 (March-December), 2020 (January-December), and early 2021 (January, February), and posted to the Fund's website, along with the Prospectus.

37.     The fact sheet included misrepresentations and misleading omissions of material facts similar to those in the Prospectus concerning the Fund's investment strategy and holdings. According to the fact sheet, the Fund "seeks to provide current income consistent with preservation of capital and daily liquidity."

38.     The fact sheet stated that the Fund's "major holdings are 3 Month US Treasuries," and that "to increase income, the fund is permitted to enter into fixed/variable interest rate securities lending, Repurchase & Reverse Repurchase agreements with banks, broker/dealers, institutional investors, institutional investment manager(s), mutual funds, insurance and/or reinsurance companies."

39.     The fact sheet additionally described the Fund's repo and lending transactions as follows (emphasis in original):

> Repurchase and Reverse Repurchase transactions – those are transactions in which the fund purchases securities as either lender or borrower <u>with the agreement to sell them at a higher price</u> at a specific future date.

> Securities Lending transactions – Securities Lending transactions allow a Fund to retain ownership of the securities loaned and, at the same time, <u>earn additional income from fees paid by borrowers</u>.

40.     As updated throughout 2019, 2020, and early 2021, the fact sheet variously

described collateral received by the Fund as consisting of mutual fund shares, "102%–115%" Treasury securities, and "100% Cash." The fact sheet consistently emphasized that the Fund's collateral was "marked to market daily" to "ensure[] that the fund will always have excess collateral (over-collateralization) to secure its activity."

41.     As Abarbanel and the Fund knew, or were reckless in not knowing, these statements in the fact sheet were false and misleading statements of material facts. For example, as with the misrepresentations and misleading omissions of material facts in the Prospectus and as detailed above, the Fund's "major holdings" were not in Treasuries, the Fund did not enter into any arms-length secured or collateralized Reverse Repos with independent third parties, as represented, the Fund did not receive collateral consisting of mutual fund shares, "102%–115%" Treasury securities, or "100% Cash," and the Fund did not have "excess collateral" to secure its lending activity.

## Abarbanel, Chilelli, and the Fund Used the Counterparties to Misappropriate Investor Group A's Assets

42.     Investor Group A was the Fund's Largest Investor. From March 2019 through February 2021, Investor Group A invested approximately $191 million in the Fund, by depositing those funds into the Fund Bank Account. As of June 2021, following its prior redemptions of approximately $85 million, Investor Group A had approximately $106 million remaining on deposit with the Fund.

43.     The Defendants never invested Investor Group A's funds as promised and represented by the Fund and Abarbanel, as detailed above. Instead, Abarbanel and Chilelli immediately transferred at least $104 million worth of Investor Group A's deposits to Counterparties IS and NALR, controlled by Abarbanel and Chilelli, in exchange for an unsecured and uncollateralized loan agreement (the Master Securities Loan Agreement) executed

by IS and NALR.  The IS and NALR Master Securities Loan Agreement transactions in no way supplied the Fund (and Investment Group A) with the sort of secure, collateralized investments promised by the Prospectus.

44.     The Counterparties, at Abarbanel's and Chilelli's direction, then transferred or used the investor funds for their own benefit.  Between March 2019 and February 2021, Abarbanel and Chilelli used Investor Group A's assets transferred from the Fund to establish brokerage accounts in the name of the Counterparties.  They then repeatedly on numerous occasions used Investor Group A's funds to engage in various transactions for their own benefit, and not for the benefit of the Fund or the Fund's investors, as explained below.

45.     For example, during the time period referred to above, Abarbanel and Chilelli purchased securities in the Counterparties' brokerage accounts, often on margin.  They also transferred funds in these accounts to different bank and brokerage accounts that they also controlled, in the name of other entities, including the Relief Defendants.  In these other accounts, the Counterparties, again acting under the direction and control of Abarbanel and Chilelli, would repeat the process, purchasing additional securities and other investments.

46.     The following are examples of violative transactions involving the misappropriation of Investor Group A's assets, as directed and controlled by Abarbanel and Chilelli:

a.     On March 5, 2019, Investor Group A wired $20,500,000 into the Fund Bank Account.  On that same day, Abarbanel directed and caused the Fund to transfer $20,500,000 to NALR's bank account.  On or about that same day, Abarbanel and Chilelli directed and caused NALR to execute a loan agreement with the Fund (the Master Loan Servicing Agreement), but did not return any Treasuries or any other form

of the required collateral to the Fund.  On that same day, Abarbanel and Chilelli  directed and caused the transfer of $20,500,000  from NALR's bank account to NALR's brokerage account.  From there, Abarbanel and Chilelli  directed and caused NALR to move $20,500,000  to an affiliated  NALR brokerage account and to purchase Treasury securities in approximately  that amount.  Those securities were held by, and for the benefit of NALR, Abarbanel, and Chilelli,  and *not* for the benefit of the Fund or Investor Group A.  Thus, they were not pledged, transferred, or assigned to the Fund, and were not collateral to the underlying  unsecured loan agreement between the Fund and NALR.

      b.      On June 27, 2019, Investor Group A wired $16,000,000  into the Fund Bank Account.  On that same day, Abarbanel directed and caused the Fund to transfer $16,000,000  to NALR's bank account.  On or about that same day, Abarbanel and Chilelli  directed and caused NALR to reexecute the Master Loan Services  Agreement with the Fund to reflect the additional  amount, but did not return any Treasuries or any other form of the required collateral to the Fund.  On that same day, Abarbanel and Chilelli  directed and caused the transfer of $16,000,000  from NALR's bank account to NALR's brokerage account.  From there, Abarbanel and Chilelli  directed and caused NALR to move $15,998,000  to an affiliated  NALR brokerage account and to purchase Treasury securities in approximately  that amount.  Again, these securities were not transferred, pledged, or assigned to the Fund for the benefit of the Fund or Investor Group A, and were not collateral to the underlying  unsecured loan agreement between the Fund and NALR.

      c.      On September 4, 2020, Investor Group A wired $14,000,000  into the Fund Bank Account.  On that same day, Abarbanel directed and caused the Fund to transfer

$14,000,000 to NALR's bank account. On or about that same day, Abarbanel and Chilelli directed and caused NALR to reexecute the Master Loan Services Agreement with the Fund to reflect the additional amount, but did not return any Treasuries or any other form of the required collateral to the Fund. On that same day, Abarbanel and Chilelli directed and caused the transfer of $13,990,000 from NALR's bank account to NALR's brokerage account. From there, Abarbanel and Chilelli directed and caused NALR to move $13,990,000 to an affiliated NALR brokerage account and to purchase Treasury securities in approximately that amount. Again, these securities were not transferred, pledged, or assigned to the Fund for the benefit of the Fund or Investor Group A, and were not collateral to the underlying unsecured loan agreement between the Fund and NALR.

47.     In the transactions detailed above, and the other transactions described herein involving assets invested in the Fund by Investment Group A, Abarbanel, Chilelli, and the Fund, acting knowingly or recklessly, by and through the Counterparties that Abarbanel and Chilelli formed and controlled, misappropriated Investor Group A's funds by (a) failing to invest funds in Reverse Repos as required by the Prospectus, (b) failing to provide the collateral required by the Prospectus to secure Investment Group A's investments in the Fund; and (c) placing the funds in the Counterparties' own accounts and using the funds for their own benefit.

**Abarbanel's and the Fund's Refusal and Failure to Honor Redemption by Investor Group A**

48.     In late February 2021, when Abarbanel learned that the SEC was investigating him and the Fund, he moved to limit the number of investors in the Fund by forcibly redeeming all investors other than Investor Group A.

49.     Abarbanel did not offer to permit Investor Group A to redeem any of its shares.

50.     On or around May 21, 2021, a, Investor Group A requested a full redemption of its shares in the Fund per the redemption terms in the Prospectus. At that time Investor Group A had approximately $106 million in the Fund.

51.     According to the terms of the Prospectus, "Fund shares are available for daily redemption" (p. 13), "[s]hares will be redeemable at the option of the Shareholder on any Business Day and at any amount" (p. 17), and "[a] redemption request must be received by the Administrator at least One (1) Business Day (or such lesser period as the Directors may generally or in any particular case permits) prior to the relevant Redemption Day" (p. 17).

52.     Despite the fact that the Prospectus provided for "daily redemption," and even though Investor Group A complied with the above-stated requirements for redemption, Abarbanel and the Fund failed to honor Investor Group A's May 21, 2021 redemption request.

53.     Instead, Abarbanel and the Fund obfuscated the facts and set up pretextual obstacles and roadblocks to delay and hinder the redemption, and failed and refused to honor it, as set forth in the following paragraphs.

54.     On May 23, 2021, by letter emailed to Investor Group A, counsel for the Fund and Abarbanel first responded to Investor Group A's redemption request. In the letter, they indicated that Investor Group A's redemption could not be fulfilled because Investor Group A must undergo an "omnibus review processes" [sic], which would require the Fund to appointing a "Money Laundering Compliance officer" and "Money Laundering Reporting Officer."

55.     In subsequent emails, including ones sent on June 1 and 4, 2021, counsel for the Fund and Abarbanel reiterated such requirements relating to purported anti money laundering (AML) protocols. The Fund had not required such an "omnibus review process," or insisted on the appointment of money laundering officers, or other AML protocols, as part of Investor Group

A's prior redemptions.

56.     On May 27, 2021, Abarbanel and the Fund, through counsel, sent a Power Point presentation by email to Investor Group A indicating that only a fraction of its funds were available, and that a full redemption was not possible.   They claimed that the Fund at that time was holding approximately $88.9 million "sitting in cash" ($84 million in three financial institutions -- a bank in Singapore, Wells Fargo, and Interactive Brokers); and $4.9 million "that can be further transferred to the Fund from counterparty"), and an additional $25.9 million in cash and Treasuries "that are still invested in lending agreement," [sic] and not able to be liquidated.

57.     In the May 27, 2021 Power Point, and in a telephone conversation held that day in which Abarbanel discussed the Power Point, the Fund and Abarbanel attempted to pitch Investor Group A into a new investment vehicle set up by Abarbanel, under which Investor Group A could redeem its shares in the Fund and immediately reinvest them with Abarbanel in a different investment vehicle, rather than obtaining a full return of the funds in cash.

58.     In a subsequent May 27, 2021 email, Investor Group A declined Abarbanel's offer and again requested a full return of its funds.   Investor Group A also requested that "this cash be secured and no further investments or expenses be undertaken from these funds pending the redemption."   Abarbanel and the Fund did not comply with this directive.

59.     In a later May 27, 2021 email, in response, the Fund and Abarbanel, through counsel, stated that Investor Group A had to fill out a detailed and lengthy (18 page) "Wolfsberg Questionnaire" in order for the Fund to fulfill a redemption of its assets.

60.     In subsequent communications with Investor Group A, Abarbanel and the Fund put forth additional requirements and conditions on the redemption, including demanding a "wet

signature," a listing of the net worth and identity of beneficial owners not even in Investor Group A, and other requirements and protocols.

61.     Later that evening, also in a May 27, 2021 email, Abarbanel and the Fund's counsel gave an update to Investor Group A, stating that the Singapore bank was in the process of sending $66.9 million to the Fund Bank Account, "which currently has a 17M balance."

62.     Abarbanel's and the Fund's refusal to honor Investor Group A's redemption request in May 2021 stands in stark contrast to how they handled earlier redemption requests, before Abarbanel and the Fund learned of the SEC's investigation.   For example, on or about March 11, 2021, Investor Group A submitted a redemption request for $75,000,000 from the Fund by simply filling out a redemption request form downloaded from the Fund website. Investor Group A was able to obtain the March 2021 redemption from the Fund by wire transfer in a matter of days.  The Fund did not require any additional information, an 18 page questionnaire, a "wet signature," or any money laundering "protocols" to honor that prior redemption.

63.     In the May 27, 2021 Power Point, and at all other relevant times, Abarbanel and the Fund failed to disclose to Investor Group A the critical fact that Abarbanel and Chilelli control the Counterparties, and presumably could easily arrange to terminate any lending agreements and to effect the return of the $26 million, if it existed.  In fact, such daily liquidity was a requirement of the Prospectus.

**Abarbanel and the Fund Sought to Force Investor Group A to Accept Terms That Fell Far Short of a Full Redemption**

64.     On or about June 1, 2021, Abarbanel and the Fund also informed Investor Group A that, to obtain a redemption, it would need to sign a new agreement which it referred to as "Annex B."  Under this new agreement, the Fund proposed to satisfy Investor Group A's

redemption request by merely providing Investor Group A with whatever accounts that Counterparties NALR and IS held, together with the "future cash flow" from the Fund's lending agreements with the Counterparties.

65.    These lending agreements were the Master Securities Loan Agreements that Abarbanel and the Fund had entered into with the Counterparties rather than investing in the properly collateralized Reverse Repos described in the Prospectus. In other words, Abarbanel and the Fund had misused Investor Group A's funds to obtain those Master Securities Loan Agreements in the first place, and now were offering to give them to Investor Group A as part of the package to satisfy Investor Group A's redemption of its investment in the Fund. Further, under Annex B, Investor Group A had to release all of its claims against the Fund, the Counterparties and others. As discussed above, the Master Securities Loan Agreements were not authorized investments, and did not reflect what the Prospectus required.

66.    Abarbanel and the Fund maintained that the Annex B reflected a "redemption in kind" under the terms of the Prospectus. But the terms reflected in Annex B did not reflect a "redemption in kind" as described in the Prospectus. The Prospectus provides that the Fund "reserves the right to honor requests for redemption or repurchase orders by making payment in whole or in part in ***readily marketable securities*** ("redemption in kind") if the amount is greater than $200,000 or 1% of the Fund's assets." (emphasis added). The lending agreements between the Fund and the Counterparties, which Abarbanel and the Fund attempted to require Investor Group A to assume as part of its redemption, are not "readily marketable securities," and are thus not "redemptions in kind."

67.    Abarbanel and the Fund also asserted that they were imposing a "forced redemption" under the Prospectus. The Prospectus permits the Fund to impose a "forced

22

redemption," but that would involve actually redeeming the investor's shares, and in exchange, the investor releasing its claims. But that is not what Abarbanel and the Fund proposed to do here. The Fund would not "redeem" Investor Group A's shares in the Fund by offering all cash and/or "readily marketable securities," but instead only offered whatever happened to be left in the Counterparties' accounts, and whatever "income stream" might in the future flow from the Master Securities Loan Agreements between the Fund and the Counterparties. And Abarbanel and the Fund would only provide that insufficient package if Investor Fund A released all of its claims against the Fund, the Counterparties and others.

68.     In short, rather than complying with their obligation to honor Investor Group A's redemption request, Abarbanel and the Fund sought to coerce Investor Group A into giving up its shares in the Fund and all claims against the Fund and others, in exchange for a package that included the Counterparties' accounts and the "income flow" from the same Master Securities Loan Agreements that Abarbanel and the Fund had entered into by fraudulently using Investor Group A's funds in the first place.

69.     Accordingly, Abarbanel and the Fund violated their obligations to honor redemption requests and return investor funds, and they have unlawfully withheld such funds.

**Recent Misappropriation and Dissipation of Funds by Abarbanel and the Fund**

70.     Documents obtained by the SEC in May 2021 revealed that the Counterparties' accounts held less than $4 million, nowhere near the $26 million they claimed the Counterparties were holding in the May 27, 2021 Power Point.

71.     Most recently, on June 4, 2021, after receiving Investor Group A's redemption request, Abarbanel and the Fund initiated a transfer of more than $64 million out of the Fund Bank Account and into the Fund's brokerage account. From this account, the funds are subject to unauthorized investment losses, and to further misappropriation and dissipation by

Defendants.

72.     Abarbanel and the Fund transferred the $64 million without any prior notice to Investor Group A, and despite the fact that any redemption to Investor Group A would need to be processed and transferred from the Fund Bank Account, not the brokerage account.

73.      Abarbanel and the Fund have provided no explanation of why they initiated and executed this unauthorized transfer of Investor Group A's funds during the pendency of Investor Group A's claim for redemption, casting doubt on the legitimacy of such a transfer.

74.     Accordingly, for the reasons discussed in the preceding paragraphs, Abarbanel and the Fund have misused and misdirected Investor Group A's investment funds, and any remaining funds are subject to further misappropriation or dissipation.

**The Relief Defendants Received Ill-Gotten Gains**

75.     At relevant times, Abarbanel and Chilelli diverted Fund assets, including assets invested by Investor Group A, into accounts that they opened and controlled in the name of the Relief Defendants, IS, NALR, GIH, CLO, ISC and EMEA. All of these are ill-gotten gains for which they gave no bona fide consideration and to which they have no legitimate claim, and therefore are subject to disgorgement.

76.     The following are non-exclusive summary charts of funds transferred into the accounts of the Relief Defendant, all of which constitute such ill-gotten gains:

a.   From March 2019 to November 2020, Defendants transferred approximately $102,500,000 (net) of Investor Group A's funds into NALR accounts, and at least $2,030,000 into IS accounts, pursuant to the purported lending agreements described herein. The below table indicates Investor Group A's subscriptions (funds deposited) into the Fund Bank Account, and the immediate transfer of these assets into NALR and IS accounts:

| Investment/ Redemption Date | Amount Deposited in Fund Bank Account | Counterparty | Counterparty Wire Date | Amount Wired to Counterparty Accounts |
|---|---|---|---|---|
| 3/5/2019 | $ 20,500,000.00 | NALR | 3/5/2019 | $ (20,500,000.00) |
| 3/15/2019 | $ 3,000,000.00 | NALR | 3/15/2019 | $ (3,000,000.00) |
| 3/21/2019 | $ 8,000,000.00 | NALR | 3/21/2019 | $ (8,000,000.00) |
| 4/24/2019 | $ (1,000,000.00) | NALR | 4/24/2019 | $ 1,000,000.00 |
| 5/10/2019 | $ 2,000,000.00 | NALR | 5/10/2019 | $ (2,000,000.00) |
| 6/27/2019 | $ 16,000,000.00 | NALR | 6/27/2019 | $ (16,000,000.00) |
| 8/7/2019 | $ 7,500,000.00 | NALR | 8/7/2019 | $ (7,500,000.00) |
| 10/2/2019 | $ 2,500,000.00 | NALR | 10/2/2019 | $ (2,500,000.00) |
| 1/2/2020 | $ 5,000,000.00 | NALR | 1/2/2020 | $ (5,100,000.00) |
| 1/22/2020 | $ (4,000,000.00) | NALR | 1/22/2020 | $ 4,000,000.00 |
| 1/28/2020 | $ (2,500,000.00) | NALR | 1/28/2020 | $ 2,500,000.00 |
| 2/14/2020 | $ 3,500,000.00 | NALR | 2/14/2020 | $ (3,500,000.00) |
| 3/13/2020 | $ 9,000,000.00 | NALR | 3/13/2020 | $ (9,000,000.00) |
| 4/27/2020 | $ 5,000,000.00 | NALR | 4/27/2020 | $ (5,000,000.00) |
| 5/22/2020 | $ 2,030,000.00 | IS | 5/22/2020 | $ (2,030,000.00) |
| 7/27/2020 | $ 2,000,000.00 | NALR | 7/27/2020 | $ (2,000,000.00) |
| 8/12/2020 | $ 6,500,000.00 | NALR | 8/12/2020 | $ (6,500,000.00) |
| 8/18/2020 | $ 7,500,000.00 | NALR | 8/18/2020 | $ (7,500,000.00) |
| 9/4/2020 | $ 14,000,000.00 | NALR | 9/4/2020 | $ (14,000,000.00) |
| 11/17/2020 | $ (2,000,000.00) | NALR | 11/17/2020 | $ 2,000,000.00 |

b.   From at least April 2019 through January 2021, Abarbanel and Chilelli transferred approximately $9.4 million from NALR accounts into accounts in the name of GIH, by way of the following transfers:

| Date | From | To | Amount |
|---|---|---|---|
| 4/1/2019 | NALR | GIH | $500,000.00 |
| 5/15/2019 | NALR | GIH | $15,000.00 |
| 6/24/2019 | NALR | GIH | $225,000.00 |
| 8/8/2019 | NALR | GIH | $6,000,000.00 |
| 1/28/2020 | NALR | GIH | $13,500.00 |

| Date | From | To | Amount |
|------|------|-----|--------|
| 2/26/2020 | NALR | GIH | $10,100.00 |
| 3/16/2020 | NALR | GIH | $1,500,000.00 |
| 4/1/2020 | NALR | GIH | $14,500.00 |
| 4/13/2020 | NALR | GIH | $60,000.00 |
| 4/14/2020 | NALR | GIH | $50,000.00 |
| 6/26/2020 | NALR | GIH | $14,000.00 |
| 7/21/2020 | NALR | GIH | $1,000,000.00 |
| 9/9/2020 | NALR | GIH | $14,000.00 |
| 1/4/2021 | NALR | GIH | $20,100.00 |
| | | Total: | **$9,436,200.00** |

c. From at least May 2019 through May 2021, Abarbanel and Chilelli transferred approximately $700,000 into accounts held by CLO, by way of the following transfers from Fund accounts:

| Date | From | To | Amount |
|------|------|-----|--------|
| 5/10/2019 | Fund | CLO | $12,000.00 |
| 7/5/2019 | Fund | CLO | $16,892.48 |
| 8/8/2019 | Fund | CLO | $15,346.14 |
| 9/5/2019 | Fund | CLO | $17,224.22 |
| 9/26/2019 | Fund | CLO | $1,000.00 |
| 10/1/2019 | Fund | CLO | $13,013.61 |
| 10/17/2019 | Fund | CLO | $1,500.00 |
| 10/28/2019 | Fund | CLO | $16,742.29 |
| 12/3/2019 | Fund | CLO | $22,196.97 |
| 1/2/2020 | Fund | CLO | $21,769.81 |
| 1/31/2020 | Fund | CLO | $22,170.85 |
| 3/2/2020 | Fund | CLO | $21,553.35 |
| 4/1/2020 | Fund | CLO | $23,956.66 |
| 4/30/2020 | Fund | CLO | $22,717.82 |
| 6/1/2020 | Fund | CLO | $25,400.50 |
| 7/1/2020 | Fund | CLO | $24,084.55 |
| 8/4/2020 | Fund | CLO | $16,616.70 |

| Date | From | To | Amount |
|------|------|-----|--------|
| 9/1/2020 | Fund | CLO | $25,480.40 |
| 10/1/2020 | Fund | CLO | $33,294.86 |
| 11/2/2020 | Fund | CLO | $36,353.88 |
| 12/1/2020 | Fund | CLO | $33,965.55 |
| 1/4/2021 | Fund | CLO | $37,475.70 |
| 2/1/2021 | Fund | CLO | $45,818.35 |
| 2/26/2021 | Fund | CLO | $45,997.56 |
| 4/2/2021 | Fund | CLO | $73,424.80 |
| 4/30/2021 | Fund | CLO | $15,000.00 |
| 5/3/2021 | Fund | CLO | $10,939.40 |
| 5/24/2021 | Fund | CLO | $48,915.26 |
| | | Total: | **$700,851.71** |

d.  From at least May 2019 through April 2, 2021, Abarbanel and Chilelli transferred

approximately $627,000 worth of Fund assets into accounts they opened in the name

of ISC, by way of the following transfers from CLO accounts:

| Date | From | To | Amount |
|------|------|-----|--------|
| 5/23/2019 | CLO | ISC | $11,740.00 |
| 7/8/2019 | CLO | ISC | $16,892.48 |
| 8/13/2019 | CLO | ISC | $22,380.00 |
| 9/6/2019 | CLO | ISC | $17,224.22 |
| 10/10/2019 | CLO | ISC | $13,500.00 |
| 10/29/2019 | CLO | ISC | $16,742.00 |
| 11/18/2019 | CLO | ISC | $2,472.50 |
| 12/3/2019 | CLO | ISC | $22,196.97 |
| 1/8/2020 | CLO | ISC | $20,077.00 |
| 2/5/2020 | CLO | ISC | $20,400.00 |
| 3/3/2020 | CLO | ISC | $21,000.00 |
| 4/1/2020 | CLO | ISC | $24,000.00 |
| 5/1/2020 | CLO | ISC | $22,000.00 |
| 6/11/2020 | CLO | ISC | $27,500.00 |
| 7/1/2020 | CLO | ISC | $23,000.00 |

| Date | From | To | Amount |
|------|------|-----|--------|
| 8/5/2020 | CLO | ISC | $16,620.00 |
| 9/4/2020 | CLO | ISC | $25,000.00 |
| 10/2/2020 | CLO | ISC | $32,500.00 |
| 11/2/2020 | CLO | ISC | $36,000.00 |
| 12/3/2020 | CLO | ISC | $37,000.00 |
| 1/4/2021 | CLO | ISC | $38,560.00 |
| 2/2/2021 | CLO | ISC | $43,000.00 |
| 3/1/2021 | CLO | ISC | $49,000.00 |
| 4/2/2021 | CLO | ISC | $68,900.00 |
| | | Total: | $627,705.17 |

e. From at least October 15, 2019 through August 18, 2020, Abarbanel and Chilelli transferred approximately $1.4 million into accounts they opened in the name of EMEA, by way of the following transfers from ISC accounts:

| Date | From | To | Amount |
|------|------|-----|--------|
| 10/15/2019 | ISC | EMEA | $150,000.00 |
| 11/19/2019 | ISC | EMEA | $15,000.00 |
| 11/20/2019 | ISC | EMEA | $2,958.00 |
| 11/20/2019 | ISC | EMEA | $2,000.00 |
| 1/6/2020 | ISC | EMEA | $230,000.00 |
| 5/8/2020 | ISC | EMEA | $5,000.00 |
| 8/18/2020 | ISC | EMEA | $1,000,000.00 |
| | | Total: | $1,404,958.00 |

## CLAIMS FOR RELIEF

## COUNT I

### Against Abarbanel, Chilelli, and the Fund for Violations of
### Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

77.     The Commission realleges and incorporates by reference paragraphs 1 through

76.

78.     By engaging in the acts and conduct alleged above, Abarbanel and the Fund each directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (a) knowingly or recklessly employed devices, schemes, or artifices to defraud; (b) with negligence, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) with negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

79.     By engaging in the acts and conduct alleged above, Chilelli directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (a) knowingly or recklessly employed devices, schemes, or artifices to defraud with scienter; and (b) with negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

80.     By reason of the foregoing, Defendants violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II

**Against Abarbanel, Chilelli, and the Fund for**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78q(b), 17 C.F.R. § 240.10b-5]**

81.     The Commission realleges and incorporates by reference paragraphs 1 through

80.

82.     By engaging in the acts and conduct alleged above, Abarbanel and the Fund directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

83.     By engaging in the acts and conduct alleged above, Chilelli directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

84.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT III

### Against Abarbanel and Chilelli for Aiding and Abetting
### Violations of Section 17(a) of the Securities Act

85.     The Commission realleges and incorporates by reference paragraphs 1 through 84.

86.     By engaging in the acts and conduct alleged above, Abarbanel, Chilelli and the Fund violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

87.     By engaging in the acts and conduct alleged above, Abarbanel and Chilelli knowingly or recklessly provided substantial assistance, and aided and abetted, each other and the Fund in their violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

88.     Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Abarbanel and Chilelli are in violation of Section 17(a) of the Securities Act to the same extent as each other and the Fund.

89.     By reason of the foregoing, Abarbanel and Chilelli are liable for aiding and abetting the aforesaid violations, and unless restrained and enjoined will continue to commit such violations.

## COUNT IV

### Against Abarbanel and Chilelli for Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
### and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

90.     The Commission realleges and incorporates by reference paragraphs 1 through 89.

91.     By engaging in the acts and conduct alleged above, Abarbanel, Chilelli and the Fund violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

92.     By engaging in the acts and conduct alleged above, Abarbanel and Chilelli knowingly or recklessly provided substantial assistance to, and aided and abetted, each other and

the Fund in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

93.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Abarbanel and Chilelli are in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder to the same extent as each other and the Fund.

94.     By reason of the foregoing, Abarbanel and Chilelli are liable for aiding and abetting the aforesaid violations, and unless restrained and enjoined will continue to commit such violations.

## COUNT V

### Against Abarbanel for Control-Person Liability for Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

95.     The Commission realleges and incorporates by reference paragraphs 1 through 94.

96.     By engaging in the acts and conduct alleged above, the Fund, through the actions of, and under the control of Abarbanel, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

97.     By reason of the conduct described above, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Abarbanel is liable for the Fund's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as set forth above, in that they exercised actual power and control over the Fund and were culpable participants in the violations by the Fund.

98.     Abarbanel did not act in good faith, and he induced, directly or indirectly, the acts and conduct of the Fund that violated the federal securities laws, as alleged herein.

By reason of the foregoing, Abarbanel is liable to the same extent as the Fund, and unless restrained and enjoined will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

### I.

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently restraining and enjoining Defendants from, directly or indirectly, participating in the issuance, purchase, offer, or sale of any security, including, but not limited to, through any entity owned or controlled by Defendants, provided, however, that such injunction shall not prevent Defendants Abarbanel and Chilelli from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

### III.

Ordering Defendants and Relief Defendants to disgorge their ill-gotten gains according to proof, plus prejudgment interest thereon;

### IV.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

### V.

Granting such other and further relief as this Court may deem just, equitable, or necessary, including but not limited to the asset freeze, accounting, and ancillary relief requested by the Commission.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  June 18, 2021

Respectfully submitted,

Paul W. Kisslinger (PK0764)
Sarah Heaton Concannon (SC9111)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4427 (Kisslinger)
(202) 551-5361 (Concannon)
*KisslingerP@sec.gov* (Kisslinger)
*ConcannonS@sec.gov* (Concannon)

*Counsel for Plaintiff Securities and Exchange Commission*

Of counsel:

David A. Becker
Virginia M. Rosado Desilets
Gregory C. Padgett
Alexandra M. Arango
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549