**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------x
**SECURITIES AND EXCHANGE COMMISSION,**          :
                                                  :
        **Plaintiff,**                   :
                                                  :
        **vs.**                         :   **Civil Action No. 21-**
                                                  :
**OFER ABARBANEL, VICTOR CHILELLI,**             :
**INCOME COLLECTING 1-3 MONTHS**                 :
**T-BILLS MUTUAL FUND,**                         :   **FILED UNDER SEAL**
                                                  :
                                                  :
        **Defendants,**                 :
                                                  :
**And**                                          :
                                                  :
**INSTITUTIONAL SYNDICATION LLC,**               :
**NORTH AMERICAN LIQUIDITY**                     :
    **RESOURCES LLC,**                        :
**INSTITUTIONAL SECURED CREDIT LLC,**            :
**GROWTH INCOME HOLDINGS LLC,**                  :
**CLO MARKET NEUTRAL LLC,**                      :
**GLOBAL EMEA HOLDINGS LLC,**                    :
                                                  :
        **Relief Defendants.**          :
----------------------------------------------------------------------x

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* EMERGENCY APPLICATION FOR AN ASSET FREEZE AND OTHER EQUITABLE RELIEF

Paul W. Kisslinger (PK0764)
Sarah Heaton Concannon (SC9111)
United States Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549
(202) 551-4427 (Kisslinger)
(202) 551-5361 (Concannon)
*KisslingerP@sec.gov* (Kisslinger)
*ConcannonS@sec.gov* (Concannon)

June 17, 2021

**CONTENTS**

PRELIMINARY STATEMENT .................................................................................... 1

DEFENDANTS ......................................................................................................... 5

RELIEF DEFENDANTS ............................................................................................ 6

STATEMENT OF FACTS .......................................................................................... 8

   A.     The Income Collecting Fund ....................................................................... 8

   B.     Abarbanel and Chilelli Establish NALR and IS to Act as Unauthorized
          Counterparties to the Fund in Unauthorized Loan Transactions ........................... 10

   C.     Defendants Misappropriate Investor Group A's Funds ......................... 10

   D.     Attempted Redemption by Investor A ...................................................... 13

   E.     Abarbanel and the Fund Sought to Force Investor Group A to Accept Terms That
          Fell Far Short of a Full Redemption ........................................................ 16

   F.     Recent Misappropriation and Dissipation of Funds by
          Abarbanel and the Fund ............................................................................ 18

ARGUMENT ............................................................................................................ 19

   A.     The Legal Standard to Obtain an Asset Freeze ...................................... 19

   B.     The Commission Has Established At Least An Inference That Defendants Have
          Violated The Federal Securities Laws ...................................................... 21

      1.    Defendants have fraudulently raised and misappropriated Investor Group A's
            funds ...................................................................................................... 22

      2.    The Fund and Abarbanel have failed to redeem $106 million and, therefore, are
            improperly holding Investor Group A's money ..................................... 23

      3.    Defendants Acted With Scienter ............................................................ 26

      4.    Defendant's Fraud Was Material and "In Connection with"
            the Sale of Securities ............................................................................. 28

   C.     The Court Should Freeze Fund Assets Under the Control of the Defendants ....... 28

   D.     The Court Should Order Defendants to Complete an Accounting ......................... 31

   E.     The Court Should Order Defendants Not To Alter, Destroy, Or Conceal
          Documents ................................................................................................. 31

   F.     The Court Should Order Expedited Discovery To Determine The Amount and
          Location of the Assets of Investor Group A ............................................ 31

CONCLUSION ........................................................................................................ 32

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") respectfully submits this memorandum of law in support of its *ex parte* application for an asset freeze and other equitable relief against defendants Ofer Abarbanel ("Abarbanel"), Victor Chilelli ("Chilelli"), the Income Collecting 1-3 Months T-Bills Mutual Fund (the "Fund") (collectively "Defendants"), and relief defendants Institutional Syndication LLC ("IS"), North American Liquidity Resources LLC ("NALR"), Institutional Secured Credit LLC ("ISC"), Growth Income Holdings LLC ("GIH"), CLO Market Neutral LLC ("CLO") and Global EMEA Holdings LLC ("Global EMEA") (collectively, "Relief Defendants").

In support of this application, the Commission submits this brief, the Declaration of Enforcement Division attorney Gregory C. Padgett ("Padgett Decl.") and accompanying exhibits, and the Declaration of Paul W. Kisslinger Under Local Civil Procedure Rule 6.1(d) and Federal Rule of Civil Procedure 65(b)(l)(B).

## PRELIMINARY STATEMENT

From at least March 2018 to the present, Abarbanel, Chilelli, and the Fund that Abarbanel formed and controls, have depleted, dissipated, and misappropriated investor funds deposited in the Fund through a course of conduct that includes the creation of nominee shell companies; the diversion of funds to these shell companies in unauthorized uncollateralized loan transactions; and the creation and dissemination of materially false and misleading statements to investors with regard to, among other things, the type of investments the Fund would make and the collateral that would secure those investments.

Most recently, Abarbanel and the Fund have refused to honor the redemption demands of their largest group of investors ("Investor Group A") and are in improper custody of approximately $106.5 million that Investor Group A placed with the Fund, in violation of the

Fund's Prospectus.  Rather than readily redeem Investor Group A's shares, Abarbanel and the Fund  have offered to return a mere fraction of Investor Group A's money, insisting that Investor Group A relinquish all claims against the Fund and two of its shell companies that are in possession of a portion of the funds.  In addition, including on June 4, 2021, while the redemption was pending, Abarbanel and the Fund, transferred $64 million of Investor Group A's deposits from the Fund's bank account into a brokerage account from which no redemptions may be drawn, and from which these assets are subject to further dissipation and misappropriation.

As outlined more fully in the accompanying Complaint and Padgett Declaration, the Defendants' misappropriation of Investor Group A's funds involved a number of steps, which included the following:

a. The Fund issued a prospectus ("Prospectus") and other documents, prepared by Abarbanel, representing that the Fund would reinvest investor assets only in stable, secure, liquid, and easily redeemable securities falling into one of two categories:  (i) United States Treasury securities ("Treasuries"); or (ii) certain types of defined loan agreements known as repurchase agreements or reverse repurchase agreements (collectively, "Reverse Repos") that the Fund would enter into in with established, well-funded, independent institutions such as banks and insurance companies, in arms-length loan transactions.  The Reverse Repos were required to be collateralized by Treasuries or other specific types of secure collateral.  The fact that these loan agreements were to be secured and collateralized by Treasuries or other specified secure collateral was a critical representation to Investor Group A, as it provided stability and security similar to owning Treasuries themselves.

b.  From March 2019 through February 2021, Investor Group A made a series of large deposits into the bank account operated by the Fund's custodian, Wells Fargo Bank N.A. (the "Fund Bank Account"), on the basis of the representations in the Prospectus and other documents, such as fact sheets issued by the Fund.

c.  As soon as Investor Group A deposited its funds into the Fund Bank Account, Abarbanel, Chilelli, and the Fund would immediately enter into purported loan transactions with two of the counterparties that Abarbanel and Chilelli controlled, NALR and IS (the "Counterparties").  These loan transactions were not secured or collateralized as required, and were not equivalent to the type of secured collateralized Reverse Repos promised and authorized in the Prospectus. Importantly, NALR and IS did not transfer *collateral* (the highly secure Treasuries or other collateral required by the Prospectus) to the Fund as part of these loan transactions, as represented in the Prospectus.

d.  Abarbanel and the Fund then immediately directed and caused the transfer of Investor Group A's funds from the Fund Bank Account to bank accounts in the name of the Counterparties, NALR and IS.

e.  Abarbanel and Chilelli then immediately directed and caused the transfer of Investor Group A's funds from NALR and IS bank accounts to brokerage firm accounts in the name of NALR and IS.

f.  From there, Abarbanel and Chilelli misused and misappropriated Investor Group A's funds in violation of the terms of the Prospectus, in ways that benefitted themselves, *but not* the Fund or Investor Group A.  For example, they purchased securities in the name of NALR and IS, often on margin, transferred funds to other accounts, and

opened up new accounts from which they made other investments benefitting
themselves, but not the Fund or Fund investors.

On or about May 21, 2021, Investor Group A requested a full redemption of all
outstanding shares in the Fund.  At the time, according to statements issued by the Fund, Investor
Group A held shares in the Fund worth $106,530,000.  Rather than immediately redeeming
Investor Group A's shares, as it had done just two months earlier, and on numerous other
occasions, Abarbanel now caused the Fund to implement a number of new and never before
demanded requirements, protocols, and conditions to delay and impede Investor Group A's final
redemption.  To date, Defendants have refused to redeem one dollar of Investor Group A's
remaining shares entrusted to the Fund.

Most recently, matters have taken an even more serious turn.  On June 4, 2021,
Defendants, without notice or explanation, transferred $64 million of Investor Group A's
remaining assets invested in the Fund from the Fund Bank Account at Wells Fargo, from which
the Fund could redeem investor money, to the Fund's brokerage account held by Interactive
Brokers, from which no redemptions may be made.  Given the extensive scope of Defendants'
deceptive conduct and misrepresentations, outlined herein, and their pattern of moving Investor
Group A's money to and from accounts overseas, and to brokerage accounts where it may be
further dissipated and misappropriated – all while Investor Group A's redemption is pending –
an asset freeze is appropriate to preserve Fund assets to which Defendants are not entitled.

To preserve the *status quo* and ensure that investor funds are not further dissipated or
expatriated, the Commission seeks an order, in conformity with the proposed order submitted
herewith: (1) freezing designated Fund accounts and Relief Defendant accounts containing Fund
assets, investor funds, and/or ill-gotten proceeds of the fraudulent scheme, subject to

disgorgement and any civil penalties the Court may impose; (2) requiring an accounting by

Defendants; (3) permitting immediate discovery from Defendants, Relief Defendants, and third

parties; and (4) preventing Defendants and Relief Defendants from destroying or altering

documents.

## DEFENDANTS

**Ofer Abarbanel**, is a citizen of Israel, with an Israeli passport, who has resided in

Woodland Hills, California since at least 2016.  At all relevant times, Abarbanel has exercised

full control over the Fund, its investments and operations, and its dealings with investors, from

his residence in California.  As such, Abarbanel drafted and issued the Fund's Prospectus and

other documents issued by the Fund that contained materially false and misleading

representations to investors, as set forth below.  With and through Chilelli, Abarbanel also

controls the Relief Defendants, including but not limited to Counterparties, NALR and IS.

Abarbanel is also the named manager of ISC.  Padgett Decl. ¶ 6.

**Victor Chilelli** is a United States citizen residing in Lewes, Delaware.  From December

2017 through the present, Chilelli was the founder, sole owner, and manager of Counterparties

NALR and IS.  For the relevant period, Chilelli was also the manager and control person for

Relief Defendant GIH.  With respect to the misappropriation of Investor Group A's funds,

among other misconduct, Chilelli set up the bank and brokerage accounts of NALR and IS,

directed the unauthorized transfer of assets into and out of these accounts, and made

unauthorized investments benefitting himself and Abarbanel, not the Fund or Investor Group A.

**Income Collecting 1-3 Months T-Bills Mutual Fund** is an off-shore mutual fund

founded and controlled by Abarbanel, registered in the Cayman Islands (registration number CR-

319456), which consists of multiple share classes listed on the Nasdaq market headquartered in

New York, New York, and using Nasdaq symbols including "BILLX," "GOVAX," "GOVBX," "GOVDX," "GOVTX," and "USABX." The share class at issue in this action is GOVBX, held by the Fund's largest investor, Investor Group A. As of May 21, 2021, the Fund has fully redeemed all other share classes to investors, other than the $106.5 million in shares currently held by Investor Group A in GOVBX. The Fund is not registered with the Commission. The Fund's designated investment strategy, as provided in its Prospectus, is to obtain "current income consistent with preservation of capital and daily liquidity." *Id.* ¶ 8.

**RELIEF DEFENDANTS**

As set forth herein, the Relief Defendants received investor funds and/or ill-gotten proceeds of the fraudulent scheme alleged herein, subject to disgorgement, for which they gave no bona fide consideration and to which they have no legitimate claim.

**Institutional Syndication LLC (IS)** is a New Jersey limited liability company, which Chilelli formed on October 31, 2017, domiciled and headquartered in New Jersey. Chilelli is the managing member and Authorized Representative of IS. IS is a shell company, controlled by Abarbanel and Chilelli, that they and the Fund used to enter into unsecured uncollateralized lending transactions with the Fund, in furtherance of their scheme. From March 2019 through November 2020, Abarbanel and the Fund transferred approximately $2,030,000 of the funds invested by Investor Group A into IS accounts, and IS had no legitimate claim to those funds. Abarbanel and Chilelli further diverted and misappropriated the funds that they deposited in IS accounts. *Id.* ¶ 10.

**North American Liquidity Resources LLC (NALR)** is a Nevada limited liability company, formed by Chilelli on October 17, 2017, domiciled and alleged herein. NALR is a shell company, controlled by Abarbanel and Chilelli, which Defendants used to enter into

unsecured uncollateralized lending transactions with the Fund, in furtherance of their scheme. From March 2019 through November 2020, Abarbanel and the Fund transferred approximately $102,000,000 of the funds invested by Investor Group A into NARL accounts.  NALR had no legitimate claim to those funds.  Abarbanel and Chilelli further diverted and misappropriated the funds that they deposited in NALR accounts. *Id.* ¶ 11.

**Institutional Secured Credit LLC (ISC)** is a Nevada limited liability company domiciled and headquartered in Nevada.  Abarbanel owns and controls ISC.  At relevant times Abarbanel and Chilelli used ISC to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds.  From at least May 2019 through April 2021, Abarbanel, Chilleli, and the Fund transferred at least $627,000 worth of Fund assets into ISC accounts, a significant portion of which represented funds deposited by Investor Group A.  ISC had no legitimate claim to those funds. *Id.* ¶ 12.

**Growth Income Holdings LLC (GIH)** is a Nevada limited liability company domiciled and headquartered in Nevada.  Chilelli is the sole owner of GIH.  At relevant times, Abarbanel and Chilelli used GIH to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds.  From at least April 2019 through January 2021, Abarbanel and Chilelli transferred at least $9.4 million worth of Fund assets into GIH accounts, a substantial portion of which represented funds deposited by Investor Group A.  GIH had no legitimate claim to those funds. *Id.* ¶ 13.

**CLO Market Neutral LLC** (CLO) is a Nevada limited liability company domiciled and purportedly headquartered in Nevada.  Abarbanel controls CLO.  At relevant times, Abarbanel and Chilelli used CLO to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds.  From at least May 2019 through May 2021, Abarbanel and Chilelli transferred

at least $700,000 worth of Fund assets into CLO accounts, a significant portion of which represented funds deposited by Investor Group A.  CLO had no legitimate claim to those funds. *Id.* ¶ 14.

**Global EMEA Holdings LLC (EMEA)** is a Nevada limited liability company domiciled and purportedly headquartered in Nevada.  At all relevant times Abarbanel owned and controlled EMEA, directly or indirectly.  From at least October 15, 2019 through August 18, 2020, Abarbanel and Chilelli transferred at least $1.4 million of Fund assets into EMEA accounts, a significant portion of which represented funds invested by Investor Group A.  EMEA had no legitimate claim to those funds.  *Id.* ¶ 15.

## STATEMENT OF FACTS

### A.    The Income Collecting Fund

In or around March 2018, Abarbanel and Chilelli took steps to register the Income Collecting Fund in the Cayman Islands and began to recruit investors in the Fund.  *Id.* ¶ 18. Abarbanel controlled all aspects of the Fund.  A letter dated April 28, 2020, which appears to be signed by the Fund's Director and Chairman, describes a motion by the Fund's Board "authorizing Mr. Ofer Abarbanel to represent the fund in all matters and that Interactive Brokers LLC is allowed to disclos[e] all fund information to Mr. Ofer Abarbanel."  *Id.* ¶ 31.

In or around early 2019, Abarbanel prepared a Prospectus and other marketing materials for the Fund, describing its structure, investments, anticipated returns, and the methods for purchasing and redeeming shares.  *Id.*  ¶ 19.  The Prospectus identified the Fund's custodians as: Wells Fargo Bank, NA in San Francisco, California ("Wells Fargo"), Interactive Brokers Group, Inc. in Greenwich, Connecticut ("Interactive Brokers"), and Alliance Trust Company, LLC in Reno, Nevada.  The Prospectus identified the Fund's administrator as Mutual Shareholder

Services, LLC in Broadview Heights, OH, and its investment advisor as NY Alaska ETF Management, located in Las Vegas, Nevada.  *Id.* ¶ 20.

The Prospectus described the Fund's "Investment Objective" as "seek[ing] current income consistent with preservation of capital and daily liquidity."  It stated that the Fund would invest primarily in U.S. Treasury securities with remaining maturities of one to three months.  *Id.* ¶ 21.

The Prospectus also stated that "to enhance income," in addition to purchasing Treasuries, the Fund may also enter into certain types of collateralized lending agreements with financial institutions, secured by Treasuries, termed repurchase agreements and reverse repurchase agreements (collectively "Reverse Repos").  *Id.* ¶¶ 22–25, 44–46 (describing Repos and Reverse Repos).  These collateralized Reverse Repos would involve either "the purchase of securities with an agreement to resell the securities at an agreed-upon price, date and interest payment;" or "the sale of securities with an agreement to repurchase the securities at an agreed-upon price, date and interest payment.  *Id.* ¶ 23.

Importantly, these Reverse Repos were to be negotiated and executed in arms-length transactions with well-funded independent financial institutions.  As the Prospectus stated, "[t]he Fund may enter into repurchase agreements and/or reverse repurchase agreements with counterparties such as:  broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies. . . ."  *Id.* ¶ 25.

As for the Reverse Repos, the Prospectus was very specific as to the forms of collateral that had to be received ("secured to the Fund") when entering into a Reverse Repos:  either mutual fund shares or Treasuries.  The Prospectus stated that the "proceeds secured to the Fund with respect to reverse repurchase agreements will include either (1) 100% units of mutual fund

symbols:  STATX or of this Fund or (2) 102%-115% U.S. Treasury securities."  *Id.* ¶ 24.  It was important to investors, including Investor Group A, that the Reverse Repos were fully collateralized as set forth in the Prospectus.  *Id. ¶ 30.*

In addition, the Prospectus provided for "daily redemptions" by investors.  The Prospectus stated that "[f]und shares are available for daily redemption;" "[s]hares will be redeemable at the option of the Shareholder on any Business Day and at any amount;" and "[a] redemption request must be received by the Administrator at least One (1) Business Day (or such lesser period as the Directors may generally or in any particular case permits) prior to the relevant Redemption Day."  *Id.* ¶ 26.

## B. Abarbanel and Chilelli Establish NALR and IS to Act as Unauthorized Counterparties to the Fund in Unauthorized Loan Transactions

Before the date that Abarbanel set up the Fund, in October 2017, Abarbanel and Chilelli took steps to set up limited liability shell companies, NALR and IS, to act as the counterparties with the Fund in unauthorized purported Reverse Repos described herein.  *Id.* ¶¶ 6–7, 10–11, 50–52.  NALR and IS were not independent, well-funded, financial institutions as required in the Prospectus for Reverse Repos.  They were single-owner shell LLCs, controlled by Abarbanel and Chilelli, with no apparent assets, operations, or business purposes other than to serve as counterparties to the Fund.  *Id.* ¶¶ 50–52.

In addition, the other four limited liability companies founded and/or controlled by Abarbanel and Chilelli, ISC, GIH, CLO, and EMEA, also had no apparent assets, operations, or business purpose other than to facilitate the unauthorized investment, transfer and misappropriation of investor funds.  *Id.* ¶¶ 12–16, 52, 65–70.

## C. Defendants Misappropriate Investor Group A's Funds

In March 2019, Investor Group A, through Accuvest Global Advisors, a registered

investment advisor in Cleveland, Ohio, began investing in the Fund in the share class GOVBX.
*Id.* ¶ 33.  At all relevant times, Investor Group A was the Fund's largest investor.

Per statements issued by the Fund and Fund Bank Account records, between March 2019
and February 2021, Investor Group A invested approximately $191 million in the Fund, and
received approximately $85.5 in partial redemptions, leaving $106.5 invested in the Fund as of
May 2021.  *Id.* ¶ 35.

Bank records also demonstrate that, from March 2019 through February 2021, Abarbanel
directed the transfer of approximately $104 million in investments deposited by Investor Group
A in the GOVBX share class to the counterparties and Relief Defendants that they controlled.
The process transpired as follows:

a.   From March 2019 through November 2020, Investor Group A invested in the Fund
by a series of approximately 20 large deposits into the Fund Bank Account held by Wells Fargo,
totaling approximately $104 million.  *Id.* ¶ 52–53, 55.

b.   As soon as Investor Group A made each deposit into the Fund Bank Account,
Abarbanel, Chilelli, and the Fund would immediately enter into purported loan transactions with
two of the counterparties that Abarbanel and Chilelli controlled, NALR and IS (the
"Counterparties").  *Id.* ¶¶ 52, 56.  These loan transactions were not secured or collateralized as
required in the Prospectus, and were not equivalent to the type of collateralized Reverse Repos
promised and authorized in the Prospectus.  *Id.* ¶ 56.  Importantly, NALR and IS did not transfer
*collateral* (the highly secure Treasuries or other secure collateral required by the Prospectus) to
the Fund as part of these loan transactions, in violation of the Prospectus.  *Id.* ¶¶ 44–46.

c.   Abarbanel and the Fund then immediately directed and caused the transfer of Investor
Group A's funds from the Fund Bank Account to bank accounts that Abarbanel and Chilelli

opened and controlled in the name of counterparties, NALR and IS.  The following chart shows

each of the Investor Group A's subscriptions coming in to the Fund Bank Account and being

wired out to NALR's and IS's accounts on the same day:

| Investor Group Investment/ Redemption Date | Amount Deposited in Fund Bank Account | Counterparty | Counterparty Wire Date | Amount |
|---|---|---|---|---|
| 3/5/2019 | $ 20,500,000.00 | NALR | 3/5/2019 | $ (20,500,000.00) |
| 3/15/2019 | $ 3,000,000.00 | NALR | 3/15/2019 | $ (3,000,000.00) |
| 3/21/2019 | $ 8,000,000.00 | NALR | 3/21/2019 | $ (8,000,000.00) |
| 4/24/2019 | $ (1,000,000.00) | NALR | 4/24/2019 | $ 1,000,000.00 |
| 5/10/2019 | $ 2,000,000.00 | NALR | 5/10/2019 | $ (2,000,000.00) |
| 6/27/2019 | $ 16,000,000.00 | NALR | 6/27/2019 | $ (16,000,000.00) |
| 8/7/2019 | $ 7,500,000.00 | NALR | 8/7/2019 | $ (7,500,000.00) |
| 10/2/2019 | $ 2,500,000.00 | NALR | 10/2/2019 | $ (2,500,000.00) |
| 1/2/2020 | $ 5,000,000.00 | NALR | 1/2/2020 | $ (5,100,000.00) |
| 1/22/2020 | $ (4,000,000.00) | NALR | 1/22/2020 | $ 4,000,000.00 |
| 1/28/2020 | $ (2,500,000.00) | NALR | 1/28/2020 | $ 2,500,000.00 |
| 2/14/2020 | $ 3,500,000.00 | NALR | 2/14/2020 | $ (3,500,000.00) |
| 3/13/2020 | $ 9,000,000.00 | NALR | 3/13/2020 | $ (9,000,000.00) |
| 4/27/2020 | $ 5,000,000.00 | NALR | 4/27/2020 | $ (5,000,000.00) |
| 5/22/2020 | $ 2,030,000.00 | IS | 5/22/2020 | $ (2,030,000.00) |
| 7/27/2020 | $ 2,000,000.00 | NALR | 7/27/2020 | $ (2,000,000.00) |
| 8/12/2020 | $ 6,500,000.00 | NALR | 8/12/2020 | $ (6,500,000.00) |
| 8/18/2020 | $ 7,500,000.00 | NALR | 8/18/2020 | $ (7,500,000.00) |
| 9/4/2020 | $ 14,000,000.00 | NALR | 9/4/2020 | $ (14,000,000.00) |
| 11/17/2020 | $ (2,000,000.00) | NALR | 11/17/2020 | $ 2,000,000.00 |
| Net Total: | $ 102,500,000.00 | NALR | | |
| Net Total: | $ 2,030,000.00 | IS | | |

*Id.* ¶ 59.

    d.  Abarbanel and Chilelli then immediately directed and caused the transfer of Investor

Group A's funds from NALR and IS bank accounts to brokerage firm accounts that they opened

and controlled in the names of NALR and IS.  *Id.*

e.  From there, Abarbanel and Chilelli misused and misappropriated Investor Group A's funds in violation of the terms of the Prospectus, in ways that benefitted themselves, *but not* the Fund or Investor Group A.  For example, they purchased Treasuries in the names of NALR and IS, often on margin, transferred funds to other accounts, and opened up new accounts from which they made other investments benefitting themselves, but not the Fund or Fund investors. *Id.* ¶¶ 60–64.

### D.    Attempted Redemption by Investor A

In March 2021, after Abarbanel learned that the Commission was investigating him and the Fund, he moved to limit the number of investors in the Fund by forcibly redeeming all investors other than Investor Group A.  *Id.* ¶ 71.  Abarbanel neither informed Investor Group A of the Commission's investigation nor offered to permit Investor Group A to redeem any of its shares.  Investor Group A's shares in GOVBX, the "biggest share class with the highest return," as stated by the Fund in a March 3 letter to investor, thus remain the only investments remaining in the Fund.  *Id.*

On or around May 21, 2021, upon learning of the Commission's investigation, Investor Group A requested a full redemption of its shares in the Fund per the redemption terms in the Prospectus, which as outlined above, guaranteed investors the ability to redeem on a daily basis, on "any Business Day and at any amount."  *Id.* ¶¶ 26, 72.

At that time, pursuant to a statement issued by the Fund's administrator, Investor Group A had approximately $106.5 million in the Fund.  *Id.* ¶ 35.  That amount conflicted with a May 25, 2021 report of Investor Group A's current holdings, which disclosed $66.9 million in cash at a Maybank in Singapore; $19 million pursuant to a Reverse Repo agreement with NALR; $6

million pursuant to a Reverse Repo agreement with IS; and $1,900 in cash at Interactive Brokers (totaling $92.9 million).  *Id.* ¶ 42.

Despite the fact that the Prospectus provided for "daily redemption," and even though Investor Group A complied with the requirements for redemption, Abarbanel and the Fund failed to honor Investor Group A's May 21, 2021 redemption request.  Instead, Abarbanel and the Fund set up pretextual obstacles and roadblocks to delay and hinder the redemption, and failed and refused to honor it, as set forth in the following paragraphs.  For example:

On May 23, 2021, Abarbanel and counsel for the Fund first responded to Investor Group A's redemption request and indicated that Investor Group A's redemption could not be fulfilled because Investor Group A must undergo an "omnibus review processes" [sic],  which would require the Fund to appointing a "Money Laundering Compliance officer" and "Money Laundering Reporting Officer."

In subsequent emails, including ones sent on June 1 and 4, 2021, counsel reiterated such requirements relating to purported anti money laundering (AML) protocols.  The Fund had not required such an "omnibus review process," or insisted on the appointment of money laundering officers, or other AML protocols, as part of Investor Group A's prior redemptions.

On May 27, 2021, Abarbanel and the Fund, through counsel, sent a Power Point presentation by email to Investor Group A indicating that only a portion of its funds were available, and that a full redemption was not possible.  They claimed that the Fund at that time was holding approximately $88.9 million "sitting in cash" ($84 million in three financial institutions -- a bank in Singapore, Wells Fargo, and Interactive Brokers; and $4.9 million "that can be further transferred to the Fund from counterparty"), and an additional $25.9 million in cash and Treasuries "that are still invested in lending agreement," [sic] and not able to be

liquidated.  *Id.* ¶ 75.

In a telephone conversation held that same day, Abarbanel discussed the Power Point with Investor Group A and attempted to pitch Investor Group A a new investment vehicle set up by Abarbanel, under which Investor Group A could redeem its shares in the Fund and immediately reinvest them with Abarbanel in the new investment, rather than obtain a full return of the funds in cash.  Abarbanel also warned that, without accepting these new terms, Investor Group A would be in the position of seeking recovery from the counterparties in bankruptcy and would likely recover only a percentage of its investment.  Abarbanel indicated that this option would be "an expensive creditor's fight."  *Id.* ¶ 76.

In a subsequent May 27, 2021 email, Investor Group A declined Abarbanel's offer and again requested a full return of its funds.  Investor Group A also requested that "this cash be secured and no further investments or expenses be undertaken from these funds pending the redemption."  Abarbanel and the Fund did not comply with this directive.  *Id.* ¶ 77.

Defendants Abarbanel and the Fund then put up new roadblocks to the redemption sought by Investor Group A.  In a later May 27, 2021 email, the Fund and Abarbanel, through counsel, stated that Investor Group A had to fill out a detailed and lengthy (18 page) "Wolfsberg Questionnaire" in order for the Fund to fulfill a redemption of its assets.  *Id.* ¶ 78.

In subsequent communications with Investor Group A, Abarbanel and the Fund also demanded a "wet signature," a listing of the net worth and identity of beneficial owners that were not even in Investor Group A, and other seemingly unnecessary requirements and protocols.  *Id.* ¶ 79.

Abarbanel's and the Fund's refusal to honor Investor Group A's redemption request in May 2021, stands in stark contrast to how they handled a large redemption request that Investor

Group A had made just two months earlier in March 2021,before Abarbanel and the Fund learned of the SEC's investigation.  Specifically, on or about March 11, 2021, Investor Group A submitted a redemption request for $75,000,000 from the Fund by simply filling out a redemption request form downloaded from the Fund website.  Investor Group A was able to obtain the March 2021 redemption from the Fund by wire transfer in a matter of days.  The Fund did not require any additional information, an 18 page questionnaire, a "wet signature," or any money laundering "protocols" to honor that prior redemption.  *Id.* ¶ 81.

Later that evening, also in a May 27, 2021 email, Abarbanel and the Fund's counsel gave an update to Investor Group A, stating that the Singapore bank was in the process of sending $66.9 million of Investor Group A's cash to the Fund's Bank Account at Wells Fargo, "which currently has a $17M balance."  *Id.* ¶ 80.

### E.   Abarbanel and the Fund Sought to Force Investor Group A to Accept Terms That Fell Far Short of a Full Redemption

On or about June 1, 2021, Abarbanel and the Fund also informed Investor Group A that, to obtain a redemption, it would need to sign a new agreement which it referred to as "Annex B." Under this new agreement, the Fund proposed to satisfy Investor Group A's redemption request by merely providing Investor Group A with whatever accounts that Counterparties NALR and IS held, together with the "future cash flow" from the Fund's lending agreements with the Counterparties.  Annex B did not include any of the $66 million in cash reflected in  Investor Group A's May 25, 2021 statement of holdings.

These lending agreements between the Fund and the Counterparties, known as Master Securities Loan Agreements, were transactions that Abarbanel and the Fund entered into with the Counterparties, rather than investing in the properly collateralized Reverse Repos described in the Prospectus.  In other words, Abarbanel and the Fund had misused Investor Group A's funds

to obtain those Master Securities Loan Agreements in the first place, and now were offering to give them to Investor Group A as part of the package to satisfy Investor Group A's redemption of its investment in the Fund.  Further, under Annex B, Investor Group A had to release all of its claims against the Fund, the Counterparties and others.  As discussed above, the Master Securities Loan Agreements were not authorized investments, and did not reflect what the Prospectus required.

Abarbanel and the Fund maintained that the Annex B reflected a "redemption in kind" under the terms of the Prospectus.  But the terms reflected in Annex B did not reflect a "redemption in kind" as described in the Prospectus.  The Prospectus provides that the Fund "reserves the right to honor requests for redemption or repurchase orders by making payment in whole or in part in ***readily marketable securities*** ("redemption in kind") if the amount is greater than $200,000 or 1% of the Fund's assets." (emphasis added).  The lending agreements between the Fund and the Counterparties, which Abarbanel and the Fund attempted to require Investor Group A to assume as part of its redemption, are not "readily marketable securities," and are thus not "redemptions in kind."

Abarbanel and the Fund also asserted that they were imposing a "forced redemption" under the Prospectus.  The Prospectus permits the Fund to impose a "forced redemption," but that would involve actually redeeming the investor's shares, and in exchange, the investor releasing its claims.  But that is not what Abarbanel and the Fund proposed to do here.  The Fund would not "redeem" Investor Group A's shares in the Fund by offering all cash and/or "readily marketable securities," but instead only offered whatever happened to be left in the Counterparties' accounts, and whatever "income stream" might in the future flow from the Master Securities Loan Agreements between the Fund and the Counterparties.  And Abarbanel

17

and the Fund would only provide that insufficient package if Investor Fund A released all of its claims against the Fund, the Counterparties and others.

In short, rather than complying with their obligation to honor Investor Group A's redemption request, Abarbanel and the Fund sought to coerce Investor Group A into giving up its shares in the Fund and all claims against the Fund and others, in exchange for a package that included the Counterparties' accounts and the "income flow" from the same Master Securities Loan Agreements that Abarbanel and the Fund had entered into by fraudulently using Investor Group A's funds in the first place.

Accordingly, Abarbanel and the Fund violated their obligations to honor redemption requests and return investor funds, and they have unlawfully withheld such funds.

### F.   Recent Misappropriation and Dissipation of Funds by Abarbanel and the Fund

Documents obtained by the Commission in May 2021 revealed that the Counterparties' accounts held less than $4 million, nowhere near the $26 million they claimed the Counterparties were holding in the May 27, 2021 Power Point.  Documents obtained by the Commission further showed that in May 2021, the Fund Bank Account held approximately $84 million, and the Counterparties approximately $4 million, for a total of $88 million, nearly $20 million less than the $106.5 million indicated in the Fund administrator's May report.  *Id.* ¶¶ 35, 87–88. Defendants have provided no explanation for this $20 million shortfall.

On June 4, 2021, after receiving Investor Group A's redemption request, Abarbanel and the Fund initiated a transfer of more than $64 million out of the Fund Bank Account and into the Fund's brokerage account.  From this account, the funds are subject to unauthorized investment losses, and to further misappropriation and dissipation by Defendants.  *Id.* ¶ 89.  Abarbanel and the Fund transferred the $64 million without any prior notice to Investor Group A, and despite

the fact that any redemption to Investor Group A would need to be processed and transferred from the Fund Bank Account, not the brokerage account.

And most recently, as of June 16, 2021, the Commission has discovered that Chilelli is attempting to withdraw $30,000 out of IS's brokerage account at Wells Fargo and into an account at PNC Bank in the name of IS.  *Id.* ¶ 92.  Abarbanel and the Fund have provided no explanation of why they initiated and/or executed these unauthorized transfer of Investor Group A's funds during the pendency of Investor Group A's claim for redemption, casting doubt on the legitimacy of such a transfer.

Accordingly, for the reasons discussed in the preceding paragraphs, Abarbanel and the Fund have misused and misdirected Investor Group A's investment funds, and any remaining funds are subject to further misappropriation or dissipation.

## ARGUMENT

### A.    The Legal Standard to Obtain an Asset Freeze

The Commission respectfully requests that the Court freeze Fund assets held in the Fund's custodial accounts at Wells Fargo and Interactive Brokers; NALR's accounts at Wells Fargo, TIAA, and Interactive Brokers; IS's accounts at Wells Fargo, PNC, and Interactive Brokers; CLO's account at Wells Fargo; ISC's accounts at Bank of America, Preferred Bank, and Interactive Brokers; and GIH's account at Interactive Brokers.

Section 22(a) of the Securities Act and Section 27 of the Exchange Act "confer general equity powers upon the district courts" that are "invoked by a showing of a securities law violation."  *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011) (*citing SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972); *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984); and *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 438 (2d Cir. 1987)).  Once the court's equity

powers are invoked, an asset freeze is a provisional remedy, "the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." *Id; SEC v. One or More Unknown Traders in Onyx Securities,* 296 F.R.D. 241, 254 (S.D.N.Y. 2013) (*citing Smith*, 653 F.3d at 127); *SEC v. Unifund Sal,* 910 F.2d 1028, 1041 (2d Cir. 1990)).  Finally, "[i]n a securities fraud case brought by the SEC, a federal court has the authority to freeze the assets of a party not accused of wrongdoing where that party: '(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'"  *SEC v. Byers*, 2009 WL 33434, *2 (S.D.N.Y. 2009) (*citing SEC v. Cavanagh,* 155 F.3d 129, 136 (2d Cir. 1998)).

In the Second Circuit, the Commission may obtain an asset freeze on a lesser showing than that required of a preliminary injunction.  *Unifund*, 910 F.2d at 1041 ("an ancillary remedy may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established") (citations omitted); *see also SEC v. Hedén*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999) (holding that an asset freeze requires "a lesser showing" than a preliminary injunction against future securities law violations). "Where an asset freeze is involved, the SEC must show either a likelihood of success on the merits, or ***that an inference can be drawn that the party has violated the federal securities laws***."  *Smith*, 653 F.3d at 128 (internal quotation marks and citations omitted) (emphasis added).

As set forth below, the Commission's evidence demonstrates, at a minimum, that an inference can be drawn that Defendants have fraudulently raised, invested, and misappropriated the funds of Investor Group A, its largest investor.  In failing to redeem Investor Group A's assets, the only remaining investor in the Fund, pursuant to the terms of the Prospectus and as they have done in the past, the Fund and the Relief Defendants are in possession of ill-gotten

20

investor funds and have no claim to those funds.  An asset freeze is appropriate to prevent the

dissipation, removal, or transfer of Investor Group A's funds to foreign accounts held by the

Fund and that are beyond the Court's jurisdiction or to other investments, through the Fund's

Interactive Brokers account, putting those funds at significant risk of loss.

> **B.     The Commission Has Established At Least An Inference That Defendants
> Have Violated The Federal Securities Laws**

Section 17(a) of the Securities Act of 1933 prohibits fraud in the offer or sale of

securities, using the mails or the instruments of interstate commerce.  *See* 15 U.S.C. §§ 77q(a).

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder prohibit

fraudulent conduct in connection with the purchase or sale of a security.  *See* 15 U.S.C. §

78j(b);17 C.F.R. §§ 240.10b–5(a), (b) & (c).  Courts apply "essentially the same" tests for

determining liability under Section 17(a), Section 10(b), and Rule 10b–5.  *See SEC v.*

*Haligiannis,* 470 F.Supp. 2d 373, 381 (S.D.N.Y. 2007).

To establish a violation under these antifraud provisions, the SEC must prove that a

defendant:  (1) made or obtained money or property by means of a material false statement or

material omission or engaged in deceptive conduct, (2) in connection with the offer, sale, or

purchase of a security, (3) by means of interstate commerce.  *See* 15 U.S.C. §§ 77q(a), 15

U.S.C. § 78j(b)10(b), 17 C.F.R. §§ 240.10b– 5(a), (b) & (c).  Scienter is required to prove a

violation of Section 17(a)(1), Section 10(b), and Rule 10b–5, while Section 17(a)(2) and (3)

can also be proven by showing a defendant acted negligently.  *Aaron v. SEC*, 446 U.S. 680,

695 (1980).  Scienter is established by a showing of knowledge or recklessness.  *SEC v.*

*Obus*, 693 F.3d 276, 286 (2d Cir. 2012).  Negligence "is the failure to 'exercise reasonable

care under all the circumstances.'"  *Robare Group, Ltd. v. SEC*, 922 F. 3d 468, 477 (D.C.

Cir. 2019) (quoting Restatement (Third) of Torts:Liability for Physical & Emotional Harm §

3 (2010)).

The Commission has demonstrated, at a minimum, that an inference can be drawn

that Defendants have fraudulently raised, invested, and misappropriated the funds of Investor

Group A, and are improperly in possession of those funds by refusing to redeem them.

    1.   **Defendants have fraudulently raised and misappropriated Investor Group A's funds**

Abarbanel established and structured the Fund, wrote the Prospectus, and listed the Fund

on the Nasdaq.  On April 28, 2020, the Fund's board "authorized Abarbanel to represent the fund

in all matters."  Padgett Decl. ¶ 31.  The Fund and Abarbanel represented to investors that the

Fund would invest primarily in Treasuries and other liquid and fully collateralized Reverse

Repos with independent, well-funded Counterparties that were broker/dealers, institutional

investors, institutional investment manager(s), banks, mutual funds, and insurance and/or

reinsurance companies.  These Reverse Repos were to be collateralized by Treasuries or other

specified collateral.  Further, according to the Prospectus, "[f]und shares are available for daily

redemption," "[s]hares will be redeemable at the option of the Shareholder on any Business Day

and at any amount."  Based upon these and oral representations regarding the collateral for the

Reverse Repos, Investor Group A contributed approximately $190 million to the Fund from

March 2019 through February 2021.  Abarbanel accepted Investor Group A into the Fund and

directed the Fund to deposit all of its funds into the Fund Bank Account.

Instead of making the represented investments, Defendants authorized the transfer of

approximately $104 million of Investor Group A's money from the Fund to NALR and IS—

entities controlled by Abarbanel and Chilelli—purportedly on the basis of certain Reverse Repos

entered into between the Fund and counterparties NALR and IS.  *Id.* ¶ 59.  These transfers were

unauthorized and not legitimate.  NALR and IS were single-member shell LLCs with no assets

or business operations, not independent, well-funded, third-party institutions as represented in the Prospectus. *Id.* ¶ 50. Further, bank and brokerage statements for the Fund, NALR, and IS fail to establish that NALR and IS transferred any collateral of the type required to the Fund Bank Account, or that any collateral is held on behalf of the Fund at Interactive Brokers. *Id.* ¶¶ 48–49. Finally, Interactive Brokerage records appear to show that NALR and IS have used all of Investor Group A's funds transferred to NALR and IS to open other brokerage accounts in their own names, and to purchase Treasuries on margin for their own benefit – not for the benefit of the Fund or its investors. *Id.* ¶¶ 59–64.

Defendants' misrepresentations in the Fund Prospectus throughout the relevant period; their misappropriation of funds into and out of unauthorized accounts; and their failure to fully collateralize Investor Group A's Reverse Repos with NALR and IS, as promised, certainly gives rise to an inference that Defendants fraudulently obtained money from Investor Group A, are engaged in deceptive conduct, and have misappropriated investor funds.

## 2. The Fund and Abarbanel have failed to redeem $106 million and, therefore, are improperly holding Investor Group A's money

On May 21, 2021, Investor Group A sought to redeem all of its remaining shares in the Fund, or approximately $106 million, after learning about the Commission's investigation into the Defendants. According to the Fund Prospectus, the Fund's investments are liquid and redemptions are available daily. Despite these representation and that—two weeks earlier—Investor A was able to redeem $75 million from the Fund, Abarbanel and the Fund have refused to redeem Investor Group A's funds. Instead Abarbanel and the Fund have set up unauthorized obstacles, roadblocks, requirements, and "protocols" that they did not impose just two months earlier when they readily redeemed $75 million of Investor Group A's shares. Instead, they have offered Investor Group A a redemption of only the assets held by NALR and IS—far less than

the value of Investor Group A's remaining shares—and they are forcing Investor Group A to give up all of its claims against the Fund and the Counterparties.

As outlined above, the Fund and Abarbanel first attempted to offer Investor Group A a redemption in exchange for an immediate transfer of its funds to a new investment. Then Abarbanel and Fund imposed new and never disclosed anti-money laundering protocols, required Investor Group A to waive all claims it may have against the Fund, NALR and IS, and offered a redemption "in-kind" of unmarketable securities contrary to the redemption in-kind provisions of the Prospectus.

In addition, Abarbanel and the Fund have claimed that the Fund does not have the assets to provide a full redemption to Investor Group A, and have provided materially false information to Investor Group A about the amount and location of the Fund's assets that are available for redemption. At the end of May 2021, Abarbanel, through counsel, claimed that the Fund at that time held $17 million in cash in the Fund Bank account, and another $89 million purportedly at a bank in Singapore. An additional $26 million, he claimed, was allegedly "still invested in [reverse repurchase] agreements" that were not able to be liquidated, despite his and the Fund's claims that the agreements were backed by collateral, and that all of Fund's investments were liquid and were available for "daily redemptions." *Id.* ¶¶ 72, 75–76. Thus, according to Abarbanel, the Fund held $132 million in assets ($17 + $89 + $26 million), more than enough to meet Investor A's redemption request.

Abarbanel's representations to Investor A with regard to the amount and location of its funds were false. As of the end of May 2021, the Counterparties' accounts held less than $4 million, nowhere near the $26 million Abarbanel and the Fund told Investor A that they were holding pursuant to the claimed Reverse Repos. *Id.* ¶¶ 87–88.

Finally, there is no indication that the Reverse Repos that Defendants caused the Fund to enter into are backed by collateral held by or for the benefit of the Fund—as evidenced by the bank and brokerage records, and by Abarbanel's claim the Fund does not have enough assets to pay the redemption to Investor Group A.  The Fund and the Relief Defendants are currently in possession of $106 million of Investor A's money that they are not authorized to hold.  These acts and transactions certainly give rise to the inference that Defendants are engaged in deceptive conduct and possible misappropriation of Investor Group A's funds.

Investor Group A's funds are the only investor assets that remain with the Fund and the Relief Defendants.  The Fund has redeemed all of the other investors.  The money that is currently held in the Funds' accounts at Wells Fargo and Interactive Brokers and the Relief Defendant's assets that are held at Interactive Brokers are at immediate risk for dissipation.  On June 4, 2021, during the time that Investor A was requesting a redemption of its entire investment, the Fund and Abarbanel transferred $64 million from the Fund's Wells Fargo account, from which redemptions are made, to a brokerage account from which no redemptions may be made, and from which the Defendants may further deplete Investor A's assets in unauthorized speculative trading.  Similarly, certain Relief Defendant's assets are held at Interactive Brokers and can easily be lost in unauthorized investments.

In addition, the Fund, as recently as May 25, 2021, held $66 million of Investor Group A's money in cash in a bank in Singapore.  *Id.* ¶ 80.  The Fund and Abarbanel still maintains foreign bank accounts, namely in Israel, Singapore, and the Cayman Islands, to which Investor Group A's assets could easily be moved and from which they are unlikely to be recovered.  Abarbanel's actions on behalf of the Fund that he owns and operates, and that holds Investor Group A's funds, are attributable to the Fund.  *See*, *e.g.*, *SEC v. Riel*, 282 F. Supp. 2d 499, 524-

25 (S.D.N.Y. 2017) (limited liability company was liable for actions of owner and sole

employee); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007) (securities law

violations of agent have long been attributed to principal under respondeat superior). *Cf.*

*Braswell v. United States*, 487 U.S. 99, 110 (1988) ("Artificial entities such as corporations may

act only through their agents").

### 3.   Defendants Acted With Scienter

Defendants knowingly or recklessly have fraudulently raised, invested, and

misappropriated the funds of Investor Group A, and are improperly refusing to return $106

million of those funds to Investor Group A.  Scienter constitutes a "mental state embracing intent

to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12

(1976).  Scienter may also be established through recklessness "Reckless conduct is at the least,

conduct which is highly unreasonable and which represents an extreme departure from the

standards of ordinary care ... to the extent that danger was either known to the defendant or so

obvious that the defendant must have been aware of it." *SEC v. Landberg*, 836 F. Supp. 2d 148,

154-55 (S.D.N.Y. 2011) (internal quotations and citations omitted).  In securities fraud cases like

this one, "circumstantial evidence can be more than sufficient" to prove scienter, particularly given

"the difficulty of proving the defendant's state of mind." *Herman & MacLean v. Huddleston*, 459

U.S. 375, 391 n.30 (1983).

Abarbanel started the Fund, wrote and disseminated the Prospectus, and operates NALR

and IS – shell entities that he knows were set up before Investor Group A even invested in the

Fund.  Abarbanel accepts all investors into the Fund and directs the investment of their assets.

Padgett Decl. ¶ 6.  He is authorized to represent the Fund in all matters.  He knew or was

reckless in not knowing that almost all of Investor Group A's assets were transferred to NALR

and IS, shell entities that were counterparties to the alleged Reverse Repos.  *Id.* ¶ 59.  He knew

or was reckless in not knowing that collateral was not held by the Fund, its custodians, or for the benefit of the Fund with respect to the Reverse Repos with NALR and IS.  *Id.*  ¶ 60.  He knew or was reckless in not knowing that his statements in the Prospectus—available to investors on the Fund's website during the relevant time period—with respect to Fund's investments and its collateral were materially false.  He knows or is reckless in not knowing that the Fund's failure to redeem Investor Group A's shares in the Fund is improper, and that the Fund currently hold $106 million to which it is not entitled.

Chilelli was the primary person responsible for transferring Investor Group A's funds to the counterparties, and beyond, in unauthorized transactions.  He set up NALR and IS prior to the time Abarbanel set up the Income Collecting Fund.  He know or was reckless in not knowing that all of the money coming into those entities was investor money coming from the Fund Bank Account.  He knew or was reckless in not knowing that using investor money to purchase U.S. Treasuries for the benefit of NALR and IS—and not the Fund—was wrong.

Abarbanel's and Chilelli's scienter should also be imputed to the other Defendants, based on their control of them.  *See SEC v. Haligiannis,* 470 F. Supp. 2d 373, 381-82 (S.D.N.Y. 2007) (imputing individual defendant's scienter to each entity that he controlled, and the downstream entities) (*citing Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 100–01 (2d Cir. 2001); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1089 n. 3 (2d Cir.1972); *Cromer Finance Ltd. v. Berger,* Nos. 00 Civ 2284 (DLC) & 00 Civ. 2498 (DLC), 2002 WL 826847, at *7–8 (S.D.N.Y. May 2, 2002)).  Here, Abarbanel and Chilelli acted, or purported to act, on behalf of the various Defendants when they engaged in their knowing deceptions and fraudulent scheme.

### 4.    Defendant's Fraud Was Material and "In Connection with" the Sale of Securities

Defendants' fraudulent acts in—raising, investing, misappropriating, and refusing to redeem Investor Group A's money—are material and in connection with the purchase or sale of securities.  The fraudulent and deceptive acts with respect to Investor Group A's money focus directly on the considerations a reasonable investor would consider significant in making a decision to invest in the Fund:  the investments the Fund intended to make, the transactions it would enter into, the level of risk it would tolerate, the expected returns on investment, and how an investor could redeem shares and obtain a return of their investment.  *See Basic Inc. v. Levinson,* 485 U.S. 224, 238 (1988) (adopting the standard for materiality as whether a "reasonable investor" would consider the information significant in making an investment decision).  Further, acts, transactions, and practices described above were in connection with and intended to further the offer, purchase, and sale of shares of the Income Collecting Fund.  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 85 (2006) ("It is enough that the fraud alleged 'coincide' with a securities transaction.") (citation omitted).

### C.    The Court Should Freeze Fund Assets Under the Control of the Defendants

The Commission has established at least an inference that Defendants have fraudulently raised, invested, and misappropriated the funds of Investor Group A, and are improperly refusing to redeem those funds.  The Court's equity powers include the power to freeze the assets of a party or non-party where, as here, the Commission has established at least an inference that the federal securities laws have been violated or that parties possess investor funds to which they are not entitled. *Smith*, 653 F.3d at 128; *Cavanagh*, 155 F.3d at 136.  A freeze on the assets that are under the control, or held in the name of, the Fund and Relief Defendants, is both necessary and appropriate to preserve the *status quo* in this matter.  Investor Group A is the only remaining

28

investor in the Fund and its assets are the only investor assets left in the Fund and/or with the

Relief Defendants.  Without such a freeze, based upon the Defendants' recent actions and

assertions, it is highly likely that Investor Group A's assets in the Fund will be dissipated and

moved beyond the jurisdiction of the Court.

Abarbanel is an Israeli citizen.  Although he resides in California, he retains his Israeli

passport, and could easily travel outside the reach of the Commission's authority.  Abarbanel

controls financial accounts in at least Israel and Singapore, and likely the Cayman Islands and

the Bahamas, in his name and in the names of the Fund and Relief Defendants ISC, T-Bill

Securities, CLO, and EMEA.  Padgett Decl. ¶ 6.  The Fund has moved Investor Group A's

money to and from a Singapore bank account as recently as a few weeks ago.  Just last week, the

Fund transferred $64 million out of the Fund Bank Account, from which redemptions are

processed, to the Fund's brokerage account which does not process redemptions,

notwithstanding an unresolved redemption request from the Fund's sole remaining shareholder.

The wire transfer left the Fund Bank Account with approximately $20 million to satisfy a $106

million redemption request.  The Fund could use the assets in the brokerage account to trade

securities that could put the funds at risk of loss.

Given the facility with which the Defendants have moved funds overseas in recent weeks

and months, this Court should act immediately to preserve the funds in place while the Court

determines the merits of the Commission's allegations.  *See, e.g., SEC v. Gonzalez de Castilla*,

145 F. Supp. 2d 402, 420 (S.D.N.Y. 2001) (granting asset freeze where defendant's "status as a

citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds

would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain

frozen") (citing *De Beers Consolidated Mines, Ltd. v. United States,* 325 U.S. 212, 215–16

(1945) (holding, in antitrust action, that "sequestration of [defendants'] property is the only means of enforcing this Court's orders or decree against said foreign corporate defendants … [who] could quickly withdraw their assets from the United States and so prevent enforcement of any order or decree which this Court may render.")); *see also FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999) (upholding district court's freeze where defendant's prior conduct included "history of spiriting their commissions away to a Cook Island trust").

Accordingly, the Commission requests that the Court freeze the following accounts that hold, or at relevant times held, Fund assets that are in danger of further dissipation:

| Financial Institution | Account Name | Account Number(s) |
|---|---|---|
| Wells Fargo Bank, N.A. | Income Collecting 1-3 Months T-Bills Mutual Fund | x4905 |
| Wells Fargo Bank, N.A. | North American Liquidity Resources LLC | x5664 |
| Wells Fargo Bank, N.A. | Institutional Syndication LLC | x0277 |
| Wells Fargo Bank, N.A. | Growth Income Holdings LLC | x3043 |
| Wells Fargo Bank, N.A. | CLO Market Neutral LLC | x9805 |
| TIAA Bank | North American Liquidity Resources LLC | x30450 |
| PNC Bank | Institutional Syndication LLC | x99191 |
| Bank of America, N.A. | Institutional Secured Credit LLC | x02284<br>x02297 |
| Preferred Bank | Institutional Secured Credit LLC | x3705 |
| Preferred Bank | Global EMEA Holdings LLC | x4088 |
| Interactive Brokers LLC | Income Collecting 1-3 Months T-Bills Mutual Fund | x1002 |
| Interactive Brokers LLC | North American Liquidity Resources LLC | x6883<br>x7218<br>x7918<br>x1670<br>x4792<br>x5226 |
| Interactive Brokers LLC | Institutional Syndication LLC | x3160<br>x8274<br>x1903 |
| Interactive Brokers LLC | Growth Income Holdings LLC | x4946<br>x18065<br>x6225 |
| Interactive Brokers LLC | Institutional Secured Credit LLC | x5358<br>x3330<br>x7649 |

D.     **The Court Should Order Defendants to Complete an Accounting**

The Commission requests that this Court order Defendants to promptly serve the

Commission with a sworn accounting.  The Commission has at least raised an inference that

Defendants have fraudulently raised, invested, and misappropriated the funds of Investor Group

A, and are improperly refusing to redeem those funds.  Given that exigent circumstances

necessitated this filing with a limited record, the Commission does not yet know the whereabouts

of Investor Group A's money or other assets that may be used to satisfy a money judgment

against Defendants.  An accounting will be a critical next step to ascertain these facts.  *See SEC

v. Lybrand*, No. 00-CV-1387, 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000) (holding that "[i]n

light of the SEC's showing on the merits and the threat of dispersal of assets, an accounting is

appropriate to determine: (1) the amount of profits reaped from the allegedly illicit sales; (2) the

present location of such proceeds; and (3) these defendants' ability to repay").

E.     **The Court Should Order Defendants Not To Alter, Destroy, Or Conceal**
       **Documents**

To protect all relevant evidence necessary to establish a complete record in this matter,

including the existence of all funds belonging to Investor Group A, and the location of such

funds, the Commission seeks an order prohibiting the destruction of relevant documents or

tangible things.  Federal courts routinely grant such "innocuous" orders to protect the integrity of

the litigation.  *See, e.g., Unifund SAL,* 910 F.2d at 1040, n.11.  This Court cannot assume good

faith preservation of documents in the context of the fraudulent conduct, and the refusal to make

a redemption, that the Commission has shown is likely to have occurred.

F.     **The Court Should Order Expedited Discovery To Determine The Amount**
       **and Location of the Assets of Investor Group A**

The SEC also requests expedited discovery.  This relief is appropriate to enable

meaningful discovery in the fourteen-day period between entry of the asset freeze and any hearing on

whether such freeze should remain in place pending final judgment in the matter. *See* Fed. R. Civ.

Pro. 65(b)(2); *see SEC v. Sonja Anticevic*, No. 05 Civ. 6991, 2005 WL 1939946, \*\*3-4 (S.D.N.Y.

Aug. 5, 2005) (ordering expedited discovery in connection with an asset freeze and order to

show cause to a foreign defendant).  Accordingly, the Commission seeks an order allowing it to

take depositions on three days' notice, to serve written discovery requiring a response within three

days, and to serve document requests requiring a response within five days.

## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's emergency motion

for an asset freeze and other equitable relief.

Dated:  June 18, 2021                                    Respectfully submitted,

Paul W. Kisslinger (PK0764)
Sarah Heaton Concannon (SC9111)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4427 (Kisslinger)
(202) 551-5361 (Concannon)
*KisslingerP@sec.gov* (Kisslinger)
*ConcannonS@sec.gov* (Concannon)

*Counsel for Plaintiff Securities and Exchange
Commission*

Of counsel:

David A. Becker
Virginia M. Rosado Desilets
Gregory C. Padgett
Alexandra M. Arango
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549