**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**vs.**

**OFER ABARBANEL, VICTOR CHILELLI,**
**INCOME COLLECTING 1-3 MONTHS T-BILLS**
**MUTUAL FUND, and NEW YORK ALASKA ETF**
**MANAGEMENT LLC,**

**Defendants,**

**And**

**INSTITUTIONAL SYNDICATION LLC, NORTH**
**AMERICAN LIQUIDITY RESOURCES LLC,**
**INSTITUTIONAL SECURED CREDIT LLC,**
**GROWTH INCOME HOLDINGS LLC, CLO**
**MARKET NEUTRAL LLC, and GLOBAL EMEA**
**HOLDINGS LLC,**

**Relief Defendants.**

**Civil Action No. 21-CV-5429 (RA)**

**ECF CASE**

**AMENDED COMPLAINT**

Plaintiff United States Securities and Exchange Commission (the "SEC" or

"Commission") alleges as follows:

**SUMMARY**

1.       From at least March 2017 through June 2021 (the "Relevant Period"), Defendants

(i) Ofer Abarbanel ("Abarbanel"), (ii) Victor Chilelli ("Chilelli"), and (iii) New York Alaska

ETF Management LLC ("NY Alaska"), the registered investment adviser that Abarbanel formed

and controlled, engaged in a fraudulent scheme to deceive and defraud investors in two mutual

funds that Abarbanel also formed and controlled:  a domestic fund, the State Funds – Enhanced

Ultra-Short Duration Mutual Fund ("State Funds"), registered in the United States; and an off-

shore fund, the Income Collecting 1-3 Months T-Bills Mutual Fund ("Income Collecting Fund"), registered in the Cayman Islands (collectively, the "Funds").

2.      During the course of their investment scheme, Abarbanel, with the assistance of NY Alaska and Chilelli, used the Funds to deplete, dissipate, and misappropriate investor assets through a fraudulent course of conduct that included the creation of nominee shell companies, the diversion of funds to these shell companies in unauthorized, uncollateralized loan transactions that violated the terms set forth in the Funds' public filings, prospectuses, and other documents issued to investors, and the submission of false and misleading statements of material facts to investors to disguise Defendants' misconduct and further their scheme.

3.      The investment scheme was composed of two overlapping phases led by Abarbanel: a domestic phase, lasting from approximately March 2017 through February 2019, and an offshore phase, lasting from approximately March 2018 through June 2021.  In both domestic and offshore phases, the Defendants engaged in similar tactics to solicit and then misuse investor funds, as described herein:  making false and misleading statements about the Funds; using the Funds to enter into unauthorized, uncollateralized loan transactions with counterparty shell companies that Defendants controlled; and then using misappropriated investor funds to engage in unauthorized, often high-risk, trading activities to benefit themselves, but not the Funds or their investors.

4.      **The Domestic Phase:**  From approximately March 2017 through February 2019, Abarbanel and NY Alaska perpetrated the fraudulent scheme through State Funds, the United States-based mutual fund registered with the SEC that Abarbanel formed and controlled, with the assistance of Chilelli.  Despite telling investors that State Funds was going to invest, and had invested, in certain types of conservative, asset-backed securities transactions known as reverse

repurchase agreements ("Reverse Repos")[1] with independent financial institutions, Abarbanel and NY Alaska instead caused State Funds to enter into unauthorized, uncollateralized loan transactions with counterparty shell companies that Abarbanel and Chilelli created and controlled.

5.     The domestic phase lasted until early 2019, when certain investors became suspicious and began to make inquiries into State Funds and its investment activities.  In February 2019, in the face of such scrutiny, Abarbanel closed down State Funds, and transferred operations to the Income Collecting Fund, the offshore fund registered in the Cayman Islands that Abarbanel formed and controlled, with the assistance of Chilelli.

6.     When closing down State Funds in early 2019, Abarbanel and NY Alaska forced U.S. investors to redeem their shares and close out their investments, and moved non-U.S. investors to the Income Collecting Fund.  Because there were insufficient assets available to provide full redemptions to State Funds' investors, Abarbanel had to commingle and misappropriate new funds invested by Income Collecting Fund investors in order to pay off the older State Funds investors.  Thus, although all investors in State Funds were fully redeemed, it

---

[1]     The Securities Industry and Financial Markets Association ("SIFMA"), describes repurchase agreements, and the other side of these collateralized lending transaction, reverse repurchase agreements, as follows:

> A repurchase agreement [] is a financial transaction in which one party sells an asset to another party with a promise to repurchase the asset at a pre-specified later date (a reverse repo is the same transaction seen from the perspective of the security buyer).  … The repo market enables market participants to provide collateralized loans to one another, and financial institutions predominantly use repos to manage short-term fluctuations in cash holdings, rather than general balance sheet funding.  …  Repos offer cash providers collateralization (with additional margin requirements in most cases) marked-to-market daily to ensure continuing protection.

*See* SIFMA, US Repo Market Fact Sheet (January 19, 2021) (available at *https://www.sifma.org /resources/research/us-repo-market-fact-sheet*).

was at the expense of new investors in the Income Collecting Fund—a hallmark of a typical Ponzi scheme.

7.    **The Offshore Phase:**  Following the closure of State Funds, Abarbanel, Chilelli, and the Income Collecting Fund continued to perpetrate their fraudulent course of conduct through the Cayman Islands registered Income Collecting Fund, using the same tactics employed during the domestic phase.  The Income Collecting Fund, in contrast to State Funds, was not registered with the SEC and did not issue public filings with the SEC, and thus provided no comparable disclosure about its operations to United States regulators.

8.    Between approximately March 2019 and June 2021, Abarbanel and the Income Collecting Fund entered into similar unauthorized, uncollateralized loan transactions with nominee shell companies that Abarbanel and Chilelli controlled, while misrepresenting to investors that the transactions were collateralized Reverse Repos entered into with independent third parties.

9.    Abarbanel, Chilelli, and the Income Collecting Fund continued the offshore phase of the scheme through 2019, 2020, and into 2021.  In February 2021, the United States Attorney's Office for the Southern District of New York (USAO) approached Chilelli and another individual associated with State Funds and the Income Collecting Fund, revealing a criminal investigation into the Funds.  Around the same, the SEC issued subpoenas to Abarbanel and others, in which the SEC disclosed its own investigation of Abarbanel and the Funds. Confronted by these investigations, Abarbanel again forced investors to redeem, ultimately paying back all investors in the Income Collecting Fund, with the exception of its largest group of investors, Investor Group A.  At the time of the forced redemptions, Investor Group A had approximately $106 million in assets invested with the Income Collecting Fund.

10.     In May 2021, Investor Group A demanded a full redemption of its $106 million outstanding investment in the Income Collecting Fund.  Due to Defendants' misappropriation, dissipation, and depletion of investor deposits, however, Abarbanel and the Income Collecting Fund were without sufficient funds to redeem Investor Group A.  Instead of returning the remaining funds to Investor Group A, Abarbanel and the Income Collecting Fund engaged in pretextual actions, and made material misrepresentations to Investor Group A, to avoid Investor Group A's redemption demands, in violation of the redemption terms in the Income Collecting Fund's prospectus.

11.     Abarbanel formed, controlled, and operated the Funds and NY Alaska.  Abarbanel and NY Alaska are investment advisers, and as such, owed their client, State Funds, fiduciary duties that encompassed a duty of loyalty to the Fund.

12.     Abarbanel and Chilelli also formed, controlled, and/or operated two limited liability companies (LLCs), Institutional Syndication LLC ("IS"), and North American Liquidity Resources LLC ("NALR") that they used, as counterparty shell companies, to enter into the unauthorized, uncollateralized lending agreements with the Funds, as described herein.

13.     Abarbanel and Chilelli also formed, controlled, and/or operated at least four other LLCs, which they used to receive, hold, transfer, and misappropriate investors' assets in furtherance of the scheme:  Institutional Secured Credit LLC ("ISC"), Growth Income Holdings LLC ("GIH"), CLO Market Neutral LLC ("CLO"), and Global EMEA Holdings LLC ("EMEA").

14.     These LLCs formed, controlled, and/or operated by Abarbanel and Chilelli (IS, NALR, ISC, GIH, CLO, and EMEA) are Relief Defendants that received ill-gotten proceeds of the fraudulent scheme that are subject to disgorgement.

15.     On June 18, 2021, to preserve the status quo and prevent further misappropriation, dissipation, and depletion of assets, the SEC moved the Court by an emergency *ex parte* application to freeze Income Collecting Fund assets and for other relief.  On that date, the Court granted the SEC's emergency application, freezing designated accounts containing Income Collecting Fund assets.  On June 23, 2021, the USAO filed a two-count complaint (Securities Fraud and Wire Fraud) against Abarbanel in the Southern District of New York, *United States v. Abarbanel,* 1:21-mj-06425-UA (S.D.N.Y).

16.     **Summary of Fraudulent Conduct:**  As detailed below, the fraudulent scheme that Abarbanel organized and implemented involved a number of common deceptive acts, and false and misleading statements of material fact, in both the domestic and offshore phases. These include:

a.     **Making False Representations About the Funds and Funds Investments.**

From at least March 2017 through May 2021, Abarbanel caused NY Alaska (for State Funds) and the Income Collecting Fund to issue documents in public filings (State Funds), and in prospectuses, website postings, fact statements, and other communications with investors (both Funds) (collectively, "Funds Documents"), making materially false and misleading representations about the Funds' investments and investment strategies, the Reverse Repos they claimed to be entering into, and the Funds' holdings, earnings, and performance.  Given Abarbanel's control over the Funds, NY Alaska, the Relief Defendants, and the transactions that these entities entered into, Abarbanel (and thus NY Alaska) knew at the time that the statements were made, or was reckless in not knowing, that they were materially false and misleading.

b. **Soliciting and Receiving Investor Deposits.**  From March 2017 through February 2021, Defendants solicited, and investors deposited, in total, more than $200 million into accounts held by the Funds, while contemporaneously, Abarbanel, NY Alaska, and persons under Abarbanel's direction and control, issued materially false and misleading representations to investors in Funds Documents and other communications.

c. **Entering Into Unauthorized, Unsecured Lending Transactions With Nominee Shell Companies.**  As soon as investors deposited their assets into Funds' accounts, Abarbanel caused and directed NY Alaska (for State Funds) and the Income Collecting Fund to enter into purported Reverse Repo loan transactions with IS and NALR, the nominee shell companies that Abarbanel and Chilelli, at Abarbanel's direction, formed and controlled for this purpose.  These loan transactions were not secured or collateralized; were not made in arms-length transactions with independent, well-funded institutions; and were far removed from the type of secured, collateralized Reverse Repos represented, promised, and required in Funds Documents.

d. **Transfer of Funds to Shell Companies.**  Abarbanel then directed and caused NY Alaska (for State Funds) and the Income Collecting Fund to transfer investor deposits from the Funds' bank accounts to bank accounts that Abarbanel and Chilelli, at Abarbanel's direction, set up in the names of IS and NALR.

e. **Misappropriation of Funds Assets through Unauthorized Trading in Relief Defendant Accounts.**  Abarbanel and Chilelli, at Abarbanel's direction, then directed and caused IS and NALR to transfer investor funds to brokerage accounts

in the names of IS, NALR, and other nominee shell companies that Abarbanel and

Chilelli controlled, including Relief Defendants ISC, GIH, CLO, and EMEA.

From these brokerage accounts, Abarbanel and Chilelli, at Abarbanel's direction,

then used investor assets to engage in tens of millions of dollars worth of

unauthorized securities trading, for Abarbanel's own benefit, not for the benefit of

the Funds or their investors.  The trading was often on margin (using funds

borrowed from the brokerage firm), and often employed high-risk, volatile

options and futures trading strategies—*far different* from the conservative,

collateralized Reverse Repos described in Funds Documents.  In essence,

Abarbanel was using Funds investors' assets as "house money" to speculate and

gamble at no risk to his own wealth.

f.  **Misappropriation and Depletion of Investor Funds:**  Throughout the course of

the fraudulent scheme, Abarbanel, NY Alaska, and the Income Collecting Fund

misappropriated, dissipated, and depleted tens of millions of dollars worth of

investor assets through trading losses and other unauthorized diversions of funds.

**Trading losses:**  Abarbanel's high-risk trading strategies, in both the

domestic and offshore phases, were unsuccessful, leading to millions of dollars of

trading losses during the Relevant Period.  Abarbanel attempted to conceal these

losses from investors using various methods, including making false statements in

Funds Documents and other communications; repeatedly rolling over the

purported Reverse Repos entered into between the Funds and his nominee shell

companies; commingling assets; and eventually, by using new investors' funds to

pay off old investors—a hallmark of a typical Ponzi scheme.

**Diversion of Funds:**  During the Relevant Period, Abarbanel also directed the Funds and Relief Defendants to make and effect other unauthorized transfers of cash for his own benefit.  For example, in March 2020, Abarbanel caused ISC to enter into sham lending and assignment agreements with the Income Collecting Fund and NALR that improperly relieved Abarbanel of the obligation to repay approximately $5.6 million he previously misappropriated and diverted to ISC (and other entities, including EMEA) for his personal use.  On June 4, 2021, Abarbanel directed and caused the Income Collecting Fund to transfer $64 million of Investor Group A's assets into a brokerage account from which no redemptions could be drawn, and from which investor funds were subject to further misappropriation, dissipation, and depletion.  On or about June 16, 2021, two days before this action was commenced, Abarbanel directed and caused the Income Collecting Fund to transfer $10 million of Investor Group A's assets to a brokerage account held by then-counsel to the Income Collecting Fund.

17.    By engaging in the above-described misconduct, Defendants have violated, and unless restrained and enjoined will continue to violate, the antifraud provisions of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77 et seq.] and the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78 et seq.] and rules thereunder.  Abarbanel and NY Alaska have further violated, and unless restrained and enjoined will continue to violate Sections 206(1), (2), and (4) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-6(1), (2), and (4)] ("Advisers Act") and Rule 206(4)-8 thereunder, and Section 34(b) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-33(b)].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

18.     The SEC brings this action pursuant to Section 20(d) of the Securities Act

[15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 209(b) of

the Advisers Act [15 U.S.C. § 80b-9(d)], and Sections 42(d) and (e) of the Investment Company

Act [15 U.S.C. §§ 80a-41(d) and 80a-41(e)] to seek an order enjoining the transactions, acts,

practices, and courses of business alleged in this Complaint, disgorgement of ill-gotten gains,

civil penalties, and such further relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b),77t(d) and 77v(a)], Sections 21(d), 21(e), and 27

of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], Sections 209(d), 209(e), and 214

of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14], Sections 42(d), 42(e), and 44 of

the Investment Company Act [15 U.S.C. §§ 80a-41(d), 80a-41(e), 80a-43], and 28 U.S.C.

§ 1331.

20.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants transact

business in this District, and certain of the acts, practices, transactions, and courses of business

constituting the violations alleged in this Complaint occurred within this District, and were

effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of

transportation or communication in interstate commerce, or of the mails, or the facilities of

national securities exchanges.

## DEFENDANTS

21.     **Ofer Abarbanel**, age 47, is a citizen of Israel, and has resided in Woodland Hills,

California since at least 2016.  Abarbanel carries an Israeli passport.  From at least October 2014

to the present, Abarbanel was the owner and sole control person for NY Alaska, a limited

liability company registered with the SEC as an investment adviser from approximately January

2015 to March 2019.  From his residence in California, Abarbanel also exercised full control

over the Funds, their operations and investments, and their dealings with investors.  Abarbanel

also controls the Relief Defendants.  He directed Chilelli to form IS and NALR, and is the named

manager of ISC, CLO, and GIH.  Abarbanel also controls bank accounts in at least Israel,

Singapore, and the Cook Islands—and likely the Cayman Islands and the Bahamas—in his name

and in the names of the Funds, ISC, T-Bill Securities, CLO, and EMEA.

22.     **Victor Chilelli**, age 52, is a United States citizen residing in Lewes, Delaware.

Until 2020, Chilelli resided in Staten Island, New York.  Until November 2016, Chilelli was

Portfolio Manager for NY Alaska.  Until October 2017, Chilelli was Deputy Compliance Officer

for State Funds.  At all relevant times, Chilelli provided substantial assistance to Abarbanel, NY

Alaska, and the Income Collecting Fund in their execution of the fraudulent scheme.  In

particular, at Abarbanel's direction, Chilelli participated in the component of the scheme

involving the unauthorized transfer of Funds assets to IS and NALR and the other Relief

Defendants.

23.     **Income Collecting 1-3 Months T-Bills Mutual Fund (the "Income Collecting

Fund")** is a mutual fund registered in the Cayman Islands (registration number CR-319456),

which consists of multiple share classes quoted on the Nasdaq market headquartered in New

York City and using Nasdaq symbols including "BILLX," "GOVAX," "GOVBX," "GOVDX,"

11

"GOVTX," and "USABX."  As of May 21, 2021, all share classes in the Income Collecting Fund

other than GOVBX have been fully redeemed.  The Income Collecting Fund is not registered

with the SEC, and has or had directors on its Board of Trustees located in New York, Florida,

California, the Cayman Islands, and the British Virgin Islands.  The Income Collecting Fund's

custodian is a bank account located in San Francisco (the "Income Collecting Fund Bank

Account"), its brokerage account is located in New York City, its investment adviser is located

in Nevada and/or the Bahamas, and its administrator is located in Ohio.  At relevant times, the

registered investment adviser for Investor Group A has been located in California and/or Utah,

and Abarbanel, Chilelli, and other Income Collecting Fund representatives had regular

communications with this investment adviser during the course of the scheme.  On or about June

21, 2021, shareholders and/or directors of the Income Collecting Fund caused the fund to enter

into voluntary liquidation in the Cayman Islands, appointed certain individuals to act as Joint

Voluntary Liquidators, and subsequently filed a petition to make the liquidation subject to the

supervision of the Grand Court of the Cayman Islands.  On or about October 11, 2021, the Grand

Court of the Cayman Islands declined to appoint the Joint Voluntary Liquidators as Joint Official

Liquidators to control the Fund, and instead appointed certain other individuals to act as Joint

Official Liquidators.

      24.    **New York Alaska ETF Management LLC ("NY Alaska")** is a Nevada Limited

Liability Company domiciled and headquartered in Nevada, and was the designated investment

adviser to State Funds during the period that State Funds operated.  NY Alaska was registered

with the SEC as an investment adviser from January 2015 to March 2019, when it terminated its

registration.  Abarbanel was the sole owner of NY Alaska and served as the firm's Chief

Executive Officer, Chief Financial Officer, and Chief Compliance Officer.

## RELIEF DEFENDANTS

25.     As alleged herein, the Relief Defendants received investor funds and/or ill-gotten

proceeds of the fraudulent scheme alleged herein, subject to disgorgement, for which they gave

no bona fide consideration and to which they have no legitimate claim.

26.     **Institutional Syndication LLC (IS)** is a New Jersey Limited Liability Company

formed by Chilelli on October 31, 2017, domiciled and headquartered in New Jersey.  IS is a

shell company, formed, controlled, and operated by Abarbanel and Chilelli, at Abarbanel's

direction, which they used to enter into unauthorized, uncollateralized lending transactions with

the Funds, in furtherance of their scheme.  From March 2019 through November 2020,

Abarbanel, and Chilelli and the Income Collecting Fund, acting at Abarbanel's direction,

transferred approximately $2,030,000 of funds invested by Investor Group A into IS accounts.

During the Relevant Period, IS received other assets that orginated from, and/or are traceable to,

investors' deposits into the Funds.  IS has no legitimate claim to those funds.

27.     **North American Liquidity Resources LLC (NALR)** is a Nevada limited

liability company, formed by Chilelli on October 17, 2017, domiciled and headquartered in

Nevada.  NALR is a shell company, formed, controlled, and operated by Abarbanel and Chilelli,

at Abarbanel's direction, which they used to enter into unauthorized, uncollateralized lending

transactions with the Funds, in furtherance of their scheme.  From March 2019 through

November 2020, Abarbanel, and Chilelli and the Income Collecting Fund, acting at Abarbanel's

direction, transferred approximately $102,000,000 of funds invested by Investor Group A into

NALR accounts.  During the Relevant Period, NALR received other assets that orginated from,

and/or are traceable to, investors' deposits into the Funds.  NALR has no legitimate claim to

those funds.

28. **Institutional Secured Credit LLC (ISC)** is a Nevada limited liability company domiciled and headquartered in Nevada. Abarbanel formed, controlled, and operated ISC. Abarbanel, and Chilelli, at his direction, used ISC to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds. In particular, during the Relevant Period, Abarbanel used ISC accounts to fund his own lifestyle, including paying his personal credit card bills and other personal expenses. From at least May 2019 through April 2021, Abarbanel, and Chilelli and the Income Collecting Fund, acting at Abarbanel's direction, transferred at least $627,000 worth of investors' assets into ISC accounts. During the Relevant Period, ISC received other assets that orginated from, and/or are traceable to, investors' deposits into the Funds. ISC has no legitimate claim to those funds.

29. **Growth Income Holdings LLC (GIH)** is a Nevada limited liability company domiciled and headquartered in Nevada. Chilelli is the sole owner of GIH. Abarbanel and Chilelli, at his direction, used GIH to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds. From at least April 2019 through January 2021, Abarbanel, and Chilelli and the Income Collecting Fund, acting at Abarbanel's direction, transferred at least $9.4 million worth of investors' assets into GIH accounts. During the Relevant Period, GIH received other assets that orginated from, and/or are traceable to, investors' deposits into the Funds. GIH has no legitimate claim to those funds.

30. **CLO Market Neutral LLC (CLO)** is a Nevada Limited Liability Company domiciled and purportedly headquartered in Nevada. Abarbanel, formed, controlled, and operated CLO. Abarbanel and Chilelli, at his direction, used CLO to hold and transfer proceeds of the fraudulent scheme, including Investor Group A's funds. From at least May 2019 through May 2021, Abarbanel, and Chilelli and the Income Collecting Fund, acting at Abarbanel's

direction, transferred at least $700,000 worth of investors' assets into CLO accounts. During the Relevant Period, CLO received other assets that orginated from, and/or are traceable to, investors' deposits into the Funds. CLO has no legitimate claim to those funds.

31.    **Global EMEA Holdings LLC (EMEA)** is a Nevada Limited Liability Company domiciled and purportedly headquartered in Nevada. Abarbanel formed, controlled, and operated EMEA. From at least October 15, 2019 through August 18, 2020, Abarbanel, and Chilelli and the Income Collecting Fund, acting at Abarbanel's direction, transferred at least $1.4 million of investors' assets into EMEA accounts. During the Relevant Period, EMEA received other assets that orginated from, and/or are traceable to, investors' deposits into the Funds. EMEA has no legitimate claim to those funds.

## RELATED ENTITIES

32.    **State Funds – Enhanced Ultra-Short Duration Mutual Fund ("State Funds")** was an open-end mutual fund registered with the SEC as an investment company (ticker symbol STATX), organized as a Delaware statutory trust, and headquartered in Las Vegas, Nevada. Formerly known as "State Trust," State Funds filed a registration statement on Form N-1A that became effective on March 9, 2017 and filed an application for deregistration due to liquidation on February 27, 2019.

## FACTUAL ALLEGATIONS

I.    **The Domestic Phase—Using State Funds To Engage In Sham Reverse Repos With Nominee Shell Companies that Abarbanel Controlled**

A.    **Abarbanel and NY Alaska Form State Funds and Solicit Investors**

33.    On July 19, 2016, Abarbanel filed a registration statement with the SEC for State

Funds, an open-end mutual fund.[2]  Abarbanel signed as Trustee, President, CEO, CFO, and

CCO.  NY Alaska, controlled by Abarbanel, was the registered investment adviser for State

Funds.  State Funds' amended registration statement became effective on March 9, 2017.

34.    Abarbanel and NY Alaska then began soliciting investors in State Funds, and

were successful in doing so.  From March 2017 through February 2019, individual investors and

groups of investors invested more than $90 million with State Funds, receiving shares in State

Funds in exchange.  In its fiscal year 2018 Brochure, NY Alaska reported that State Funds had

$90.5 million in assets under management.

35.    Abarbanel prepared and signed all public SEC filings for State Funds, including

the registration statements, the prospectus and proxy materials, and the annual, semi-annual, and

quarterly reports to shareholders ("Public Filings").  When signatures of the trustees were

required, Abarbanel signed on the trustees' behalf, pursuant to a power of attorney.

**B.    Abarbanel and NY Alaska Made Misrepresentations and Misleading Omissions of Material Facts in State Funds' Public Filings**

36.    After forming State Funds, from March 2017 through December 2018, Abarbanel

directed NY Alaska to issue and file a number of Public Filings with the SEC on behalf of State

Funds on the SEC's public database, EDGAR,[3] including prospectuses, quarterly and annual

statements, and other documents that described, among other things, State Funds' management,

structure, investment strategy, risk profile, investments, holdings, assets, earnings, dividends, and

anticipated returns.

---

[2]    Open-end mutual funds typically do not limit the number of shares they can offer, and are bought and sold on demand.  When an investor purchases shares in an open-end fund, the fund issues those shares, and when the investor sells (redeems) shares, they are bought back by the fund.  (*See https://www.finra.org/investors/learn-to-invest/types-investments/investment-funds/mutual-funds*).

[3]    EDGAR, the Electronic Data Gathering, Analysis, and Retrieval system, is the primary system for companies and others submitting documents under the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, and the Investment Company Act of 1940.  (*See* https://www.sec.gov/edgar/about).

37.     The Public Filings contained numerous false and misleading statements and omissions of material fact about State Funds and its investments.  A list of these misrepresentations is set forth in **Appendix A**.  Set forth below are representative examples:

38.     On March 7, 2017, Abarbanel directed NY Alaska to issue a form N-1A/A registration statement on behalf of State Funds, and published it on EDGAR.  In this registration statement, State Funds described its "Principal Investment Strategies" as including:

> In order to enhance income, the Fund intends to enter into securities lending, repurchase agreement and/or reverse repurchase agreement transactions that provide the Fund with income at either fixed or floating (variable) interest rates and fees. The Fund may lend its portfolio of securities to broker/dealers, institutional investors, banks, mutual funds, and insurance and/or reinsurance companies located in one of the member countries of The Organization for Economic Co-operation and Development ("OECD").

39.     This representation was materially false and misleading.  As set forth further herein, State Funds did not lend its portfolio of securities to anyone.  Further, the purported Reverse Repo transactions State Funds entered into, as described herein, were with IS and NALR, single-member shell LLCs with no operations or assets outside of their dealings with State Funds; they were not broker/dealers, institutional investors, banks, mutual funds, or insurance/reinsurance companies.  This description of fund counterparties also was rendered materially false and misleading by the omission of any disclosure that State Funds' manager and control person, Abarbanel, also controlled IS and NALR, the counterparties to these transactions.

40.     In the same registration statement, Abarbanel and NY Alaska further described State Funds' "Principal Investment Strategy" as:

> Securities lending allows the Fund to retain ownership of the securities loaned and, at the same time, earn additional income from fees paid by borrowers.  Loans will be made only to parties who have been reviewed and deemed satisfactory by New York Alaska ETF Management LLC, the Fund's investment adviser (the "Adviser"), pursuant to guidelines adopted by the Board of Trustees (the "Board" or the "Board of Trustees") of State Trust (the "Trust") . . . .

41.     This representation was rendered materially false and misleading through the

omission of material conflicts of interest.  First, Abarbanel and NY Alaska did not disclose that

IS and NALR, the counterparties to State Funds' purported securities lending, were controlled by

Abarbanel—the control person for State Funds and NY Alaska.  Second, Abarbanel and NY

Alaska did not disclose that State Funds' Board of Trustees was also controlled by Abarbanel,

who could not exercise independent judgment.

42.     In the same registration statement, Abarbanel and NY Alaska further described

State Funds' "Principal Investment Strategy" as:

> Loans will be made only to parties who have been reviewed and deemed satisfactory . . .
> and which provide collateral, which is either (i) 102% cash or (ii) 102%–115% U.S.
> government securities.  The collateral is marked to market daily and, if the value of the
> existing collateral decreases or the value of the securities lent increases, the borrower will
> be required to post additional collateral.

43.     This representation was materially false and misleading.  State Funds made loans

to IS and NALR without receiving *any* collateral in the form of cash or United States

government securities.

44.     In the same registration statement, Abarbanel and NY Alaska further described

State Funds' "Principal Investment Strategy" as:

> Repurchase transactions involve the purchase of securities with an agreement to resell the
> securities at an agreed-upon price, date and interest payment.  Reverse repurchase
> transactions involve the sale of securities with an agreement to repurchase the securities
> at an agreed-upon price, date and interest payment and have the characteristics of
> borrowing.  Proceeds (collateral) received with respect to reverse repurchase agreements
> include cash, U.S. Treasury securities or debt instruments secured by U.S. Treasury
> securities.

45.     This representation was materially false and misleading.  State Funds did not sell

securities to IS or NALR, and IS and NALR did not sell securities to State Funds.  State Funds

did not receive cash, Treasuries, or "debt instruments secured by Treasuries" as collateral for the

Reverse Repos.  Although State Funds received purported debt instruments from IS and NALR (which Abarbanel falsely characterized as "secured notes" or "secured bonds") these debt instruments were unsecured promissory notes and did not constitute the promised liquid, secure collateral.

46.    In the same registration statement, Abarbanel and NY Alaska further described State Funds' "Principal Investment Strategy" as:  "The Fund will earmark or establish a segregated account in which it will maintain cash, U.S. Treasury securities or other liquid portfolio securities equal in value to its obligations in respect of reverse repurchase agreements."

47.    This representation was materially false and misleading.  Abarbanel and NY Alaska did not cause State Funds to earmark or establish a segregated account to hold cash, Treasuries, or other liquid portfolio securities equal in value to its obligations in respect of the Reverse Repos.  No such collateral was ever received by State Funds or its custodian.

48.    In the same registration statement, Abarbanel and NY Alaska described State Funds' Fund Distributions, and its Dividends and Distributions policies, as follows:

FUND DISTRIBUTIONS

The Fund distributes substantially all of its net investment income to shareholders in the form of dividends.  The Fund intends to declare and distribute income dividends every two weeks to shareholders of record.  In addition, the Fund distributes any net capital gains it earns from the sale of portfolio securities to shareholders no less frequently than annually.  Net short-term capital gains may be paid more frequently.  Dividend payments are made through DTC participants and indirect participants to beneficial owners then of record with proceeds received from the Fund.

* * * *

DIVIDENDS AND DISTRIBUTIONS

General Policies

Dividends from net investment income, if any, are declared and paid every two weeks by the Fund. Distributions of net realized capital gains, if any, generally are declared and paid once a year, but the Trust may make distributions on a more frequent basis for the

Fund to comply with the distribution requirements of the Internal Revenue Code, in all
events in a manner consistent with the provisions of the 1940 Act.  It is currently
expected that the Fund will distribute virtually all of its net income (interest less
expenses) monthly while capital gains distributions will generally occur annually in
December.

49.     These representations were materially false and misleading.  Abarbanel and NY

Alaska did not cause State Funds to pay or distribute any dividends to investors from net

investment income, much less on a biweekly, monthly, or even yearly basis.

50.     As detailed in **Appendix A**, Abarbanel and NY Alaska also caused State Funds to

make similar materially false and misleading representations about the fund's investments,

assets, earnings, income, holdings, dividends, and distributions in other public filings, including

Forms N-CSR (filed on June 30, 2017, December 31, 2017, June 30, 2018), a Form N-CSR/A

(filed on December 31, 2018), a Form 485POS (filed on March 29, 2018), and Forms N-Q (filed

on March 31, 2018 and September 30, 2018).  Each of these filings was submitted to the SEC

and made available to the public on EDGAR.

51.     Abarbanel and NY Alaska also directed and caused State Funds to make these

same types of materially false and misleading representations in Fact Sheets posted to State

Funds' website between 2017 and 2019, and also emailed to investors.  For example, a "Fact

Sheet" that Abarbanel directed to be prepared and posted on State Funds' website on or about

January 2, 2018—and that Abarbanel separately emailed to prospective investors—stated that, as

of January 2, 2018, State Funds' "major holdings" were in U.S. Treasury Bills, amounting to

74.70% of the fund's holdings, and in "Overnight Reverse Repo," representing 23.94% of the

portfolio.

52.     In addition, the "Fact Sheet" stated that State Funds:

a.   "seeks to provide current income consistent with preservation of capital and daily

liquidity."

 b. has "major holdings [in] 3 Month US Treasuries"

 c. "is permitted to enter into fixed/variable interest rate securities lending,

  Repurchase & Reverse Repurchase agreements with banks, broker/dealers,

  institutional investors, institutional investment manager(s), mutual funds,

  insurance and/or reinsurance companies" in order "to increase income."

 d. engaged in lending transactions as follows:

  Repurchase and Reverse Repurchase transactions – those are transactions
  in which the fund purchases securities as either lender or borrower ***with
  the agreement to sell them at a higher price*** at a specific future date.

  Securities Lending transactions – Securities Lending transactions allow a
  Fund to retain ownership of the securities loaned and, at the same time,
  ***earn additional income from fees paid by borrowers***.  (emphasis in
  original)

 e. "receives securities lending collateral which is limited to (i) 102% cash or

  (ii) 102% - 115% US Government Securities."

 53. These representations were materially false and misleading.  As discussed herein,

State Funds did not enter into any arms-length secured or collateralized Reverse Repos with

independent third parties, and State Funds did not receive cash, "US Government Securities," or

"excess collateral" to secure its lending activity.

 54. Abarbanel and NY Alaska made additional misrepresentations and omissions of

material fact in Fact Sheets posted on State Funds' website about interest payments.  For

example, in Fact Sheets published on the Fund's website from 2017 to 2019, Abarbanel told

State Funds' investors that the counterparties to the Reverse Repos would make significant

interest payments, which would enhance State Funds' investment income.  In reality, however,

Abarbanel knew, or was reckless in not knowing, that IS and NALR did not have a source of

income from which to make such payments (absent a big win from his unauthorized risky trading strategies, as outlined herein), and that such payments were not being made.

55.    As described herein, given that Abarbanel (i) formed and had control over State Funds' accounts into which assets were deposited, and from which assets were withdrawn; (ii) directed the formation of, and controlled the nominee shell companies, IS and NALR, that entered into the unauthorized, uncollateralized loan agreements with State Funds; (iii) directed the transfer of cash from State Funds to IS and NALR, and also to the other Relief Defendants; and (iv) directed and controlled all trading and other activities of the nominee shell companies IS, NALR, and the other Relief Defendants, Abarbanel and NY Alaska knew at the time that they made all of the above misrepresentations, or were reckless in not knowing, that the statements were false and misleading.

### C.    Abarbanel and NY Alaska Create Nominee Shell Counterparties IS and NALR to Enter into Unauthorized Loan Agreements with State Funds

56.    As described above, in State Funds' Public Filings, Fact Sheets, and other documents issued to investors, Abarbanel and NY Alaska represented that State Funds would invest primarily in Treasuries, or in Reverse Repos collateralized by Treasuries, entered into with independent, well-funded, third parties.  This did not happen.  Instead, Abarbanel and NY Alaska directed and caused State Funds to enter into unsecured, uncollateralized loan transactions with nominee shell entities that Abarbanel controlled.  And these unsecured, uncollateralized loan transactions formed the core of their fraudulent scheme.

57.    Although in early 2017, State Funds initially entered into a handful of Reverse Repos with an independent counterparty, those agreements were short-lived.  In or about October 2017, frustrated that he lacked control over the independent counterparty to State Funds' Reverse Repos, Abarbanel terminated these Reverse Repos with the independent counterparty and

instructed Chilelli to form two LLCs that Abarbanel could control going forward for the purpose of entering into purported Reverse Repos with State Funds.

58.     In December 2017, following Abarbanel's directive, Chilelli formed IS and NALR, which immediately assumed all of the prior Reverse Repos from the independent counterparty.

59.     From that point forward, Abarbanel and NY Alaska did not invest State Funds' investors' assets in Treasuries or Reverse Repos, as they represented and promised.  Instead, from late 2017 until early 2019, Abarbanel and NY Alaska transferred investors' funds to accounts in the names of IS and NALR, in exchange for unsecured, uncollateralized loan agreements.  The loan agreements were memorialized in the form of boilerplate Global Master Repurchase Agreements ("GMRAs") executed by State Funds and the particular counterparty to the transaction, IS or NALR, that Abarbanel caused and directed to be updated for each particular loan transaction.  These loan agreements were purportedly secured by a form of promissory note that Abarbanel referred to in correspondence with State Fund's custodian and counterparties as "secured bonds" or "secured notes," although they did not function as either secured bonds or secured notes.  They were not collateralized or secured, as indicated in the notes, and did not provide the type of liquid, secure collateral promised and represented in the Public Filings and Fact Sheets.

60.     Although these unsecured, uncollateralized loan agreements memorialized by the GMRAs purported to be Reverse Repos of the type Abarbanel and NY Alaska represented in State Funds' Public Filings, in fact, they were in no meaningful way similar to the promised secured, collateralized Reverse Repo transactions.  They differed in at least three fundamental ways:

61.     *First*, the counterparties IS and NALR were not well-funded, independent third parties; they were nominee shell companies controlled by Abarbanel and Chilelli (at Abarbanel's direction).  State Funds' Public Filings disclosed that the fund "may enter into repurchase agreements with broker/dealers, institutional investors, institutional investment managers, banks, mutual funds, and insurance and/or reinsurance companies."  Counterparties IS and NALR did not fall into any of these categories.  IS and NALR were single-member LLCs formed and controlled by Abarbanel and Chilelli with no capitalization, no source of funds other than investors' cash transferred from State Funds, and no other business purpose or activities except to be counterparties to State Funds in the unsecured, uncollateralized loan transactions described above, and then vehicles for the receipt and transfer of investor cash in other unauthorized transactions.

62.     *Second*, no Reverse Repos, as described in State Funds' Public Filings, were executed.  The Public Filings described the Reverse Repos as follows:  "[T]he Fund enters into a contract with a counterparty under which (i) the Fund sells securities for cash or cash equivalents to the counterparty, and (ii) the Fund agrees to repurchase the securities at an agreed-upon price, date, and interest payment."  This never happened.  Although State Funds' schedule of investments included a number of purported Reverse Repos, State Funds never sold or transferred securities to any counterparty.  Nor did any counterparty ever send cash or cash equivalents to State Funds or its custodian.  Rather, State Funds sent cash to IS and NALR, and got nothing in return except the unsecured, uncollateralized promissory notes described above.

63.     *Third*, no collateral was exchanged.  State Funds' public filings stated that loans would only be made to parties who "provide collateral, which is either (i) 102% cash or (ii) 102-115% U.S. government securities."  Likewise, the schedules of investments filed by State Funds

represented that collateral was 102-103% of the amount of the principal for each purported

Reverse Repo listed, and described the collateral by reference to specific U.S. Treasury Bills and

their maturation dates.  This never happened.  In reality, there was *no* collateral exchanged for

the cash payments that State Funds sent to IS and NALR, and State Funds did not receive cash or

Treasuries from IS or NALR in exchange for the cash payments, only unsecured promissory

notes of the type described above.

64.    Abarbanel and NY Alaska's representations in the Public Filings and Fact Sheets

concerning secure, liquid collateralization were *critical* to the investment decisions of investors

(including Investor Group A, as described below).  A reasonable investor reading the Public

Filings and Fact Sheets would expect, believe, and understand that the transactions entered into

by State Funds would be conservative and low-risk because they were secured by unencumbered

Treasuries in State Funds' possession, which could be easily liquidated in the event of default.

65.    Investors were deceived and misled by way of the lack of collateral transferred

back to State Funds in exchange for the tens of millions worth of investors' deposits that

Abarbanel and NY Alaska caused to flow to nominee shell companies IS, NALR, and the other

Relief  Defendants.

**D.    Abarbanel Used Investor Funds to Engage in Unauthorized High-Risk
       Trading In The Relief Defendants' Accounts**

66.    After (i) causing State Funds to enter into the unauthorized, uncollateralized loan

transactions with IS and NALR, purporting to be Reverse Repos; and (ii) transferring State

Funds' investor deposits into IS and NALR accounts that he controlled, Abarbanel now had

access to tens of millions of dollars of investor cash with which he could unlawfully speculate

and gamble, as he saw fit, at no risk to his own personal wealth.

67.    Between March 2017 and February 2019, Abarbanel and Chilelli, under

Abarbanel's direction, directed and caused IS and NALR to engage in numerous unauthorized, often high-risk securities transactions using State Funds' investors' deposits as capital. These unauthorized trading processes generally entailed the following steps:

68.     First, Abarbanel and Chilelli, under his direction, used State Funds' investor assets to establish and fund brokerage accounts in the names of IS and NALR. The dollars transferred to IS and NALR accounts purported to correspond to the amount of funds that State Funds "loaned" to IS and NALR as part of the unsecured, uncollateralized loan transactions described herein.

69.     Now, having millions of dollars of State Funds' investors' cash at his disposal, Abarbanel, and Chilelli, under his direction, used the cash to engage in tens of millions of dollars worth of unauthorized securities transactions in the name of, and for the benefit of Abarbanel, Chilelli, IS, and/or NALR, *not* State Funds or its investors. These unauthorized securities transactions often were on margin (using funds borrowed from the brokerage firm), transacted in margin accounts, and often employed high-risk options and futures strategies. These volatile, high-risk securities transactions, directed and controlled by Abarbanel, were contrary to the conservative, secure transactions that Abarbanel and NY Alaska described and promised that State Funds would enter into in the Public Filings and Fact Sheets, as described above.

70.     In essence, Abarbanel's plan (in both the Domestic Phase and Offshore Phase) involved using investors' assets as "house money" with which to speculate and gamble. If Abarbanel "won" his bets using investor funds, and his high-risk trades were successful, he could cover the interest owed in the underlying loan transactions that State Funds entered into with IS and NALR, with potentially extra for himself to spare; and if he "lost," which was the case, as described herein, he could (and did) try to hide his losses by various methods, including by

rolling over the loan agreements, buying time until his high-risk, high-reward trades might possibly cover accrued losses.  Eventually, when time ran out, Abarbanel resorted to the age-old Ponzi-scheme-like method of hiding his losses by using new investor deposits to pay off old investors who sought to redeem.

71.    In addition to these high-risk trades made in IS and NALR accounts, Abarbanel and Chilelli, at Abarbanel's direction, also transferred investor funds from IS and NALR accounts to different bank and brokerage accounts in the names of the other Relief Defendant LLCs, as well as other entities that Abarbanel and Chilelli formed, controlled, and/or operated.

72.    From these other nominee accounts, Abarbanel and Chilelli, at Abarbanel's direction, again entered into similar high-risk securities transactions, again, often on margin, and again, often employing high-risk options and futures strategies for the benefit of Abarbanel, Chilelli, and the Relief Defendants, not State Funds or its investors.

73.    In purported documentation of the Reverse Repos, Abarbanel and Chilelli, at Abarbanel's direction, directed IS and NALR to send original, signed hard copies of the updated unsecured promissory notes, described above, to State Funds' custodian, instructing the custodian to preserve the agreements.  As described above, these unsecured promissory notes were the *only* purported collateral provided to State Funds in exchange for the cash payments transferred to IS and NALR.

74.    On multiple occasions, including in emails dated October 2018 through February 2019, Abarbanel directly or indirectly instructed State Funds' custodian to destroy particular promissory notes, asserting that they had been repaid or altered.  Abarbanel's representations concerning repayment of the promissory notes were false; none of the promissory notes had been repaid.  Moreover, Abarbanel's directives to destroy *any* critical business records such as the

promissory notes were improper, and were done only to further and conceal his fraudulent scheme.

75.     In the end, Abarbanel's hopes that his high-risk trading strategies would yield sufficient profits, from which IS and NALR could make promised interest payments, did not come to fruition.  Instead, his trading in IS's and NALR's accounts, using investor assets, generated millions of dollars in losses.  For example, in calendar year 2018, tax records for IS and NALR indicate that they lost nearly $7 million from unsuccessful trading.

76.     Because of the significant losses incurred as a result of Abarbanel's high-risk trading, because IS and NALR did not have an independent source of income, and because Abarbanel siphoned money out of these accounts for his own uses, IS and NALR were unable to repay the unsecured loans made from State Funds.  Instead, Abarbanel and NY Alaska caused the Reverse Repos to be repeatedly rolled over, with new expiration dates added, and IS and NALR made regular interest payments from the amounts loaned to them by State Funds, concealing from investors the inability of IS and NALR to repay the unsecured promissory notes exchanged for the cash payments from State Funds.

77.     In December 2018, a Connecticut-based investor contacted Abarbanel to discuss the investor's questions and concerns about the counterparties and Reverse Repos.  Abarbanel attempted to allay the investor's concerns, but—after conducting additional due diligence concerning State Funds, IS and NALR, and the collateral (or lack thereof) provided by these counterparties—the investor ultimately requested a full redemption of its investment.

78.     Abarbanel had already established the Income Collecting Fund in the Cayman Islands at this time.  Shortly after his conversations with the Connecticut-based investor, Abarbanel and NY Alaska encouraged all of State Funds' non-U.S. investors to move their

investments to the Income Collecting Fund.  Abarbanel and NY Alaska then forcibly redeemed

all remaining U.S. investors in State Funds, and, in February 2019, filed an application with the

SEC to de-register State Funds.

79.    At the time Abarbanel forcibly redeemed State Funds' U.S. investors and moved

its non-U.S. investors to the Income Collecting Fund, IS and NALR did not have sufficient funds

to repay the outstanding Reverse Repos with State Funds.  Abarbanel directed and caused IS and

NALR to enter into new agreements with the Income Collecting Fund.  Abarbanel then used the

funds received by IS and NALR from the Income Collecting Fund to repay State Funds' U.S.

investors in the forced redemptions.  Because Abarbanel used funds invested by the Income

Collecting Fund's investors to redeem State Funds' investors, he ultimately left the Income

Collecting Fund without sufficient funds to redeem its own investors (namely, Investor Group

A), as further described below in Section III.

## II.    The Offshore Phase—Using the Income Collecting Fund To Engage In Sham Reverse Repos With Nominee Shell Companies that Abarbanel Controlled

### A.    Abarbanel Founded and Used the Income Collecting Fund to Engage in Unauthorized, Uncollateralized Loan Agreements

80.    In or around March 2018, Abarbanel took steps to register the Income Collecting

Fund in the Cayman Islands by renaming an exempted company previously incorporated under

the name "US Bonds Mutual Fund."

81.    Abarbanel arranged for nominee personnel in the Bahamas and British Virgin

Islands to serve as directors of the Income Collecting Fund, leaving Abarbanel free to control the

activities of the Income Collecting Fund without meaningful hindrance or oversight.

82.    Abarbanel controlled all aspects of the Income Collecting Fund.  A March 2020

letter signed by the fund's Director and Chairman describes a motion by the Income Collecting

Fund's Board "authorizing Mr. Ofer Abarbanel to represent the fund in all matters and that Interactive Brokers LLC is allowed to disclos[e] all fund information to Mr. Ofer Abarbanel."

83.    Chilelli provided substantial assistance to Abarbanel with respect to the offshore phase of the scheme.  In particular, Chilelli oversaw the transfer of Income Collecting Fund assets to counterparties, IS and NALR, which Chilelli, at Abarbanel's direction, formed, controlled, and operated.

**B.    Abarbanel and the Income Collecting Fund Made Materially False and Misleading Statements and Omissions in the Income Collecting Fund's Prospectus**

84.    In approximately January 2019, Abarbanel created a prospectus on behalf of the Income Collecting Fund, and issued and/or made it available to investors on the fund's website (www.govbxfund.com).

85.    Investor Group A accessed and reviewed the Income Collecting Fund's prospectus.

86.    Between February 2019 and at least August 2020, on at least 9 occasions (including February, March, April, May, June, and July of 2019, and April, July, and August of 2020), Abarbanel and the Income Collecting Fund issued updates to the prospectus that contained minor modifications, and posted the prospectus on the fund website.

87.    As with State Funds' public filings set forth above, the Income Collecting Fund's prospectus described the fund's structure, investment strategy, investments, anticipated returns, and methods for purchasing and redeeming shares.  The prospectus described the Income Collecting Fund's investment objective as "seek[ing] current income consistent with preservation of capital and daily liquidity."

88.    As Abarbanel and the Income Collecting Fund knew at the time, or were reckless

in not knowing, this representation was materially false and misleading.  The transfer of funds to IS and NALR that they directed and controlled, in uncollateralized, unsecured lending transactions, was not consistent with the preservation of capital or daily liquidity.

89.    As with State Funds' Public Filings, The Income Collecting Fund's prospectus represented that it would invest primarily in Treasuries.  In the description of the Income Collecting Fund's "Principal Investment Strategies," the prospectus disclosed, in relevant part, that "the Fund invests its net assets primarily (exclusive of collateral with respect to securities lending and reverse repurchase agreement transactions) in U.S. Treasury securities, which include bills, notes, and bonds issued by the U.S. Treasury."  As Abarbanel and the Income Collecting Fund knew at the time, or were reckless in not knowing, this representation was materially false and misleading.  The Income Collecting Fund did not invest primarily in Treasuries.  In fact, as reported in a year-end 2019 fund report, the Income Collecting Fund's investments comprised only 1 percent Treasuries.

90.    Similar to State Funds' Public Filings, the Income Collecting Fund's prospectus also stated that it might enter into Reverse Repos.  As stated in the prospectus:  "In order to enhance income, the Fund intends to enter into securities lending, repurchase agreements and/or reverse repurchase agreement transactions that provide the Fund with income at either fixed or floating (variable) interest rates and fees."  As Abarbanel and the Income Collecting Fund knew at the time, or were reckless in not knowing, this representation was materially false and misleading.  The Income Collecting Fund did not enter into Reverse Repos with counterparties that provided income at fixed or floating interest rates.

91.    The Income Collecting Fund's prospectus further stated that the fund "may enter into repurchase agreements and/or reverse repurchase agreements with counterparties such as:

broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies." Abarbanel and the Income Collecting Fund knew at the time, or were reckless in not knowing, that this statement was materially false and misleading. The counterparties to the purported Reverse Repos into which the Income Collecting Fund entered were not independent, well-funded, established institutions such as those listed, but, instead, were single-member shell LLCs, formed, controlled, and operated by Abarbanel and Chilelli, with no assets, operations, or business purpose other than to facilitate the unauthorized investment, transfer and misappropriation of investor funds as described herein.

92.    The Income Collecting Fund prospectus further represented that "Reverse repurchase transactions involve the sale of securities with an agreement to repurchase the securities at an agreed upon price, date and interest payment," and that the "proceeds (collateral) secured to the Fund with respect to reverse repurchase agreements will include either (1) 100% units of mutual fund symbols: STATX or of this Fund or (2) 102%–115% U.S. Treasury securities." Abarbanel and the Income Collecting Fund knew at the time, or were reckless in not knowing, that this statement was materially false and misleading, because, in practice, the purported Reverse Repos with IS and NALR involved neither the lending nor sale of securities with an agreement to repurchase the securities at an agreed upon price, date and interest payment, nor collateral in the form of mutual fund shares or Treasuries.

93.    Rather, between March 2019 and February 2021, each transaction involved sending Investor Group A's funds to IS or NALR, as directed by Abarbanel, Chilelli, and the Income Collecting Fund. In exchange, the Income Collecting Fund and each counterparty executed a boilerplate "Master Securities Loan Agreement," which the Income Collecting Fund sent to the Income Collecting Fund's custodian. This exchange of investor funds for unsecured,

uncollateralized loan agreements did not satisfy the prospectus' requirement to supply collateral in the form of Treasuries or other specified collateral.

94.     In short, as Abarbanel and the Income Collecting Fund knew at the time, or were reckless in not knowing, the representations in the prospectus were materially false and misleading statements, because:  (a) the MSLA was not a repurchase agreement or reverse repurchase agreement as described in the prospectus, or as a reasonable investor would understand, (b) the prospectus and other documents issued by Abarbanel and the Income Collecting Fund did not correctly describe the actual related-party transactions that Abarbanel, Chilelli, and the Income Collecting Fund orchestrated between the Income Collecting Fund and counterparties IS and NALR—in that the Income Collecting Fund neither bought nor sold securities with an agreement to repurchase the securities at an agreed-upon price, date, and interest payment; and the Fund never received collateral in the form of the specified mutual fund symbols or Treasuries.  In addition, IS and NALR were single-member shell LLCs with no significant assets or business operations, not "broker/dealers, institutional investors, institutional investment manager(s), banks, mutual funds, and insurance and/or reinsurance companies."

**C.     Abarbanel and the Income Collecting Fund Made Misrepresentations and Misleading Omissions of Material Facts in the Income Collecting Fund's Fact Sheets**

95.     In addition to the prospectus, Abarbanel also prepared a "Fact Sheet" for the Income Collecting Fund, which was updated at Abarbanel's direction on a monthly basis throughout 2019 (March-December), 2020 (January-December), and early 2021 (January, February), and to post to the Income Collecting Fund's website, along with the prospectus.

96.     The Fact Sheet included materially false and misleading representations and omissions concerning the Income Collecting Fund's investment strategy and holdings, similar to

those in the prospectus.

97.     For example, the Fact Sheet stated that the Income Collecting Fund:

    a.    "seeks to provide current income consistent with preservation of capital and daily

          liquidity."

    b.    has "major holdings [in] 3 Month US Treasuries"

    c.    "is permitted to enter into fixed/variable interest rate securities lending,

          Repurchase & Reverse Repurchase agreements with banks, broker/dealers,

          institutional investors, institutional investment manager(s), mutual funds,

          insurance and/or reinsurance companies" in order "to increase income."

    d.    engaged in lending transactions as follows:

          Repurchase and Reverse Repurchase transactions – those are transactions
          in which the fund purchases securities as either lender or borrower **with
          the agreement to sell them at a higher price** at a specific future date.

          Securities Lending transactions – Securities Lending transactions allow a
          Fund to retain ownership of the securities loaned and, at the same time,
          **earn additional income from fees paid by borrowers**.  (emphasis in
          original)

98.     In addition, as updated throughout 2019, 2020, and early 2021, the Fact Sheet

variously described the collateral received by the Income Collecting Fund as comprised of

mutual fund shares, "102%–115%" Treasury securities, and "100% Cash."  The Fact Sheet

consistently emphasized that the Income Collecting Fund's collateral was "marked to market

daily" to "ensure[] that the fund will always have excess collateral (over-collateralization) to

secure its activity."

99.     As Abarbanel and the Income Collecting Fund knew at the time, or were reckless

in not knowing, these statements in the Fact Sheet were materially false and misleading:  The

Income Collecting Fund's "major holdings" were not in Treasuries; the Income Collecting Fund

34

did not enter into any arms-length secured or collateralized Reverse Repos with independent third parties, as represented; the Income Collecting Fund did not receive collateral consisting of mutual fund shares, "102%–115%" Treasury securities, or "100% Cash;" and the Income Collecting Fund did not have "excess collateral" to secure its lending activity.

> **D.      Abarbanel, Chilelli, and the Income Collecting Fund Used IS and NALR to Misappropriate, Deplete, and Dissipate Investor Group A's Assets**

100.      Investor Group A was the Income Collecting Fund's largest investor.  From March 2019 through February 2021, Investor Group A invested approximately $191 million in the Income Collecting Fund, by depositing those funds into the Income Collecting Fund Bank Account.  As of June 2021, following its prior redemptions of approximately $85 million, Investor Group A had approximately $106 million remaining on deposit with the Income Collecting Fund.

101.      Abarbanel and the Income Collecting Fund never invested Investor Group A's funds as promised and represented, as detailed above.

102.      Instead, following Investor Group A's investment, Abarbanel and the Income Collecting Fund immediately transferred at least $104 million worth of Investor Group A's deposits into IS and NALR, which Abarbanel and Chilelli controlled, in exchange for unsecured and uncollateralized loan agreements (the Master Securities Loan Agreement) executed by IS and NALR.

103.      The IS and NALR Master Securities Loan Agreement transactions in no meaningful way supplied the Income Collecting Fund (and Investment Group A) with the secure, collateralized investments promised by the prospectus.

104.      IS and NALR, at Abarbanel's and Chilelli's direction, then transferred or used the investor funds for their own benefit.  Between March 2019 and February 2021, Abarbanel and

Chilelli (at Abarbanel's direction) used Investor Group A's assets transferred from the Income

Collecting Fund to establish brokerage accounts in the names of IS and NALR.  In the same

manner as Abarbanel orchestrated in the Domestic Phase, using State Funds' investors assets,

Abarbanel and the Income Collecting Fund then repeatedly used Investor Group A's funds to

engage in various securities transactions for their own benefit, and not for the benefit of the

Income Collecting Fund or its investors.  As in the Domestic Phase, these securities transactions

were often high-risk and volatile, often on margin, and often employed volatile, high-risk

futures-options trading strategies similar to those Abarbanel employed in the Domestic Phase.

105.    For example, during the time period referred to above, Abarbanel and Chilelli, at

Abarbanel's direction, purchased securities in the brokerage accounts of IS and NALR, often on

margin.  Abarbanel and Chilelli, at Abarbanel's direction, also transferred funds in these

accounts to different bank and brokerage accounts that they also controlled, in the name of other

entities, including the Relief Defendants.  In these other accounts, IS and NALR, again acting

under the direction and control of Abarbanel and Chilelli, would repeat the process, purchasing

additional securities and other investments.

106.    The following are examples of Defendants' misappropriation, depletion, and

dissipation of Investor Group A's assets:

    a.    On March 5, 2019, Investor Group A wired $20,500,000 into the Income

        Collecting Fund Bank Account.  On that same day, Abarbanel directed and caused

        the Income Collecting Fund to transfer $20,500,000 to NALR's bank account.

        On or about that same day, Abarbanel and Chilelli directed and caused NALR to

        execute a loan agreement with the Income Collecting Fund (the Master Loan

        Servicing Agreement), but did not return any Treasuries or any other form of the

required collateral to the Income Collecting Fund.  On that same day, Abarbanel and Chilelli directed and caused the transfer of $20,500,000 from NALR's bank account to NALR's brokerage account.  From there, Abarbanel and Chilelli directed and caused NALR to move $20,500,000 to an affiliated NALR brokerage account, and to purchase Treasury securities in approximately that amount.  Those securities were held by, and for the benefit of NALR, Abarbanel, and Chilelli, and *not* for the benefit of the Income Collecting Fund or Investor Group A.  Thus, they were not pledged, transferred, or assigned to the Income Collecting Fund, and were not collateral to the underlying unsecured loan agreement between the Fund and NALR.

b.  On June 27, 2019, Investor Group A wired $16,000,000 into the Income Collecting Fund Bank Account.  On that same day, Abarbanel directed and caused the Fund to transfer $16,000,000 to NALR's bank account.  On or about that same day, Abarbanel and Chilelli directed and caused NALR to re-execute the Master Loan Services Agreement with the Income Collecting Fund to reflect the additional amount, but did not return any Treasuries or any other form of the required collateral to the Fund.  On that same day, Abarbanel and Chilelli directed and caused the transfer of $16,000,000 from NALR's bank account to NALR's brokerage account.  From there, Abarbanel and Chilelli directed and caused NALR to move $15,998,000 to an affiliated NALR brokerage account and to purchase Treasury securities in approximately that amount.  Again, these securities were not transferred, pledged, or assigned to the Fund for the benefit of the Income Collecting Fund or Investor Group A, and were not collateral to the

underlying unsecured loan agreement between the Income Collecting Fund and NALR.

    c.    On September 4, 2020, Investor Group A wired $14,000,000 into the Income Collecting Fund Bank Account. On that same day, Abarbanel directed and caused the Income Collecting Fund to transfer $14,000,000 to NALR's bank account. On or about that same day, Abarbanel and Chilelli directed and caused NALR to re-execute the Master Loan Services Agreement with the Income Collecting Fund to reflect the additional amount, but did not return any Treasuries or any other form of the required collateral to the Income Collecting Fund. On that same day, Abarbanel and Chilelli directed and caused the transfer of $13,990,000 from NALR's bank account to NALR's brokerage account. From there, Abarbanel and Chilelli directed and caused NALR to move $13,990,000 to an affiliated NALR brokerage account and to purchase Treasury securities in approximately that amount. Again, these securities were not transferred, pledged, or assigned to the Income Collecting Fund for the benefit of the Income Collecting Fund or Investor Group A, and were not collateral to the underlying unsecured loan agreement between the Income Collecting Fund and NALR.

107.    In the transactions detailed above, and the other transactions described herein involving assets invested in the Income Collecting Fund by Investment Group A, Abarbanel, Chilelli, and the Income Collecting Fund, acting knowingly or recklessly—by and through counterparties IS and NALR that Abarbanel and Chilelli formed, controlled, and operated— misappropriated, dissipated, and depleted Investor Group A's funds by: (i) failing to invest funds in Reverse Repos as required by the prospectus; (ii) failing to provide the collateral

required by the prospectus to secure Investment Group A's investments in the Income Collecting

Fund; and (iii) placing Investor Group A's funds in IS and NALR's accounts and using the funds

for Defendants' benefit.

108.    In addition, Abarbanel personally misappropriated millions of dollars of investor

funds, including on or about March 16, 2020 by causing ISC to transfer $5.6 million to NALR

and then to his own personal accounts.

## III.    Abarbanel and the Income Collecting Fund's Pretextual Response to Investor Group A's Redemption Demands

### A.    Abarbanel and the Income Collecting Fund Refused and Failed to Honor Investor Group A's Redemption Demands

109.    In February 2021, Abarbanel became aware of the SEC's investigation and

parallel investigations by the U.S. Attorney's Office for the Southern District of New York and

the U.S. Office of the Postal Inspector.

110.    When Abarbanel learned of the SEC's investigation, he took immediate action to

limit the number of investors in the Income Collecting Fund by forcibly redeeming all of the

investors in the Income Collecting Fund, except for its largest investor, Investor Group A.

111.    Based on financial records and other documents, Abarbanel and a close family

member may have been among the investors in the Income Collecting Fund who were redeemed.

112.    Abarbanel did not inform Investor Group A of the SEC's investigation or offer to

redeem Investor Group A's shares of stock in the Income Collecting Fund.

113.    On or around May 21, 2021, Investor Group A independently learned of the

SEC's investigation, and requested a full redemption of its shares in the Income Collecting Fund,

pursuant to the prospectus' redemption terms.  At the time Investor Group A requested a full

redemption, its total investment in the Income Collecting Fund was approximately $106 million.

114.    According to the terms of the prospectus, "Fund shares are available for daily

redemption" (p. 13), "[s]hares will be redeemable at the option of the Shareholder on any

Business Day and at any amount" (p. 17), and "[a] redemption request must be received by the

Administrator at least One (1) Business Day (or such lesser period as the Directors may

generally or in any particular case permits) prior to the relevant Redemption Day" (p. 17).

115.    Investor Group A complied with the prospectus' redemption requirements.

116.    Despite Investor Group A's compliance and the prospectus' provision for "daily

redemption," Abarbanel and the Income Collecting Fund did not honor Investor Group A's

redemption request.

117.     Instead, Abarbanel and the Income Collecting Fund obfuscated the facts and set

up pretextual obstacles and roadblocks to delay and obstruct Investor Group A's redemption

request, as follows:

    a.    On May 23, 2021, by letter emailed to Investor Group A, Abarbanel and the

          Income Collecting Fund responded to Investor Group A's redemption request.

          Abarbanel and the Income Collecting Fund stated that Investor Group A's

          redemption request could not be fulfilled, because Investor Group A must

          undergo an "omnibus review process[]," which would require the Income

          Collecting Fund to appoint a "Money Laundering Compliance officer" and

          "Money Laundering Reporting Officer."

    b.    In subsequent communications with Investor Group A, including on June 1 and 4,

          2021, Abarbanel and the Income Collecting Fund reiterated these and similar

          requirements relating to purported anti-money laundering ("AML") protocols.

    c.    In connection with Investor Group A's redemption requests before May 2021,

          Abarbanel and the Income Collecting Fund did not mention an "omnibus review

process," insist on the appointment of money laundering officers, or impose any

AML protocols.

118.    On May 27, 2021, Abarbanel and the Income Collecting Fund, provided Investor

Group A with a presentation, which represented that only a fraction of Investor Group A's funds

were available and that a full redemption was not possible.  Abarbanel and the Income Collecting

Fund asserted that the Income Collecting Fund was holding approximately $88.9 million "sitting

in cash" ($84 million in a bank in Singapore; and $4.9 million "that can be further transferred to

the Fund from counterparty"), and an additional $25.9 million in cash and Treasuries "that are

still invested in lending agreement," [*sic*] and not able to be liquidated.

119.    In the May 27, 2021 presentation and during a telephone conversation later that

day, Abarbanel attempted to persuade Investor Group A to invest in a new investment vehicle set

up by Abarbanel, under which Investor Group A could redeem its shares in the Income

Collecting Fund and immediately reinvest its funds with Abarbanel in a different investment

vehicle, rather than obtaining a full return of its investment in cash.

120.    On May 27, 2021, Investor Group A declined Abarbanel's offer and again sought

a full return of its investment funds.  Investor Group A also requested that "this cash be secured

and no further investments or expenses be undertaken from these funds pending the redemption."

121.    Abarbanel and the Income Collecting Fund did not comply with Investor Group

A's directive.  Instead, later the same day, Abarbanel and the Income Collecting Fund stated that

Investor Group A must complete a detailed and lengthy (18 page) "Wolfsberg Questionnaire" in

order for the Income Collecting Fund to fulfill Investor Group A's redemption request.

Abarbanel and the Income Collecting Fund did not require completion of this questionnaire in

connection with Investor Group A's prior redemption requests.

122.    In subsequent communications with Investor Group A, Abarbanel and the Income Collecting Fund imposed additional requirements and conditions for the redemption, including demanding a "wet signature," an itemization of the identity and net worth of beneficial owners (including those not in Investor Group A), and other requirements and protocols.  Abarbanel and the Income Collecting Fund did not impose these requirements in connection with Investor Group A's prior redemption requests.

123.    Later that evening, Abarbanel and the Income Collecting Fund provided an update to Investor Group A, stating that the Singapore bank was in the process of sending $66.9 million to the Income Collecting Fund Bank Account, "which currently has a 17M balance."

124.    The refusal by Abarbanel and the Income Collecting Fund to honor Investor Group A's May 2021 redemption request is in stark contrast to the way in which Abarbanel and the Income Collecting Fund engaged with Investor Group A and other investors concerning redemption requests before Abarbanel learned of the SEC's investigation.  For example, on or about March 11, 2021, Investor Group A submitted a redemption request for $75 million to the Income Collecting Fund by filling out a redemption request form downloaded from the Income Collecting Fund's website.  Within days, Investor Group A received $75 million by wire transfer from the Income Collecting Fund.  Abarbanel and the Income Collecting Fund did not require completion of an 18-page questionnaire, a wet signature, or compliance with any additional anti-money laundering protocols before honoring Investor Group A's redemption request.

125.    During their numerous communications with Investor Group A in connection with its May 2021 redemption request, Abarbanel and the Income Collecting Fund did not disclose to Investor Group A that IS and NALR were controlled by Abarbanel and Chilelli, and that Abarbanel therefore could readily arrange to terminate any lending agreements and effect the

return of $26 million from IS and NALR to the Income Collecting Fund and Investor Group A. In fact, such daily liquidity was a requirement of the Income Collecting Fund's prospectus.

**B.    Abarbanel and the Income Collecting Fund Sought to Force Investor Group A to Accept Terms That Fell Far Short of a Full Redemption**

126.    On or about June 1, 2021, Abarbanel and the Income Collecting Fund also informed Investor Group A that, to obtain a redemption, it would need to sign a new agreement, referred to as "Annex B."  Under this new agreement, Abarbanel and the fund proposed to satisfy Investor Group A's redemption request by providing Investor Group A with an unspecified amount of money held by IS and NALR, along with the "future cash flow" from the Income Collecting Fund's lending agreements with counterparties IS and NALR.

127.    These lending agreements were the Master Securities Loan Agreements into which Abarbanel and State Funds entered with IS and NALR, rather than investing in secured and collateralized Reverse Repos, as described in the prospectus, which were rolled over to the Income Collecting Fund after Abarbanel de-registered State Funds.

128.    In other words, Abarbanel and the Income Collecting Fund misused Investor Group A's funds to obtain the Master Securities Loan Agreements in the first place, and then offered to give the proceeds of those unauthorized loan agreements, if any, to Investor Group A as part of the package to satisfy Investor Group A's redemption request.

129.    Under Annex B, as provided to Investor Group A, in exchange for its receipt of monies held by IS and NALR and future cash flows, Investor Group A would be required to release its claims against the Income Collecting Fund, counterparties IS and NALR, and others.

130.    Abarbanel and the Income Collecting Fund told Investor Group A that Annex B reflected a "redemption in kind" under the terms of the Income Collecting Fund's prospectus. This was false.  The Income Collecting Fund's prospectus provides that the Fund "reserves the

right to honor requests for redemption or repurchase orders by making payment in whole or in part in ***readily marketable securities*** ("redemption in kind") if the amount is greater than $200,000 or 1% of the Fund's assets." (emphasis added). The unsecured loan agreements between the Income Collecting Fund and IS and NALR that Abarbanel and the Income Collecting Fund attempted to require Investor Group A to assume as part of its redemption, are not "readily marketable securities," and therefore are not "redemptions in kind."

131.    Abarbanel and the Income Collecting Fund also told Investor Group A that they were imposing a "forced redemption" under the Income Collecting Fund's prospectus. The prospectus permits the Income Collecting Fund to impose a "forced redemption." Any "forced redemption" requires actually redeeming the investor's shares, however, in exchange for which the investor releases its claims. But that is not what Abarbanel and the Income Collecting Fund proposed to do here. Instead of redeeming Investor Group A's shares in the Income Collecting Fund by offering cash or "readily marketable securities," Abarbanel and the Income Collecting Fund instead offered whatever remained in IS and NALR's accounts, and whatever future cash flows the Master Securities Loan Agreements between the Income Collecting Fund and IS and NALR might, in the future, generate. Moreover, Abarbanel and the Income Collecting Fund would only provide that insufficient redemption package if Investor Fund A released all of its claims against the Income Collecting Fund, IS, NALR, and others.

132.    In short, rather than complying with their obligation to honor Investor Group A's redemption request, Abarbanel and the Income Collecting Fund sought to coerce Investor Group A into relinquishing its shares in the Income Collecting Fund and waiving all claims against the Income Collecting Fund and others, in exchange for a package that included IS and NALR's accounts and the cash flow from the same Master Securities Loan Agreements that Abarbanel

and the Income Collecting Fund entered into by fraudulently using Investor Group A's funds in the first place.

133.    Accordingly, Abarbanel and the Income Collecting Fund violated their obligations to honor Investor Group A's redemption requests and return its investment funds, and they have unlawfully withheld such funds.

**C.    Abarbanel and the Income Collecting Fund Misappropriated, Depleted, and Dissipated Investor Assets in the Income Collecting Fund**

134.    Documents obtained by the SEC in May 2021 reveal that IS and NALR's accounts hold less than $4 million, nowhere near the $26 million that Abarbanel and the Income Collecting Fund claimed that IS and NALR were holding in the May 27, 2021 presentation.

135.    Documents obtained by the SEC further showed that, in May 2021, the Income Collecting Fund Bank Account held approximately $84 million—not the $17 million claimed by Abarbanel and the Income Collecting Fund in their May 27 communications with Investor Group A.

136.    On June 4, 2021, after receiving Investor Group A's redemption request, Abarbanel and the Income Collecting Fund initiated a transfer of more than $64 million out of the Fund's bank account and into the Income Collecting Fund's brokerage account.  From this account, the funds were vulnerable to unauthorized investment losses, and to further misappropriation, depletion, and dissipation by Abarbanel and the Income Collecting Fund.

137.    Abarbanel and the Income Collecting Fund transferred the $64 million without notice to Investor Group A and despite the fact that any redemption to Investor Group A would need to be processed and transferred from the Income Collecting Fund Bank Account, not the brokerage account.

138.    On June 17, 2021, again without notice to investors, Abarbanel caused and

directed the Fund to transfer $10 million (USD) into a Vanguard account held by Fund counsel in an unauthorized transaction.

139.    Accordingly, Abarbanel and the Income Collecting Fund have misused and misdirected Investor Group A's investment funds, and any remaining funds are subject to further misappropriation, depletion, or dissipation.

## IV.    The Relief Defendants Received Ill-Gotten Gains

140.    Abarbanel, Chilelli, and the Income Collecting Fund diverted Income Collecting Fund assets, including assets invested by Investor Group A, into accounts in the names of the Relief Defendants—IS, NALR, GIH, CLO, ISC, and EMEA—which Abarbanel and Chilelli formed, controlled, and operated.

141.    These assets are ill-gotten gains for which the Relief Defendants gave no bona fide consideration and to which they have no legitimate claim.  Therefore, these funds are subject to disgorgement.

142.    The following are non-exclusive summary charts of funds transferred into the accounts of the Relief Defendants, all of which constitute such ill-gotten gains:

      a.    From March 2019 to November 2020, Abarbanel, Chilelli, and the Income Collecting Fund transferred at least $102,500,000 (net) of Investor Group A's funds into NALR accounts, and at least $2,030,000 into IS accounts, pursuant to the purported lending agreements described herein.  The below table indicates Investor Group A's subscriptions (funds deposited) into the Income Collecting Fund Bank Account, Investor Group A's redemptions (funds withdrawn) from that account, and the corresponding immediate transfers of these assets to and from the NALR and IS accounts:

| Investment/ Redemption Date | Amount Deposited in/ Withdrawn from Income Collecting Fund Bank Account | Counterparty | Wire Date | Amount Wired to/ from Counterparty |
|---|---|---|---|---|
| 3/5/2019 | $ 20,500,000.00 | NALR | 3/5/2019 | $ (20,500,000.00) |
| 3/15/2019 | $ 3,000,000.00 | NALR | 3/15/2019 | $ (3,000,000.00) |
| 3/21/2019 | $ 8,000,000.00 | NALR | 3/21/2019 | $ (8,000,000.00) |
| 4/24/2019 | $ (1,000,000.00) | NALR | 4/24/2019 | $ 1,000,000.00 |
| 5/10/2019 | $ 2,000,000.00 | NALR | 5/10/2019 | $ (2,000,000.00) |
| 6/27/2019 | $ 16,000,000.00 | NALR | 6/27/2019 | $ (16,000,000.00) |
| 8/7/2019 | $ 7,500,000.00 | NALR | 8/7/2019 | $ (7,500,000.00) |
| 10/2/2019 | $ 2,500,000.00 | NALR | 10/2/2019 | $ (2,500,000.00) |
| 1/2/2020 | $ 5,000,000.00 | NALR | 1/2/2020 | $ (5,100,000.00) |
| 1/22/2020 | $ (4,000,000.00) | NALR | 1/22/2020 | $ 4,000,000.00 |
| 1/28/2020 | $ (2,500,000.00) | NALR | 1/28/2020 | $ 2,500,000.00 |
| 2/14/2020 | $ 3,500,000.00 | NALR | 2/14/2020 | $ (3,500,000.00) |
| 3/13/2020 | $ 9,000,000.00 | NALR | 3/13/2020 | $ (9,000,000.00) |
| 4/27/2020 | $ 5,000,000.00 | NALR | 4/27/2020 | $ (5,000,000.00) |
| 5/22/2020 | $ 2,030,000.00 | IS | 5/22/2020 | $ (2,030,000.00) |
| 7/27/2020 | $ 2,000,000.00 | NALR | 7/27/2020 | $ (2,000,000.00) |
| 8/12/2020 | $ 6,500,000.00 | NALR | 8/12/2020 | $ (6,500,000.00) |
| 8/18/2020 | $ 7,500,000.00 | NALR | 8/18/2020 | $ (7,500,000.00) |
| 9/4/2020 | $ 14,000,000.00 | NALR | 9/4/2020 | $ (14,000,000.00) |
| 11/17/2020 | $ (2,000,000.00) | NALR | 11/17/2020 | $ 2,000,000.00 |

b.   From at least April 2019 through January 2021, Abarbanel, Chilelli, and the

Income Collecting Fund transferred at least $9.4 million from NALR accounts

into accounts in the name of GIH, by way of the following transfers:

| Date | From | To | Amount |
|------|------|------|--------|
| 4/1/2019 | NALR | GIH | $ 500,000.00 |
| 5/15/2019 | NALR | GIH | $ 15,000.00 |
| 6/24/2019 | NALR | GIH | $ 225,000.00 |
| 8/8/2019 | NALR | GIH | $ 6,000,000.00 |
| 1/28/2020 | NALR | GIH | $ 13,500.00 |
| 2/26/2020 | NALR | GIH | $ 10,100.00 |
| 3/16/2020 | NALR | GIH | $ 1,500,000.00 |
| 4/1/2020 | NALR | GIH | $ 14,500.00 |
| 4/13/2020 | NALR | GIH | $ 60,000.00 |
| 4/14/2020 | NALR | GIH | $ 50,000.00 |
| 6/26/2020 | NALR | GIH | $ 14,000.00 |
| 7/21/2020 | NALR | GIH | $ 1,000,000.00 |
| 9/9/2020 | NALR | GIH | $ 14,000.00 |
| 1/4/2021 | NALR | GIH | $ 20,100.00 |
| | | **Total:** | **$ 9,436,200.00** |

c.   From at least May 2019 through May 2021, Abarbanel and the Income Collecting Fund transferred at least $700,000 into accounts held by CLO, by way of the following transfers from Income Collecting Fund accounts:

| Date | From | To | Amount |
|------|------|------|--------|
| 5/10/2019 | Fund | CLO | $ 12,000.00 |
| 7/5/2019 | Fund | CLO | $ 16,892.48 |
| 8/8/2019 | Fund | CLO | $ 15,346.14 |
| 9/5/2019 | Fund | CLO | $ 17,224.22 |
| 9/26/2019 | Fund | CLO | $ 1,000.00 |
| 10/1/2019 | Fund | CLO | $ 13,013.61 |
| 10/17/2019 | Fund | CLO | $ 1,500.00 |
| 10/28/2019 | Fund | CLO | $ 16,742.29 |
| 12/3/2019 | Fund | CLO | $ 22,196.97 |
| 1/2/2020 | Fund | CLO | $ 21,769.81 |
| 1/31/2020 | Fund | CLO | $ 22,170.85 |

| 3/2/2020 | Fund | CLO | $ | 21,553.35 |
|---|---|---|---|---|
| 4/1/2020 | Fund | CLO | $ | 23,956.66 |
| 4/30/2020 | Fund | CLO | $ | 22,717.82 |
| 6/1/2020 | Fund | CLO | $ | 25,400.50 |
| 7/1/2020 | Fund | CLO | $ | 24,084.55 |
| 8/4/2020 | Fund | CLO | $ | 16,616.70 |
| 9/1/2020 | Fund | CLO | $ | 25,480.40 |
| 10/1/2020 | Fund | CLO | $ | 33,294.86 |
| 11/2/2020 | Fund | CLO | $ | 36,353.88 |
| 12/1/2020 | Fund | CLO | $ | 33,965.55 |
| 1/4/2021 | Fund | CLO | $ | 37,475.70 |
| 2/1/2021 | Fund | CLO | $ | 45,818.35 |
| 2/26/2021 | Fund | CLO | $ | 45,997.56 |
| 4/2/2021 | Fund | CLO | $ | 73,424.80 |
| 4/30/2021 | Fund | CLO | $ | 15,000.00 |
| 5/3/2021 | Fund | CLO | $ | 10,939.40 |
| 5/24/2021 | Fund | CLO | $ | 48,915.26 |
| | | | **Total:** | **$ 700,851.71** |

    d. From at least May 2019 through April 2, 2021, Abarbanel and the Income

       Collecting Fund transferred at least $627,000 worth of investors' assets into

       accounts they opened in the name of ISC, by way of the following transfers from

       CLO accounts:

| Date | From | To | Amount | |
|---|---|---|---|---|
| 5/23/2019 | CLO | ISC | $ | 11,740.00 |
| 7/8/2019 | CLO | ISC | $ | 16,892.48 |
| 8/13/2019 | CLO | ISC | $ | 22,380.00 |
| 9/6/2019 | CLO | ISC | $ | 17,224.22 |
| 10/10/2019 | CLO | ISC | $ | 13,500.00 |
| 10/29/2019 | CLO | ISC | $ | 16,742.00 |
| 11/18/2019 | CLO | ISC | $ | 2,472.50 |
| 12/3/2019 | CLO | ISC | $ | 22,196.97 |

| 1/8/2020 | CLO | ISC | $ | 20,077.00 |
|---|---|---|---|---|
| 2/5/2020 | CLO | ISC | $ | 20,400.00 |
| 3/3/2020 | CLO | ISC | $ | 21,000.00 |
| 4/1/2020 | CLO | ISC | $ | 24,000.00 |
| 5/1/2020 | CLO | ISC | $ | 22,000.00 |
| 6/11/2020 | CLO | ISC | $ | 27,500.00 |
| 7/1/2020 | CLO | ISC | $ | 23,000.00 |
| 8/5/2020 | CLO | ISC | $ | 16,620.00 |
| 9/4/2020 | CLO | ISC | $ | 25,000.00 |
| 10/2/2020 | CLO | ISC | $ | 32,500.00 |
| 11/2/2020 | CLO | ISC | $ | 36,000.00 |
| 12/3/2020 | CLO | ISC | $ | 37,000.00 |
| 1/4/2021 | CLO | ISC | $ | 38,560.00 |
| 2/2/2021 | CLO | ISC | $ | 43,000.00 |
| 3/1/2021 | CLO | ISC | $ | 49,000.00 |
| 4/2/2021 | CLO | ISC | $ | 68,900.00 |
| | | | **Total:** | **$ 627,705.17** |

e.  From at least October 15, 2019 through August 18, 2020, Abarbanel and the Income Collecting Fund transferred at least $1.4 million of investors' assets into accounts they opened in the name of EMEA, by way of the following transfers from ISC accounts.  These assets originated from, and/or are traceable to, deposits made by investors in State Funds and the Income Collecting Fund during the Relevant Period:

| Date | From | To | Amount |
|------|------|-----|--------|
| 10/15/2019 | ISC | EMEA | $      150,000.00 |
| 11/19/2019 | ISC | EMEA | $       15,000.00 |
| 11/20/2019 | ISC | EMEA | $        2,958.00 |
| 11/20/2019 | ISC | EMEA | $        2,000.00 |
| 1/6/2020 | ISC | EMEA | $      230,000.00 |
| 5/8/2020 | ISC | EMEA | $        5,000.00 |
| 8/18/2020 | ISC | EMEA | $    1,000,000.00 |
| | | Total: | $    1,404,958.00 |

143.     During the Relevant Period, the Relief Defendants received other assets, in addition to the above, that originated from, and/or are traceable to, investors in State Funds and the Income Collecting Fund that are subject to disgorgement.

## CLAIMS FOR RELIEF

### COUNT I

**Against Abarbanel, Chilelli, NY Alaska, and the
Income Collecting Fund for Violations of Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)]**

144.     The SEC realleges and incorporates by reference paragraphs 1 through 143.

145.     By engaging in the acts and conduct alleged above, Abarbanel, NY Alaska, and the Income Collecting Fund each directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (a) knowingly or recklessly employed devices, schemes, or artifices to defraud; (b) with negligence, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) with negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1), (2) and (3) of the Securities Act [15

U.S.C. § 77q(a)(1), (2) and (3)].

146. By engaging in the acts and conduct alleged above, Chilelli directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (a) knowingly or recklessly employed devices, schemes, or artifices to defraud with scienter; and (b) with negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

147. By reason of the foregoing, Defendants violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II

**Against Abarbanel, Chilelli, NY Alaska, and the Income Collecting Fund for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder [15 U.S.C. § 78q(b), 17 C.F.R. § 240.10b-5]**

148. The SEC realleges and incorporates by reference paragraphs 1 through 147.

149. By engaging in the acts and conduct alleged above, Abarbanel, NY Alaska, and the Income Collecting Fund directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b)

and (c)].

150.    By engaging in the acts and conduct alleged above, Chilelli directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

151.    By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT III

### Against Abarbanel and Chilelli for Aiding and Abetting
### Violations of Section 17(a) of the Securities Act

152.    The SEC realleges and incorporates by reference paragraphs 1 through 151.

153.    By engaging in the acts and conduct alleged above, Abarbanel, Chilelli, NY Alaska, and the Income Collecting Fund violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

154.    By engaging in the acts and conduct alleged above, Abarbanel and Chilelli knowingly or recklessly provided substantial assistance, and aided and abetted, each other, NY Alaska, and the Income Collecting Fund in their violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

155.    Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)],

Abarbanel and Chilelli are in violation of Section 17(a) of the Securities Act to the same extent as each other, NY Alaska, and the Income Collecting Fund.

156.    By reason of the foregoing, Abarbanel and Chilelli are liable for aiding and abetting the aforesaid violations, and unless restrained and enjoined will continue to commit such violations.

## COUNT IV

### Against Abarbanel and Chilelli for Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

157.    The SEC realleges and incorporates by reference paragraphs 1 through 156.

158.    By engaging in the acts and conduct alleged above, Abarbanel, Chilelli, NY Alaska, and the Income Collecting Fund violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

159.    By engaging in the acts and conduct alleged above, Abarbanel and Chilelli knowingly or recklessly provided substantial assistance to, and aided and abetted, each other, NY Alaska, and the Income Collecting Fund in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

160.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Abarbanel and Chilelli are in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder to the same extent as each other, NY Alaska, and the Income Collecting Fund.

161.    By reason of the foregoing, Abarbanel and Chilelli are liable for aiding and abetting the aforesaid violations, and unless restrained and enjoined will continue to commit such violations.

## COUNT V

**Against Abarbanel for Control-Person Liability for Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].**

162.    The SEC realleges and incorporates by reference paragraphs 1 through 161.

163.    By engaging in the acts and conduct alleged above, NY Alaska and the Income Collecting Fund, through the actions of, and under the control of Abarbanel, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

164.    By reason of the conduct described above, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Abarbanel is liable for NY Alaska's and the Income Collecting Fund's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as set forth above, in that he exercised actual power and control over NY Alaska and the Income Collecting Fund and was a culpable participant in the violations by these entities.

165.    Abarbanel did not act in good faith, and he induced, directly or indirectly, the acts and conduct of NY Alaska and the Income Collecting Fund that violated the federal securities laws, as alleged herein.

166.    By reason of the foregoing, Abarbanel is liable to the same extent as NY Alaska and the Incoming Collecting Fund, and unless restrained and enjoined will continue to do so.

## COUNT VI

**Against Abarbanel and NY Alaska for Violations of Section 206(1) of the Investment Advisers Act [15 U.S.C. § 80b-6(1)]**

167.    The SEC realleges and incorporates by reference paragraphs 1 through 166.

168.    By engaging in the acts and conduct set forth herein, Abarbanel and NY Alaska were acting as investment advisers to State Funds within the meaning of Section 202(a)(11) of

the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because they were persons who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

169.    By engaging in the acts and conduct alleged herein, Abarbanel and NY Alaska directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as investment advisers, willfully engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client.

170.    As investment advisers, Abarbanel and NY Alaska owed State Funds' investors a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure to investors of all material facts, as well as the duty to act in State Funds' best interests, and not act in their own interests to the detriment of State Funds and its investors.

171.    Abarbanel and NY Alaska breached their fiduciary duties to State Funds and engaged in fraudulent conduct that violated Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)] by, among other ways as alleged herein, knowingly or recklessly making misstatements and omissions of material fact; causing State Funds to enter into unsecured unauthorized lending transactions with IS and NALR, counterparties that Abarbanel controlled; making unauthorized transfers of State Funds' assets to accounts that Abarbanel and NY Alaska controlled; engaging in securities transactions that benefitted Abarbanel and NY Alaska and not State Funds; misappropriating millions of dollars of investors' money; and failing to disclose conflicts of interests with State Funds that Abarbanel and NY Alaska created and from which they profited.

172.    By reason of the foregoing, Abarbanel and NY Alaska violated, and unless enjoined will again violate, Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VII

### Against Abarbanel and NY Alaska for Violations of
### Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)]

173.    The SEC realleges and incorporates by reference paragraphs 1 through 172.

174.    By engaging in the acts and conduct alleged herein, Abarbanel and NY Alaska, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as investment advisers, willfully engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client.

175.    As investment advisers, Abarbanel and NY Alaska owed State Funds a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure to investors of all material facts, as well as the duty to act in State Funds' best interests, and not act in their own interests to the detriment of State Funds.

176.    Abarbanel and NY Alaska breached their fiduciary duties to State Funds and engaged in fraudulent conduct that violated Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)] by, among other ways as alleged herein, knowingly or recklessly making misstatements and omissions of material fact; causing State Funds to enter into unsecured unauthorized lending transactions with IS and NALR, counterparties that Abarbanel controlled; making unauthorized transfers of investors' funds to accounts that Abarbanel and NY Alaska controlled; engaging in securities transactions that benefitted Abarbanel and NY Alaska and not State Funds; misappropriating millions of dollars of investors' money; failing to disclose conflicts of interests with State Funds that Abarbanel and NY Alaska created and from which they profited.

177.    By reason of the foregoing, Abarbanel and NY Alaska violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT VIII

### Against Abarbanel and NY Alaska for Violations of
### Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)]
### and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8(a)]

178.    The SEC realleges and incorporates by reference paragraphs 1 through 177.

179.    By engaging in the acts and conduct alleged herein, Abarbanel and NY Alaska were acting as investment advisers to State Funds within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because they were persons who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

180.    State Funds was a pooled investment vehicle within the meaning of Rule 206(4)-8(b) of the Advisers Act [17 C.F.R. § 275.206(4)-8(b)].  It was engaged in, held itself out as being engaged primarily, and proposed to engage itself primarily in the business of investing, reinvesting, and/or trading in securities, and thus was an investment company as defined in Section 3(a) of the Investment Company Act [15 U.S.C. § 80a-3(a)], or would have been an investment company under that provision but for the exclusion provided from that definition under either Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(c)(1) & (7)].

181.    By engaging in the acts and conduct alleged herein, Abarbanel and NY Alaska, while acting as investment advisers to State Funds, by use of the means and instrumentalities of interstate commerce and of the mails, willfully (1) made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in the pooled investment vehicles; and (2) engaged in acts, practices, and courses of

business that were fraudulent, deceptive, and manipulative with respect to investors and prospective investors in pooled investment vehicles.

182.    By reason of the foregoing, Abarbanel and NY Alaska have violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8(a) thereunder [17 C.F.R. § 275.206(4)-8(a)].

183.    By reason of the foregoing, Abarbanel and NY Alaska violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT IX

### Against Abarbanel and NY Alaska for Violations of
### Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)]

184.    The SEC realleges and incorporates by reference paragraphs 1 through 183.

185.    State Funds is an investment company, as defined in Section 3(a)(1)(A) of the Investment Company Act [15 U.S.C. § 80a-3(a)(1)(A)] as it is an issuer that is, or that holds itself out as, being engaged primarily in the business of investing, reinvesting, or trading in securities.  State Funds was registered with the SEC as an investment company subject to the provisions of the Investment Company Act.

186.    Section 34(b) of the Investment Company Act makes it unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to Section 31(a), or to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

187.    By engaging in the acts and conduct alleged herein, Abarbanel and NY Alaska, acting willfully, made untrue statements of material fact in State Funds' registration statements,

prospectuses, reports, accounts, records, and other documents filed or transmitted pursuant to this title or the keeping of which is required pursuant to Section 31(a), and omitted to state in those documents facts necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

188.    By reason of the foregoing, Abarbanel and NY Alaska violated, and unless enjoined will again violate, Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a judgment:

### I.

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and permanently enjoining Abarbanel and NY Alaska from, directly or indirectly, violating Sections 206(1), (2), and (4) of the Advisers Act and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8(a)]; and Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)].

### II.

Permanently restraining and enjoining Defendants from, directly or indirectly, participating in the issuance, purchase, offer, or sale of any security, including, but not limited to, through any entity owned or controlled by Defendants, provided, however, that such injunction shall not prevent Defendants Abarbanel and Chilelli from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

### III.

Ordering Defendants and Relief Defendants to disgorge their ill-gotten gains according to proof, plus prejudgment interest thereon;

### IV.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], and Section 42(e) of the Investment Company Act [15 U.S. § 80a-41(e)]; and

### V.

Granting such other and further relief as this Court may deem just, equitable, or necessary, including but not limited to the asset freeze, accounting, and ancillary relief requested by the SEC.

### **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  January 27, 2022                                   Respectfully submitted,


                                                           */s/ Paul W. Kisslinger*
                                                           Paul W. Kisslinger (PK0764)
                                                           Securities and Exchange Commission
Of counsel:                                                100 F Street, N.E.
                                                           Washington, D.C. 20549
David A. Becker                                            (202) 551-4427 (Kisslinger)
Virginia M. Rosado Desilets                                *KisslingerP@sec.gov*
Gregory C. Padgett
Alexandra M. Arango                                        *Counsel for Plaintiff Securities and Exchange*
SECURITIES AND EXCHANGE                                    *Commission*
COMMISSION
100 F Street, N.E.
Washington, D.C. 20549

## SEC v. Abarbanel, et al.

## APPENDIX A: MATERIAL MISREPRESENTATIONS IN STATE FUNDS FILINGS

| Date | How Published | Statement/Omission | Why False and/or Misleading |
|---|---|---|---|
| March 7, 2017 | Form N-1A/A | Principal Investment Strategies: "In order to enhance income, the Fund intends to enter into securities lending, repurchase agreement and/or reverse repurchase agreement transactions that provide the Fund with income at either fixed or floating (variable) interest rates and fees. The Fund may lend its portfolio of securities to broker/dealers, institutional investors, banks, mutual funds, and insurance and/or reinsurance companies located in one of the member countries of The Organization for Economic Co-operation and Development ("OECD")." **[Hereinafter Misrepresentation A]** | The Fund did not lend its portfolio of securities to anyone. Further, the loans the Fund did make were to single-member LLCs with no operations or assets outside of its transactions with the Fund; none were broker/dealers, institutional investors, banks, mutual funds, and insurance and/or reinsurance companies. Further, this description of potential counterparties was rendered misleading by the omission of any disclosure that the Fund's manager and control person also controlled the Fund's counterparties. **[Hereinafter Explanation A]** |
| March 7, 2017 | Form N-1A/A | Principal Investment Strategies: "Securities lending allows the Fund to retain ownership of the securities loaned and, at the same time, earn additional income from fees paid by borrowers. Loans will be made only to parties who have been reviewed and deemed satisfactory by New York Alaska ETF Management LLC, the Fund's investment adviser (the "Adviser"), pursuant to guidelines adopted by the Board of Trustees (the "Board" or the "Board of Trustees") of State Trust (the "Trust") . . . ." **[Hereinafter Misrepresentation B]** | These representations were rendered misleading by the omission of any disclosure that the counter-parties were controlled by Abarbanel, control person for the Fund and for the Adviser; and by the omission of any disclosure that the Fund's Board of Trustees was controlled by Abarbanel and failed to exercise independent judgment. **[Hereinafter Explanation B]** |
| March 7, 2017 | Form N-1A/A | Principal Investment Strategies: "Loans will be made only to parties who have been reviewed and deemed satisfactory . . . and which provide collateral, which is either (i) 102% cash or (ii) 102%-115% U.S. government securities. The collateral is marked to market daily and, if the value of the existing collateral decreases or the value of the securities lent increases, the borrower will be required to post additional collateral." **[Hereinafter Misrepresentation C]** | The Fund made loans to IS and NALR without receiving any collateral in the form of cash or U.S. government securities. **[Hereinafter Explanation C]** |

| Date | How Published | Statement/Omission | Why False and/or Misleading |
|---|---|---|---|
| **March 7, 2017** | Form N-1A/A | "Repurchase transactions involve the purchase of securities with an agreement to resell the securities at an agreed-upon price, date and interest payment. Reverse repurchase transactions involve the sale of securities with an agreement to repurchase the securities at an agreed-upon price, date and interest payment and have the characteristics of borrowing. Proceeds (collateral) received with respect to reverse repurchase agreements include cash, U.S. Treasury securities or debt instruments secured by U.S. Treasury securities." **[Hereinafter Misrepresentation D]** | The Fund never sold securities to IS or NALR, nor did IS or NALR ever sell securities to State Funds.<br><br>The Fund did not receive cash, U.S. Treasury securities, or debt instruments secured by U.S. Treasury securities as collateral for the reverse repurchase agreements.  While the Fund received purported "debt instruments," referred to by Abarbanel as "secured bonds," they were simply unsecured promissory notes. **[Hereinafter Explanation D]** |
| **March 7, 2017** | Form N-1A/A | "The Fund will earmark or establish a segregated account in which it will maintain cash, U.S. Treasury securities or other liquid portfolio securities equal in value to its obligations in respect of reverse repurchase agreements." **[Hereinafter Misrepresentation E]** | The Fund did not earmark or establish a segregated account to hold cash, U.S. Treasury securities, or other liquid portfolio securities equal in value to its obligations in respect of reverse repurchase agreements.  No such collateral was ever received by the Fund.  **[Hereinafter Explanation E]** |
| **June 30, 2017** | Form N-CSR | "Reverse Repurchase Agreements - The Fund may also enter into reverse repurchase agreements with counterparties.   In a typical reverse repurchase agreement, the Fund enters into a contract with a counterparty under which (i) the Fund sells securities for cash or cash equivalents to the counterparty, and (ii) the Fund agrees to repurchase the securities at an agreed-upon price, date and interest payment." **[Hereinafter Misrepresentation F]** | The Fund never sold securities to its purported reverse repurchase agreement counterparties, nor did the fund receive cash or cash equivalents from its reverse repurchase agreement counterparties.<br><br>The Fund never repurchased any securities from its counterparties. **[Hereinafter Explanation F]** |
| **June 30, 2017** | Form N-CSR | "While a reverse repurchase agreement has legal characteristics of both a sale and a secured transaction, economically it functions as a loan from the counterparty to the Fund, in which the securities purchased by the counterparty serve as collateral for the loan.<br>Securities received by the Fund through reverse repurchase agreements include cash, U.S. Treasury securities or debt instruments secured by U.S. Treasury securities." **[Hereinafter Misrepresentation G]** | The counterparties to the Fund's reverse repurchase agreements never made a loan to the Fund; to the contrary, the Fund loaned money to the counterparties.<br><br>The Fund did not receive cash, U.S. Treasury securities, or debt instruments secured by U.S. Treasury securities through the reverse repurchase agreements. **[Hereinafter Explanation G]** |
| **June 30, 2017** | Form N-CSR | *See* **Misrepresentation E** | *See* **Explanation E** |

| Date | How Published | Statement/Omission | Why False and/or Misleading |
|---|---|---|---|
| **December 31, 2017** | Form N-CSR | *See* **Misrepresentation F** | *See* **Explanation F** |
| **December 31, 2017** | Form N-CSR | *See* **Misrepresentation G** | *See* **Explanation G** |
| **December 31, 2017** | Form N-CSR | "There are many existing examples that borrowers earn profit in spite of their borrowing activity . . . . In the Fund's case, the fund charges additional fees that turn its borrowing activity into profits by charging fees for allowing its counterparties to substitute the proceeds (collateral) it receives for reasons such as substituting collateral durations." **[Hereinafter Misrepresentation H]** | The Fund neither borrowed money from its counterparties nor sent them collateral that they would have been able to substitute. **[Hereinafter Explanation H]** |
| **March 29, 2018** | Form 485POS | *See* **Misrepresentation A** | *See* **Explanation A** |
| **March 29, 2018** | Form 485POS | *See* **Misrepresentation B** | *See* **Explanation B** |
| **March 29, 2018** | Form 485POS | *See* **Misrepresentation C** | *See* **Explanation C** |
| **March 29, 2018** | Form 485POS | *See* **Misrepresentation D** | *See* **Explanation D** |
| **March 29, 2018** | Form 485POS | "[T]he Fund will invest over 5% of its assets in reverse repurchase agreements in which proceeds (collateral) received with respect to reverse repurchase agreements will include cash, U.S. Treasury securities or debt instruments secured by U.S. Treasury securities." **[Hereinafter Misrepresentation I]** | The Fund never received collateral in the form of cash, U.S. Treasury securities, or debt instruments secured by U.S. Treasury securities. **[Hereinafter Explanation I]** |
| **March 29, 2018** | Form 485POS | *See* **Misrepresentation E** | *See* **Explanation E** |
| **March 31, 2018** | Form N-Q | *See* **Misrepresentation E** | *See* **Explanation E** |
| **March 31, 2018** | Form N-Q | *See* **Misrepresentation F** | *See* **Explanation F** |
| **March 31, 2018** | Form N-Q | *See* **Misrepresentation H** | *See* **Explanation H** |
| **March 31, 2018** | Form N-Q | *See* **Misrepresentation G** | *See* **Explanation G** |
| **March 31, 2018** | Form N-Q | *See* **Misrepresentation I** | *See* **Explanation I** |

| Date | How Published | Statement/Omission | Why False and/or Misleading |
|---|---|---|---|
| **June 30, 2018** | Form N-CSR | "Collateral is secured by at least 102% of the underlying US treasuries:<br>U.S Treasury Bill 0.00%, 08/23/18<br>U.S Treasury Bill 0.00%, 08/30/18<br>U.S Treasury Bill 0.00%, 09/06/18<br>U.S Treasury Bill 0.00%, 09/20/18<br>U.S Treasury Bill 0.00%, 09/27/18<br>U.S Treasury Bill 0.00%, 10/11/18<br>U.S Treasury Bill 0.00%, 10/25/18" | Investors reasonably understood this to mean that the Fund held collateral in the form of U.S. Treasury securities in the amount and maturation stated in the Form N-CSR. The Fund never held collateral in the form of U.S. Treasury securities.<br><br>To the extent this disclosure is intended to convey that the Fund held debt instruments that were secured by the T-bills listed in the Form N-CSR, this was not only misleading but also false. The purported debt instruments were unsecured. The T-bills listed were held at a brokerage account in the name of, and under the complete control of, the counterparties. In addition, the counterparties borrowed against the T-bills, leaving them as collateral for margin loans in amounts of approximately 95% of the value of the T-bills. As a result, the T-bills could not have secured any debt agreements to the fund, as they were already collateralizing the counterparties' significant margin loans from the broker. None of these facts was disclosed to investors. **[Hereinafter Explanation J]** |
| **June 30, 2018** | Form N-CSR | *See* **Misrepresentation F** | *See* **Explanation F** |
| **June 30, 2018** | Form N-CSR | *See* **Misrepresentation H** | *See* **Explanation H** |
| **June 30, 2018** | Form N-CSR | *See* **Misrepresentation G** | *See* **Explanation G** |
| **June 30, 2018** | Form N-CSR | *See* **Misrepresentation I** | *See* **Explanation I** |
| **June 30, 2018** | Form N-CSR | *See* **Misrepresentation E** | *See* **Explanation E** |
| **September 30, 2018** | Form N-Q | *See* **Misrepresentation E** | *See* **Explanation E** |
| **September 30, 2018** | Form N-Q | "Collateral received is secured by at least 102% of the following underlying US treasuries:<br>U.S Treasury Bill 0.00%, 11/29/18<br>U.S Treasury Bill 0.00%, 12/27/18<br>U.S Treasury Bill 0.00%, 02/21/19" | *See* **Explanation J** |
| **September 30, 2018** | Form N-Q | *See* **Misrepresentation F** | *See* **Explanation F** |
| **September 30, 2018** | Form N-Q | *See* **Misrepresentation H** | *See* **Explanation H** |
| **September 30, 2018** | Form N-Q | *See* **Misrepresentation G** | *See* **Explanation G** |
| **September 30, 2018** | Form N-Q | *See* **Misrepresentation I** | *See* **Explanation I** |

| Date | How Published | Statement/Omission | Why False and/or Misleading |
|------|---------------|--------------------|-----------------------------|
| **December 31, 2018** | Form N-CSR/A | "As required by Prospectus, the US Treasuries securities that secure the collateral asset received are:<br>U.S Treasury Bill 0.00%, 06/20/2019<br>U.S Treasury Bill 0.00%, 05/16/2019<br>U.S Treasury Bill 0.00%, 07/18/2019<br>U.S Treasury Bill 0.00%, 05/09/2019<br>U.S Treasury Bill 0.00%, 04/25/2019" | *See* **Explanation J** |
| **December 31, 2018** | Form N-CSR/A | *See* **Misrepresentation F** | *See* **Explanation F** |
| **December 31, 2018** | Form N-CSR/A | "In the Fund's case, the fund collects fee income that turn its borrowing activity into profits by charging fees for allowing its counterparties to substitute the proceeds (collateral) it receives for reasons such as substituting collateral durations while the fund conducts daily mark-to-market price monitoring as well as calculating the collateral's change in dollar value per every increase or decrease of 0.01% in yield, such risk management calculation is also known as calculating the Dollar Value change per every change of one basis point . . . ." | *See* **Explanation H** |
| **December 31, 2018** | Form N-CSR/A | Offsetting Assets and Liabilities: "The Fund is party to Master Repurchase Agreements that govern transactions between the Fund and selected counterparties. On the Statement of Assets and Liabilities, as permitted by US GAAP, the Fund has elected to offset the amounts owed to these counterparties with the Securities received from the same counterparty under the reverse repurchase agreements." | The Fund neither owed any amounts to the repurchase agreement counterparties nor received any securities from those counterparties. |